Dana M. Johnson, Idaho Bar #8359
Wilderness Watch
P.O. Box 9623
Moscow, Idaho 83843
Tel: (208) 310-7003
danajohnson@wildernesswatch.org

Matthew K. Bishop, *pro hac vice*
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59603
Tel: 406-324-8011
bishop@westernlaw.org

Peter M.K. Frost, *pro hac vice*
Western Environmental Law Center
120 Shelton McMurphey Blvd., Suite 310
Eugene, Oregon 97401
Tel: 541-359-3238
frost@westernlaw.org

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WILDEARTH GUARDIANS, et al., | Case No. 1:19-cv-00203-CWD |
| Plaintiffs, | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS [Dkt. 28]** |
| v. | |
| U.S. FOREST SERVICE, et al., | |
| Defendants. | |

Table of Contents.

Table of Authorities ................................................................................................................ ii

Summary ................................................................................................................................. 1

Standard of Review ................................................................................................................ 2

Facts ....................................................................................................................................... 2

Argument ............................................................................................................................... 8

A.      The Fish and Wildlife Service is a Proper Defendant for the Reinitiation Claim ............. 8

B.      The Forest Service Has a Duty to Supplement its EA .................................................... 15

Conclusion ............................................................................................................................ 21

Table of Authorities.

Cases:

*Alaska v. Andrus,*
    591 F.2d 537 (9th Cir. 1979) ............................................................. 19

*Arizona Cattle Growers' Ass'n v. U.S. Fish and Wildlife Serv.,*
    273 F.3d 1229 (9th Cir. 2001) ............................................................ 10

*Carson-Truckee Water Conserv. Dists. v. Clark,*
    741 F.2d 257 (9th Cir. 1984) .............................................................. 14

*City of Santa Clarita v. U.S. Dep't of Interior,*
    2006 WL 4743970 (C.D. Cal. Jan. 30, 2006) ..................................... 13

*Cold Mountain v. Garber,*
    375 F.3d 884 (9th Cir. 2004) .............................................................. 19

*Conservation Congress v. Finley,*
    774 F.3d 611 (9th Cir. 2014) ................................................................ 9

*Conservation Congress v. U.S. Forest Service,*
    720 F.3d 1048 (9th Cir. 2013) .............................................................. 7

*Ctr. for Biological Diversity v. Nat'l Marine Fisheries Serv.,*
    977 F. Supp. 2d 55 (D.P.R. 2013) ...................................................... 14

*Ctr, for Biological Diversity v. Salazar,*
    706 F.3d 1085 (9th Cir. 2013) ............................................................ 20

*Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.,*
    698 F.3d 1101 (9th Cir. 2012) ............................................................ 12

*Defs. of Wildlife v. Andrus,*
    428 F. Supp. 167 (D.D.C. 1977) ........................................................ 14

*Defs. of Wildlife v. Flowers,*
    414 F.3d 1066 (9th Cir. 2005) ............................................................ 12

*Defs. of Wildlife v. Zinke,*
    856 F.3d 1248 (9th Cir. 2017) ..................................................... 11, 12

*Envt'l Prot. Info. Ctr. v. Simpson Timber Co.,*
    255 F.3d 1073 (9th Cir. 2001) ............................................................ 10

*Enying Li v. Holder*,
  738 F.3d 1160 (9th Cir. 2013) ......................................................................... 11

*Farrakhan v. Gregoire*,
  590 F.3d 989 (9th Cir. 2010) .......................................................................... 17

*Fund for Animals, Inc. v. Thomas*,
  932 F. Supp. 368 (D.D.C. 1996) .................................................................... 7, 8

*Fund for Animals, Inc. v. Thomas*,
  127 F.3d 80 (D.C. Cir. 1997) ............................................................... 8, 16, 17

*Gifford Pinchot Task Force v. U.S. Fish and Wildlife Serv.*,
  378 F.3d 1059 (9th Cir. 2004) ................................................................. 10, 11

*Havasupai Tribe v. Provencio*,
  906 F.3d 1155 (9th Cir. 2018) ....................................................................... 17

*Hoopa Valley Tribe v. Nat. Marine Fisheries Serv.*,
  230 F. Supp. 3d 1106 (N.D. Cal. 2017) .......................................................... 13

*Idaho Rivers United v. Probert*,
  No. 3:16-cv-00102-CWD, 2016 WL 2757690 (D. Id. May 12, 2016) ................. 15

*Lazy Y Ranch Ltd. v. Behrens*,
  546 F.3d 580 (9th Cir. 2008) ........................................................................... 2

*Marsh v. Or. Nat. Res. Council*,
  490 U.S. 360 (1989) ...................................................................................... 16

*Maya v. Centex Corp.*,
  658 F.3d 1060 (9th Cir. 2004) ......................................................................... 2

*Or. Nat. Res. Council v. Allen*,
  476 F.3d 1031 (9th Cir. 2007) .................................................................... 5, 12

*Pacific Coast Fed. of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*,
  Civ. C02-2006-SBA, 2006 WL 798920 (N.D. Cal. Mar. 27, 2006) .................... 13

*Pacific Coast Fed. Of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*,
  226 Fed. App. 715 (9th Cir. 2007) ................................................................. 10

*Pacificans for a Scenic Coast v. Cal. Dept. of Trans.*,
  204 F. Supp. 3d 1075 (N.D. Cal. 2016) .......................................................... 13

*Ramsey v. Kantor,*
    96 F.3d 434 (9th Cir. 1996) .................................................................. 17, 18

*Safe Air for Everyone v. Meyer,*
    373 F.3d 1035 (9th Cir. 2004) .........................................................................2

*Salmon Spawning & Recovery Alliance v. Gutierrez,*
    545 F.3d 1220 (9th Cir. 2008) ...................................... 9, 10, 11, 12, 13, 15

*San Francisco Tomorrow v. Romney,*
    472 F.2d 1021 (9th Cir. 1973) .......................................................................20

*Sierra Club v. Bosworth,*
    510 F.3d 1016 (9th Cir. 2007) ................................................................ 3, 17

*Sierra Club v. Penfold,*
    857 F.2d 1307 (9th Cir. 1987) .......................................................................20

*Silvas v. E\*Trade Mortg. Corp.,*
    514 F.3d 1001 (9th Cir. 2008) .........................................................................2

*United States v. 14.02 Acres,*
    530 F.3d 883 (9th Cir. 2008) ...........................................................................3

*United States v. Johnson,*
    256 F.3d 895 (9th Cir. 2001) .........................................................................11

*Wash. Toxics Coal. v. EPA,*
    413 F.3d 1024 (9th Cir. 2005) .......................................................................15


Statutes:

16 U.S.C. § 1531(b) ...........................................................................................14

16 U.S.C. § 1533(f) ............................................................................................14

16 U.S.C. § 1536(a) .............................................................................................9

16 U.S.C. § 1536(a)(1) .......................................................................................14


Regulations:

40 C.F.R. § 402.12(a) ..........................................................................................4

40 C.F.R. § 1502.9(c)(1)(i)..................................................................16

40 C.F.R. § 1502.9(c)(1)(ii).................................................................15

40 C.F.R. § 1508............................................................................20

40 C.F.R. § 1508.18.........................................................................18

50 C.F.R. § 402.13(a)........................................................................7

50 C.F.R. § 402.14(a).......................................................................12

50 C.F.R. § 402.14(b)(1).....................................................................7

50 C.F.R. § 402.14(i)(4)....................................................................14

50 C.F.R. § 402.16..........................................................................13

50 C.F.R. § 402.16(a).................................................................9, 12, 15


Federal Register:

59 Fed. Reg. 11,765 (April 14, 1994)..........................................................5

60 Fed. Reg. 14,720 (March 20, 1995)...........................................2, 3, 6, 7, 17

84 Fed. Reg. 44,976 (Aug. 27, 2019)..........................................................15


Legislative History:

H.R. Rep. No. 97-567 (1982), reprinted in 1982 U.S.C.C.A.N. 2807................................13, 14

Pursuant to Dist. Idaho Loc. Civ. R. 7.1(c), Plaintiffs WildEarth Guardians et al. ("Guardians") hereby respectfully file this opposition to the partial motion to dismiss filed by Defendants U.S. Forest Service and U.S. Fish and Wildlife Service ("FWS"). Dkt. #28.

## Summary.

This case concerns the effects on grizzly bears of the use of bait to hunt black bears in national forests in Idaho and Wyoming. Until 1992, the Forest Service generally regulated the use of bait in national forests. In 1994, the Forest Service proposed a national policy to allow states to decide whether bait can be used in national forests. When it did so, it acknowledged its proposal is likely to affect grizzly bears, which were then and remain listed as threatened with extinction under the Endangered Species Act ("ESA") in the contiguous states. To evaluate effects of its proposal, in 1995, the Forest Service prepared an Environmental Assessment ("EA") under the National Environmental Policy Act ("NEPA"), and consulted with FWS under Section 7 of the ESA to determine whether its proposal would jeopardize listed species, including grizzly bears. FWS issued a Biological Opinion ("BiOp") in which it found that at time, there is only a "remote" possibility that a grizzly bear will be taken due to black bear baiting in national forests, and issued an incidental take statement that requires two things: the Forest Service "has a continuing duty to regulate" black bear baiting in national forests, and meantime "no incidental take" of grizzly bears due to black bear baiting is allowed. If "any" single take occurs, the Forest Service must reinitiate formal consultation with the FWS.

Since the Forest Service adopted its national policy, and since FWS issued its BiOp and incidental take statement, Guardians alleges that numerous grizzly bears have been taken due to black bear hunting using bait in national forests in Idaho and Wyoming. Accordingly, Guardians alleges that a fundamental premise of the EA is outdated, and significant new information exists

that requires it to be supplemented. Further, Guardians alleges that the level of permissible take has been exceeded, and the Forest Service and FWS must reinitiate formal consultation.

Defendants move to dismiss in part. First, they seek to dismiss FWS as a defendant, even though the Ninth Circuit has held FWS is a proper defendant for a failure to reinitiate consultation claim. Second, the Forest Service seeks to dismiss the NEPA claim against it, asserting it has no duty to supplement its EA, on the theory that it never undertook a "major federal action" under NEPA in the first place and, further, no such action remains to occur. None of these assertions has merit. The Court should deny the motion.

Standard of Review.

Defendants file their motion under Rule 12(b)(1) and Rule 12(b)(6). Dkt. #28-1, Ds' Mem. in Support of Motion to Dismiss ("Ds' Mem.") at 6–7. The Rule 12(b)(1) motion is a facial attack asserting the allegations in the amended complaint are insufficient to invoke federal jurisdiction. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). In a facial attack, the Court "must accept as true all material allegations of the complaint." *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2004) (citation omitted). Under Rule 12(b)(6), dismissal is appropriate if a complaint fails to state a claim upon which relief may be granted. *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008). Again, "[a]ll allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party." *Silvas v. E*Trade Mortg. Corp.*, 514 F.3d 1001, 1003 (9th Cir. 2008).

Facts.

"Baiting" in the context of hunting means to use generally food or other items to attract wildlife to a specific area. 60 Fed. Reg. 14,720, 14,721 (March 20, 1995). Until 1992, the Forest Service required a hunter or outfitter to obtain a special use permit to use black bear bait in

national forests. Dkt. #12, Plfs' Amended Cmpl. ("AC") ¶ 17. In the early 1990s, ten states,

including Idaho and Wyoming, authorized use of bait to hunt black bears. Plfs' Ex. 1 at 5.[1]

However, because black bear baiting in national forests in Wyoming was affecting grizzly bears,

and because "Wyoming had no regulations covering the placement and removal of baits," the

Forest Service required Wyoming hunters in national forests to obtain special use permits. AC ¶

17; Plfs' Ex. 1 at 5. 1992, the Forest Service decided to discontinue requiring special use permits

in national forests in Wyoming, and instead to issue a general "closure order prohibiting black

bear baiting" except where allowed. Plfs' Ex. 1 at 5. Two organizations sued the Forest Service

for switching from special use permits to closure orders in Wyoming without preparing a NEPA

analysis as to the effects on black bears. *Id.* at 5-6. In 1993, the Forest Service prepared an EA to

consider the effects of different alternatives for administering black bear baiting in national

forests in Wyoming. Plfs' Ex. 2 at 2.[2] The 1993 EA considered, among other things, closing

baiting in what was then the "proposed grizzly bear recovery zone" in Wyoming, as well as

closing baiting in wilderness areas in Wyoming. *Id.*

---

[1]  Guardians files six exhibits—all Forest Service or FWS documents—to provide a complete background for the Court. Guardians respectfully requests that the Court take judicial notice of them. *United States v. 14.02 Acres*, 530 F.3d 883, 894 (9th Cir. 2008) (a court "may take judicial notice of matters of public record and consider them without converting a Rule 12 motion into one for summary judgment. Judicial notice is appropriate for records and reports of administrative bodies.") (internal citations omitted).

[2]  The Forest Service states that in 1993 it "concluded that deferring to state regulation in Wyoming was 'not a major federal action'" requiring a NEPA analysis. Ds' Mem. at 4. That appears to be incorrect. When it considered the national bait policy, in 1995, the Forest Service stated that its "preliminary conclusion was that the proposal should be categorically excluded" from NEPA. 60 Fed. Reg. at 14,721. That still means its proposal is a "major federal action" under NEPA; it simply means the agency thinks an analysis is not required, because the action fits a category for exclusion. *Sierra Club v. Bosworth*, 510 F.3d 1016, 1018–19 (9th Cir. 2007). Regardless, after reviewing public comments on its proposal, the Forest Service prepared an EA. 60 Fed. Reg at 14,721. It appears the Forest Service did not assert that its policy was not a major federal action requiring a NEPA analysis until two years later, in the context of litigation.

Pursuant to Section 7 of the ESA, in March, 1993, the Forest Service prepared a Biological Evaluation to assess how its baiting proposal would affect ESA-listed species in Wyoming, including grizzly bears. *Id.* at 1; Plfs' Ex. 3 at 1.[3] The Forest Service acknowledged its proposal may adversely affect grizzly bears, so it formally consulted with FWS, which in April, 1993, prepared a BiOp. AC ¶ 19; Plfs' Ex. 2 at 1. The BiOp states that "baiting for black bears within the range of the grizzly bear" can result in mortality to grizzlies, if a hunter mistakes a grizzly for a black bear, if a grizzly attempts to defend a food source from what it perceives as a competitor, or if a hunter perceives a grizzly threatens the hunter's safety. *Id.* at 4. The BiOp also states that grizzlies may become "conditioned" to the foods used for bait, and seek them elsewhere, and become "problem" bears requiring "management actions." *Id.* The BiOp states that between 1967 and 1993, five grizzlies were reported killed at black bear bait sites in Wyoming. *Id.* at 5. However, the BiOp notes that proposals such as "[c]losing the proposed grizzly bear recovery area and all areas covered by a special order prohibiting improper storage of food in grizzly bear habitat (mitigation measures common to all alternative[s]) will have a beneficial affect [*sic*] on grizzly bears." *Id.* at 2. Based in part on proposed modifications to baiting in Wyoming, in its BiOp, FWS found that the alternatives in the 1993 EA would not jeopardize the continued existence of the grizzly bear. AC ¶ 19; Plfs' Ex. 2 at 6.

FWS noted, however, the "remaining potential for incidental take of grizzly bears" due to the use of bait to hunt black bears, so it issued an Incidental Take Statement ("ITS") that included conditions it deemed "critical to fulfillment of [the Forest Service's] responsibilities"

---

[3] Under the ESA regulations, an "action agency" such as the Forest Service prepares a Biological Evaluation, or a Biological Assessment, that it then gives to the expert agency to help it determine whether formal consultation is necessary. *See* 40 C.F.R. § 402.12(a).

under the ESA. AC ¶ 21; Plfs' Ex. 2 at 6.[4] The ITS provides as a mandatory term and condition: "The [Forest Service] has a continuing duty to regulate the activity covered by this incidental take statement." *Id.* at 7. The ITS further provides that "[a]lthough there is a remote possibility that a grizzly bear may be taken as a result of black bear baiting on [Forest Service] lands in Wyoming, [FWS] does not anticipate that such take will occur. Therefore, no incidental take is allowed. Should any take occur, the [Forest Service] must reinitiate formal consultation with [FWS] and provide the circumstances surrounding the take." AC ¶ 21; Plfs' Ex. 2 at 7.

After the Forest Service issued its EA and FWS issued its BiOp and ITS related to the use of bait in national forests in Wyoming, the Forest Service faced "the threat of another [law]suit," so it decided that "a national policy on baiting was needed." Plfs' Ex. 1 at 6. Pending such a policy, it banned baiting in national forests in Wyoming. *Id.*

In April, 1994, the Forest Service published an interim national bait policy that generally leaves to states whether to authorize the use of bait in national forests, subject to oversight and regulation by the Forest Service. 59 Fed. Reg. 11,765 (April 14, 1994). Subsequently, in March, 1995, the Forest Service prepared another EA to consider permanently adopting the national policy. Plfs' Ex. 1 at 3. The 1995 EA states that the purpose of the policy is two-fold: to "clarify that baiting is a hunting method that is authorized by the States and regulated by the States, and to establish procedures that will be used by the Forest Service when State regulations conflict with Federal laws, regulations, and policies." Plfs' Ex. 1 at 5. The 1995 EA states: "There is a

---

[4]  "When the FWS concludes that an action will not jeopardize the existence of a listed species or adversely modify its habitat, but the project is likely to result in incidental taking of listed species, the FWS must provide a written statement with the BiOp that authorizes such takings." *Or. Nat. Res. Council v. Allen*, 476 F.3d 1031, 1034 (9th Cir. 2007).

need to ensure that State regulations governing baiting protect Federal resources, and, failing sufficient State protection, that the Forest Service provide such protection." *Id.*

The proposed action in the 1995 EA is to amend the Forest Service manual to adopt the national policy to allow states to regulate bait, subject to Forest Service oversight and regulation. *Id.* at 3–4; 60 Fed. Reg. 14,720 (March 20, 1995). The policy states: "Where States permit the use of bait for attracting resident game, this activity is allowed on National Forest Service lands, subject to State hunting laws and regulation, unless the authorized officer determines on a site-specific basis that there is a need to prohibit or restrict the practice. *Id.* at 14,723. The Forest Service stated it would "monitor State regulations" to ensure they "protect Federal interests." *Id.* at 14,721. It explained that if the "use of bait conflicts with Federal law or regulations, forest plan direction, or other uses or users. . . . the authorized officer could prohibit or restrict the use of bait, in an area, by issuing a closure order." *Id.* Before issuing a closure order, the officer "would first consult with the State fish and wildlife agency to see if the conflict could be resolved without a closure or restrictive order," but "the Forest Service would close specific areas to baiting if conflicts cannot be resolved . . . ." *Id.* at 14,720–22. It stated "the authorized officer must close an area to baiting" if certain circumstances arise, including when "State laws and regulations conflict with Federal law, such as the Endangered Species Act." *Id.*

Pursuant to Section 7 of the ESA, in February, 1995, the Forest Service wrote FWS that it was "in the process of preparing a National Policy on bear baiting." Plfs' Ex. 4 at 1. The Forest Service wrote that it had reviewed its own prior Biological Evaluation, the BiOp, state regulations on baiting, and closure orders, and stated that "it is our opinion that the National Policy, when issued, would not change the conditions or situations that were present when the original [BiOp] was issued." *Id.* The Forest Service asked FWS to "review the original [BiOp] in

light of this proposed new policy, and the actions we have taken, to determine if you concur that the actions we have taken to protect the grizzly bear are still adequate." *Id.*

In February, 1995, FWS responded that it "reviewed the proposed [national] policy and our biological opinion of April 14, 1993 . . . [and] believe that the two documents are compatible." Plfs' Ex. 5 at 1. FWS stated that "[t]he proposed National Policy appears to be consistent with our biological opinion of April 14, 1993, and no information has become available to suggest that additional terms and conditions are necessary at this time." *Id.* at 2. Subsequently responding to another Forest Service letter requesting concurrence that its policy "is not likely to adversely effect [*sic*] federally listed species," FWS concurred. Plfs' Ex. 6 at 1.[5] In March, 1995, the Forest Service adopted the policy. 60 Fed. Reg. 14,720 (March 20, 1995).

Six animal rights groups and two individuals then sued the Forest Service, alleging it violated NEPA by preparing only an EA for the new national policy, and violated the ESA by failing to engage in formal consultation as to the effects of the national policy. *Fund for Animals, Inc. v. Thomas*, 932 F. Supp. 368, 370 (D.D.C. 1996). The plaintiffs focused on the use of bait to hunt, which they asserted is "odious." *Id.* at 369. The Forest Service defended its EA by asserting that its policy was not a "major federal action" under NEPA, because (in the district court's words), it simply "revert[ed] to its traditional reliance upon the states to regulate all hunting practices, including game-baiting on federal forest lands." *Id.* at 370. The agency defended the ESA claim by noting it engaged in informal consultation with FWS, and it agreed formal consultation was unnecessary. *Id.* at 370. The district court ruled in favor of the Forest Service

---

[5] "An action agency may bypass formal consultation if it determines, and the consulting agency agrees, that the proposed action 'is not likely to adversely affect any listed species or critical habitat.'" *Conservation Congress v. U.S. Forest Service*, 720 F.3d 1048, 1051 (9th Cir. 2013) (citing 50 C.F.R. § 402.14(b)(1)). "When that occurs, 'the consultation process is terminated, and no further action is necessary.'" *Id.* (citing 50 C.F.R. § 402.13(a)).

on both claims. *Id*. at 371. The D.C. Circuit affirmed. *Fund for Animals, Inc. v. Thomas*, 127

F.3d 80 (D.C. Cir. 1997). The D.C. Circuit assumed without deciding the national policy

constitutes federal "action," and held it did not constitute "major" federal action under NEPA

requiring an EIS, or formal consultation under the ESA. *Id*. at 83-84.

Currently, among the contiguous states, only Idaho and Wyoming allow the use of bait to

hunt black bears in national forests. AC ¶ 15. Further, Idaho and Wyoming allow the use of bait

in areas in national forests that grizzly bears may inhabit. *Id*. Moreover, since the Forest Service

adopted its national policy, and since it consulted with FWS to obtain its BiOp and ITS,

Guardians alleges numerous grizzly bears have been killed by black bear hunters using bait in

national forests in Idaho and Wyoming. AC ¶¶ 35, 36, 37, 40, 44.[6] Guardians also alleges these

mortalities are likely incomplete because some preliminary grizzly mortality reports don't

disclose whether bait was used, and some don't report precise locations, to determine whether a

mortality occurred in a national forest. AC ¶ 61. However, Guardians alleges, in 2018, Idaho

Fish and Game staff killed two grizzlies in eastern Idaho that became attracted to or dependent

on human food sources. AC ¶ 61. And in June, 2019, a grizzly bear was discovered in the Kelly

Creek drainage in the Nez Perce-Clearwater National Forests in Idaho. AC ¶ 59. The grizzly was

seen by a licensed hunter who was stocking a black bear bait site with food. *Id*. The State of

Idaho urged black bear hunters to be cautious when selecting bears as targets in the area. *Id*.

Argument.

A.    <u>The Fish and Wildlife Service is a Proper Defendant for the Reinitiation Claim</u>.

Under Section 7 of the ESA, federal "action" agencies must consult with the "expert" (or

---

[6]  Since the national policy was adopted, Wyoming would admit three grizzly bears have been
killed at bait stations in national forests in Wyoming, Dkt. #18-2 at ¶ 1, and Idaho would admit
one grizzly bear has been killed at a bait station in a national forest in Idaho. Dkt. #23-2 at ¶ 45.

"consulting") agency to obtain its opinion as to whether a proposed action that may affect a listed species will jeopardize its continued existence or adversely modify its critical habitat. 16 U.S.C. § 1536(a). After formal or informal consultation has occurred, ESA regulations provide:

> Reinitiation of formal consultation is required and shall be requested by the Federal agency or by the Service, where discretionary Federal involvement or control over the action has been retained or is authorized by law and: (1) If the amount or extent of taking specified in the incidental take statement is exceeded; (2) If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered. . . .

50 C.F.R. § 402.16(a).[7] Here, Guardians alleges both the Forest Service and FWS must reinitiate consultation, because the amount or extent of taking in the ITS has been exceeded, and new information reveals effects of the action not previously considered. AC ¶¶ 75 & 76. Defendants don't dispute the Forest Service is a proper defendant for this claim. Ds' Mem. at 7 & n.1. They assert FWS is not, but their arguments lack merit.

Foremost, the Ninth Circuit has decided this issue, and stated that the "duty to reinitiate consultation lies with both the action agency and the consulting agency." *Salmon Spawning & Recovery Alliance v. Gutierrez*, 545 F.3d 1220, 1229 (9th Cir. 2008). In that case, conservation groups challenged the failure of the State Department and the National Marine Fisheries Service ("NMFS") to reinitiate consultation concerning a fishing treaty with Canada. *Id.* at 1223. The plaintiffs alleged both federal agencies were required to reinitiate consultation because, among other things, permissible take was exceeded, and new information existed that revealed effects of the action that had not been previously considered. *Id.* at 1223 & 1229. Both agencies moved to dismiss for lack of standing, and the district court granted the motion. The Ninth Circuit

---

[7]  The Ninth Circuit has held that the duty to reinitiate consultation applies after "both formal and informal consultation." *Conservation Congress v. Finley*, 774 F.3d 611, 619 (9th Cir. 2014).

reversed, holding in part that "a court order requiring *the agencies* to reinitiate consultation would remedy the harm asserted." *Id.* at 1229 (emphasis added).

The Ninth Circuit stated the same rule in *Gifford Pinchot Task Force v. U.S. Fish and Wildlife Serv.*, 378 F.3d 1059 (9th Cir. 2004), *superseded by regulation on other grounds as stated in Alliance for the Wild Rockies v. Savage*, 2019 WL 5692261 (9th Cir. Nov. 4, 2019). There, conservation groups challenged the fact that FWS amended its BiOps related to the effects of logging on listed species. *Id*. at 1976-78. FWS asserted it did not violate the rule that such amendments are prohibited, on the ground they were based on previously existing data. *Id.* at 1077. The Ninth Circuit observed "if the data are new and the new data may affect the jeopardy or critical habitat analysis, then the FWS was obligated to reinitiate consultation pursuant to 50 C.F.R. § 402.16 . . . ." *Id.*

The Ninth Circuit has repeated its rule. *Envt'l Prot. Info. Ctr. v. Simpson Timber Co.*, 255 F.3d 1073, 1076 (9th Cir. 2001) ("The duty to reinitiate consultation lies with both the action agency and the consultation agency."); *Arizona Cattle Growers' Ass'n v. U.S. Fish and Wildlife Serv.*, 273 F.3d 1229, 1249 (9th Cir. 2001) ("Incidental Take Statements set forth a 'trigger' that, when reached, results in an unacceptable level of incidental take, invalidating the safe harbor provision, and requiring *the parties* to reinitiate consultation.") (emphasis added); *Pacific Coast Fed. Of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, 226 Fed. App. 715, 717 (9th Cir. 2007) ("The enclosure's in-depth discussion of new and relevant data demonstrates why the [action agency] and *the NMFS* must reinitiate the consultation process to develop comprehensive, up-to-date biological opinion.") (emphasis added).

FWS attempts but fails to distinguish these Ninth Circuit cases. It asserts *Salmon Spawning* "was a standing opinion, considering the plaintiffs' standing to bring a 'failure to

reinitiate' claim against *any* agency given that the agency action at issue was an international treaty that could not be enjoined by the Court." Ds' Mem. at 14 (emphasis in original). However, to establish standing to sue NMFS (the expert agency) the plaintiffs had to prove redressability, *i.e.*, that "a court order requiring the agencies to reinitiate consultation would remedy the harm asserted." *Salmon Spawning*, 545 F.3d at 1229. That means NMFS has the authority and duty to reinitiate consultation in the first place. Similarly, for *Gifford Pinchot*, FWS asserts the Ninth Circuit's statement that FWS must reinitiate consultation when new data becomes available was stated "gratuitously," Ds' Mem. at 15, when in fact it was the logical predicate to the Ninth Circuit's holding that "[i]f the data was preexisting, then the FWS is to be faulted for not generating the information in time for the initial BiOp." *Gifford Pinchot*, 378 F.3d at 1077. FWS's duty to reinitiate consultation where new data becomes available that may affect its opinion—which is among Guardians' claims here—was not stated "gratuitously."[8]

FWS continues by citing inapposite Ninth Circuit cases. In *Defs. of Wildlife v. Zinke*, 856 F.3d 1248 (9th Cir. 2017), the Ninth Circuit did not address whether a consulting agency has the duty to reinitiate consultation, *cf.* Ds' Mem. at 9 & 14, but whether an action agency does. *Zinke*, 856 F.3d at 1264. In fact, on the same page FWS cites, the Ninth Circuit noted that "[i]ncidental take statements must set forth a trigger that, when reached, results in an unacceptable level of incidental take, invalidating the safe harbor provision of the ESA, and requiring *the parties* to

---

[8]    FWS asserts the Ninth Circuit's statements in *Simpson Timber*, *Arizona Cattle Growers*, and *Pacific Coast Federation* are dicta. Ds' Mem. at 14. Even if dicta, each is well-reasoned and consistent with other Ninth Circuit opinions, and therefore confirm the rule of this circuit. *Enying Li v. Holder*, 738 F.3d 1160, 1164 n.2 (9th Cir. 2013) ("[W]ell-reasoned dicta is the law of the circuit."); *United States v. Johnson*, 256 F.3d 895 (9th Cir. 2001) (Kozinski, J. concurring) ("[W]here a panel confronts an issue germane to the eventual resolution of the case, and resolves it after reasoned consideration in a published opinion, that ruling becomes the law of the circuit, regardless of whether doing so is necessary in some strict logical sense.").

reinitiate consultation." *Id.* at 1264 n.3 (emphasis added; citation omitted). Similarly, *Allen* did

not involve a claim against a consulting agency for failing to reinitiate, *cf.* Ds' Mem. at 13, but

rather a challenge to an ITS, and the Ninth Circuit affirmed an action agency must reinitiate

consultation when incidental take is exceeded. *Allen*, 476 F.3d at 1040; *see also Ctr. for*

*Biological Diversity v. U.S. Bureau of Land Mgmt.*, 698 F.3d 1101, 1108 (9th Cir. 2012) (same).

Finally, FWS relies on *Defs. of Wildlife v. Flowers,* 414 F.3d 1066 (9th Cir. 2005), but it is also

inapposite, because the Ninth Circuit there addressed the duty to initiate consultation in the first

place, and not the duty to reinitiate consultation. *Id.* at 1069–70.[9]

Next, FWS distinguishes the duty to reinitiate and the duty to complete reinitiated

consultation, and asserts *Salmon Spawning* and other cases "can only be reconciled as references

to the duty to *complete* reinitiated consultation *after* the action agency has elected to pursue it."

Ds' Mem. at 8, 13. The distinction is unpersuasive. First, the regulation does not describe a "duty

to complete consultation," but rather requires reinitiation of consultation when a trigger occurs,

and imposes the duty to request it on *both* the action and consulting agencies. 50 C.F.R. §

402.16(a). Second, *Salmon Spawning* and the other cases FWS cites do not concern whether such

a distinction would be meaningful—*i.e.*, where an action agency has requested reinitiation and

the consulting agency fails to complete it. Rather, *Salmon Spawning*, like this case, involved a

direct challenge to a consulting agency's failure to reinitiate consultation. And, even if a

distinction exists between the duty to reinitiate consultation and the duty to complete it could be

---

[9] Consultation is initiated under a different regulation than the one requiring reinitiation of consultation. *Compare* 50 C.F.R. § 402.14(a); *with* 50 C.F.R. § 402.16(a). The distinction matters. Before consultation has occurred, the action agency alone possesses information about its proposed action. After it has initiated consultation, however, it must inform the consulting agency about its proposal, and the consulting agency must then opine whether the proposal will jeopardize a species or adversely modify its critical habitat.

ascribed to *Salmon Spawning*, Guardians alleges the Forest Service and FWS have failed to reinitiate and *complete* consultation, AC ¶¶ 75 & 76, and asks the Court to order the Forest Service and FWS to reinitiate and *complete* consultation. *Id.*, Relief Sought, #4. As FWS appears to concede, it must complete reinitiation of consultation "if the Forest Service is required to reinitiate." Ds' Mem at 15.

In sum, as the district court in *Hoopa Valley Tribe v. Nat. Marine Fisheries Serv.*, 230 F. Supp. 3d 1106 (N.D. Cal. 2017) recently explained:

> The federal defendants' effort to distinguish these [Ninth Circuit] cases is wholly unpersuasive. Formal consultation is a collaborative process that requires the participation of both the [action agency] and the [consulted agency]. The purpose of reinitiating consultation is not simply to check off a procedural box, but to complete a formal consultation process that ensures to the extent possible that there are no substantive violations of the ESA. Both the [action agency] and the [consulted agency] have a clear obligation to participate in and complete this reinitiation process.

*Id.*, 230 F. Supp. 3d at 1117. Other district courts agree.[10]

Nonetheless, FWS continues with its theory that only the action agency must reinitiate consultation due to the "basic scheme" of Section 7, which "places the duty to avoid jeopardizing listed species, and to consult, on the agency that is authorizing, funding, or carrying out an action." Ds' Mem 10.[11] It's true that under Section 7(a)(2), the action agency must avoid

---

[10] *See, e.g., Pacificans for a Scenic Coast v. Cal. Dept. of Trans.*, 204 F. Supp. 3d 1075, 1093 (N.D. Cal. 2016) ("Consistent with the plain text of [50 C.F.R. § 402.16], the Ninth Circuit has stated that the duty to reinitiate consultation lies with both the action agency and the consulting agency."); *Pacific Coast Fed. of Fishermen's Ass'ns v. U.S. Bureau of Reclamation*, Civ. C02-2006-SBA, 2006 WL 798920 at *5 (N.D. Cal. Mar. 27, 2006) ("When new information emerges, NMFS must reinitiate consultation, 50 C.F.R. § 402.16, and undertake the full consultation process."). The outlier appears *City of Santa Clarita v. U.S. Dep't of Interior*, 2006 WL 4743970 (C.D. Cal. Jan. 30, 2006), but it precedes *Salmon Spawning,* and is against the circuit rule.

[11] FWS asserts the legislative history of the ESA "states[] that the action agency bears any duty to reinitiate consultation." Ds' Mem. at 10 (citing H.R. Rep. No. 97-567, at 27 (1982), reprinted in 1982 U.S.C.C.A.N. 2807, 2827). The history notes Congress' "expect[ation] that the Federal [action] agency or permittee or licensee will immediately reinitiate consultation," where

jeopardy. However, under Section 7(a)(1), the consulting agency bears the substantive duty to "utilize" its programs "in furtherance of the purposes of [the ESA]." 16 U.S.C. § 1536(a)(1). These purposes include "to provide a means whereby the ecosystems may be conserved, to provide a program for the conservation of such endangered and threatened species." 16 U.S.C. § 1531(b); *see also Carson-Truckee Water Conserv. Dists. v. Clark*, 41 F.2d 257, 261–62 (9th Cir. 1984) (the ESA "direct[s] that [FWS] actively pursue a species conservation policy"); *Defs. of Wildlife v. Andrus*, 428 F. Supp. 167, 169–70 (D.D.C. 1977) ("It is clear from the face of the statute that [FWS] … must do far more than merely avoid the elimination of protected species. It must bring these species back from the brink so that they may be removed from the protected class, and it must use all methods necessary to do so.").

Thus, if the status of a species changes due to factors not consulted on, so the baseline for a jeopardy or no jeopardy opinion is no longer appropriate, it makes sense that FWS must reinitiate consultation, even when an action agency like the Forest Service might not. After all, FWS, not the Forest Service, has the overarching duty to recover species. 16 U.S.C. § 1533(f). That is why ESA regulations require action agencies such as the Forest Service to "monitor the impacts of incidental take" and "report the progress of the action and its impact on the species" to the consulting agency. 50 C.F.R. § 402.14(i)(4). If, based on those reports, the consulting agency concludes new information or other data require it to reconsider its original opinion, it makes sense it can require reinitiation of consultation, even if the action agency disagrees.[12]

---

"the specified impact on the species is exceeded." *Id*. Where, as here, an action agency fails to meet Congress' "expectation," then the consulting agency has independent duty to reinitiate, to ensure the purposes of the ESA are not frustrated.

[12] If an ITS "is exceeded, the [consulting agency] must reinitiate Section 7 consultation to ensure that its 'no jeopardy' determination still complies with federal law"). *Ctr. for Biological Diversity v. Nat'l Marine Fisheries Serv.*, 977 F. Supp. 2d 55, 62 (D.P.R. 2013).

There are two other practical reasons why FWS should remand a defendant in this lawsuit. First, the Court is likely to address, if not resolve, the reinitiation claim depending in part on its reading of documents that FWS alone wrote, including the BiOp, the ITS, and any FWS correspondence. FWS should be a party in the case to explain what it wrote. The Forest Service is a separate agency, with different duties under the ESA, and it should not be allowed to speak for FWS as to FWS's intent. Second, because Guardians' reinitiation claim was properly brought pursuant to the citizens suit provision of the ESA, *Salmon Spawning* 545 F.3d at 1229–30, discovery is allowed, *Wash. Toxics Coal. v. EPA*, 413 F.3d 1024, 1034 (9th Cir. 2005), and it's appropriate that FWS remain in the case to be subject to and participate in discovery.

Finally, FWS cites the preamble to its and NMFS' recent changes to the ESA regulations, in which the agencies state they interpret 50 C.F.R. § 402.16(a) to "not impose an affirmative obligation on the Service to reinitiate consultation if any of the criteria [for reinitiation] have been met." Ds' Mem. at 11 (citing 84 Fed. Reg. 44,976, 44,980 (Aug. 27, 2019)). The problem with this argument is the regulation requiring reinitiation of consultation is unchanged (unlike other provisions of the ESA regulations). *See* 84 Fed. Reg. at 45,017; 50 C.F.R. § 402.16(a). So the Court is left merely with the agencies' unconvincing statement that they disagree with the Ninth Circuit's rulings based on an unchanged regulation.

There are no grounds to dismiss FWS from this case.

B.       The Forest Service Has a Duty to Supplement its EA.

As the Court is aware, a federal agency that prepared a NEPA analysis must supplement its analysis when "significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." *Idaho Rivers United v. Probert*, No. 3:16-cv-00102-CWD, 2016 WL 2757690 at *15 (D. Id. May 12, 2016) (citing 40 C.F.R. §

1502.9(c)(1)(ii)). However, the agency must supplement its NEPA analysis only if "major

federal action" remains. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 374 (1989).

Here, in its claim for declaratory relief, Guardians primarily alleges that since the Forest

Service issued its EAs in 1993 and 1995, "significant new information related to the effects of

black bear baiting on grizzly bears has arisen that is relevant to environmental concerns and the

proposed action and its impacts." AC ¶ 79 (citing 40 C.F.R. § 1502.9(c)(1)(i)). Specifically,

Guardians alleges that after the assumption of only a "remote possibility" grizzly bears would be

killed at bait stations, and the adoption of a zero incidental take allowance, numerous grizzlies

have been killed by hunters using bait in national forests in Idaho and Wyoming, AC ¶¶ 35, 36,

37, 40, 44, and these mortalities are likely incomplete. AC ¶ 61. Guardians also alleges Idaho

Fish and Game staff killed two grizzlies attracted to or dependent on human food sources, AC ¶

61, and this year a grizzly was found in the Nez Perce-Clearwater National Forests in Idaho,

where it visited black bear baiting sites, prompting Idaho to warn hunters. AC ¶ 59.

The Forest Service does not dispute that significant new circumstances or information

have arisen since it prepared its EAs. It nonetheless moves to dismiss this claim, first, on the

theory that its decision to adopt the national baiting policy did not constitute "major federal

action" under NEPA "in the first place." Ds' Mem at 17. It relies on a footnote in *Fund for

Animals*, in which the D.C. Circuit stated: "Assuming the final [baiting] policy constitute federal

'action' at all—because it implements the existing federal policy of leaving baiting regulation to

individual states that have adopted adequate regulatory provisions[], we nevertheless agree with

the Forest Service that it is not a 'major' federal action under NEPA." *Id.*, 127 F.3d at 83.

*Fund for Animals* does not control whether "major federal action" existed in the first

place. "Out-of-circuit cases are not binding on this Court and therefore do not constitute

'controlling authority'" in the Ninth Circuit. *Farrakhan v. Gregoire*, 590 F.3d 989, 1000 (9th

Cir. 2010), *overruled on other grounds*, 623 F.3d 990 (9th Cir. 2010) (en banc). Further, the

footnote in *Fund for Animals* is dictum; the APA provides for judicial review of final agency

action, which was the Forest Service's 1995 EA, not whether it should have prepared an EA in

the first place.[13] Indeed, in a different context, the Ninth Circuit has rejected a federal agency's

attempt to assert that no final agency action existed, because it was not required to prepare a

report that it actually did. *Havasupai Tribe v. Provencio*, 906 F.3d 1155, 1162 (9th Cir. 2018)

(stating that "whether or not the Mineral Report was legally required, it was prepared.").[14]

Moreover, when the D.C. Circuit considered whether the Forest Service's adoption of the

national policy in 1995 was "major federal action," the court was incorrect to characterize the

Forest Service's national policy as to "refrain from future regulation of baiting." *Fund for

Animals*, 127 F.3d at 83 n.3. Instead, when it adopted its policy, the Forest Service committed to

"monitor State regulations" to ensure they continue to "protect Federal interests," 60 Fed. Reg. at

14,721. The Forest Service asserted its officers would "determine on a site-specific basis that

there is a need to prohibit or restrict the practice." *Id.* at 14,723. In fact, the Forest Service stated

its officers "*must* close an area to baiting" if certain events occur, including conflicts with federal

law, "such as the Endangered Species Act." *Id.* at 14,721 (emphasis added). The 1995 EA

---

[13]    When it considered adopting the national bait policy, the Forest Service's "preliminary
conclusion was that the proposal should be categorically excluded" from NEPA. 60 Fed. Reg. at
14,721. However, after reviewing public comments on the proposal, it prepared a second EA. *Id.*
Regardless, even if the Forest Service had chosen to categorically exclude its proposal from
NEPA, that still means NEPA applies; it simply means that the agency thinks a NEPA analysis is
not required. *See, e.g.*, *Sierra Club*, 510 F.3d at 1018–19.

[14]   A NEPA analysis was also required in the "first place" because issuance of an ITS that
arguably extends "take" immunity to non-federal entities (such as Idaho and Wyoming) requires
such an analysis. *Ramsey v. Kantor*, 96 F.3d 434, 444 (9th Cir. 1996).

confirms these duties, stating the "policy *mandates corrective action* through cooperative effort with the States *or through Federal action*." Plfs' Ex. 1 at 12 (emphases added).

In turn, in the context of consultation, FWS issued an ITS with mandatory terms and conditions that it deemed "critical to fulfillment of [the Forest Service's] responsibilities" under the ESA. BiOp at 6. One is "[t]he [Forest Service] *has a continuing duty to regulate the activity* covered by this incidental take statement." *Id.* at 7 (emphasis added). The ITS also provides that "*no* incidental take is allowed" of grizzly bears due to baiting in national forests, and that "[s]hould *any* take occur, the [Forest Service] must reinitiate formal consultation with the [FWS] and provide the circumstances surrounding the take." *Id.* (emphases added).

NEPA regulations define "major federal action" to mean "actions with effects that may be major and which are potentially subject to Federal control or responsibility." 40 C.F.R. § 1508.18. Here, given the allegations in the amended complaint, there should be no dispute that continued state-authorized baiting in national forests has in fact had "effects that may be major" on grizzly bears, and is an activity that remains "subject to Federal control or responsibility."

Further, the Ninth Circuit has held that the failure of an agency to disapprove of state actions as inconsistent with federal law constitutes "major federal action." *Ramsey*, 96 F.3d at 444–45. There, a federal agency delegated authority to prepare fishery management plans to the State of Alaska, but was required to review state plans to ensure they were consistent with national standards and applicable laws. *Id.* at 445. The Ninth Circuit found the plans would have a major effect and that the agency's failure to disapprove them was "major federal action." *Id.* Similarly, here, the Forest Service has effectively delegated its authority to regulate bear baiting on its lands to states, but has the duty to monitor baiting and regulate it to ensure compliance with federal law, including specifically the ESA. This is "major federal action" under *Ramsey*.

The Forest Service cites two Ninth Circuit cases to support its argument, Ds' Mem. at 17–18, but neither is like this one. In *Alaska v. Andrus*, 591 F.2d 537 (9th Cir. 1979), the Ninth Circuit considered whether the Secretary of Interior's "nonexercise of executive power (which he may or may not possess) to regulate wildlife on federal land" required him to prepare an EIS to evaluate the State of Alaska's killing of wolves on federal lands. *Id*. at 538–39. The Ninth Circuit held primarily that because the Secretary did not finance the killing, he had no duty to prepare an EIS in the first place, to evaluate his "nonexercise of any authorities" to do so. *Id*. at 541. *Andrus* is unlike this case. Here, the Forest Service prepared an EA. And, significantly, it has authority to control or prohibit baiting in national forests; in fact, it outright prohibited baiting in national forests in Wyoming during the period when it considered whether to adopt the national policy. Plfs' Ex. 1 at 6. Further, as noted, here, it must regulate state-permitted baiting, and it has stated it "shall" close areas to baiting if it conflicts with federal objectives, including the ESA.

The Forest Service also cites *Cold Mountain v. Garber*, 375 F.3d 884 (9th Cir. 2004), where the plaintiffs alleged the Forest Service failed to supplement an EA evaluating whether to issue a special use permit to the State of Montana to allow it to haze bison leaving Yosemite National Park to prevent the spread of brucellosis. *Id*. at 887, 894. The plaintiffs alleged significant new information existed, because Montana's hazing caused "take" of bald eagles. *Id*. at 894. The Ninth Circuit observed Montana may be liable for a "take" claim but it was not a party to the appeal. *Id*. at 890. Regardless, the Ninth Circuit held that no major federal action remained, because the Forest Service had "approved and issued" Montana's permit, and possessed no ongoing oversight or involvement afterwards. *Id.* at 891. Here, by contrast, the Forest Service must ensure any continued bear baiting does not violate federal interests, including the ESA, and asserted it would issue closure orders where it does.

To be clear, Guardians acknowledges that in different factual contexts, the Ninth Circuit has held that an agency's duty to merely monitor a pre-approved continuing activity is not major federal action.[15] For example, in *Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085 (9th Cir. 2013), an agency prepared a NEPA analysis for a mine in 1988, and allowed it to restart after a 17-year hiatus; the plaintiffs asserted the analysis was stale and had to be supplemented. *Id.* at 1094. But unlike this case, there didn't appear to be any significant new information, and the agency's ongoing involvement were mere "ministerial tasks" of data entry and analysis as to bond amounts. *Id.* at 1096. Similarly, in *Sierra Club v. Penfold*, 857 F.2d 1307 (9th Cir. 1987), the plaintiffs asserted an agency must perform a NEPA analysis if it receives any miners' "notice" of intent to mine, even though agency approval isn't required in the first place. *Id.* at 1309–10, 1314. The Ninth Circuit held that the agency's role was only "marginal" federal action, and the fact that "[n]otice mine operations are subject to monitoring" does not amount to major federal action. *Id.* at 1310, 1314. By contrast, again, here, the Forest Service is required to monitor continued baiting in order to determine if federal law is violated (i.e., new information, or excessive take), which then also triggers a mandatory duty to act ("regulate," reinitiate consultation, and/or issue closure orders). Here, major federal action remains in both the Forest Service's ongoing duty to regulate baiting, and its failure to regulate, issue closure orders, and reinitiate consultation. *Cf.* 40 C.F.R. § 1508 (Federal actions that trigger NEPA "include the circumstance where the responsible officials fail to act and that failure is reviewable by courts . . . . "). There are no grounds to dismiss the NEPA supplementation claim.

---

[15]     The origin of this line of cases is *San Francisco Tomorrow v. Romney,* 472 F.2d 1021 (9th Cir. 1973), where the Ninth Circuit held that urban renewal project approvals that predated enactment of NEPA did not require a NEPA analysis, where agencies monitored compliance with contracts issued in 1966. *Id.* at 1025. Monitoring implementation of contracts for projects that never underwent NEPA analysis is different than regulating a major federal action that did.

Conclusion.

The Court should deny the motion.

Date: December 6, 2019.                    Respectfully submitted,

                                           /s/ Peter M. K. Frost
                                           Peter M. K. Frost, *pro hac vice*
                                           Dana M. Johnson, Idaho Bar #8359