ƒlaDana M. Johnson, Idaho Bar #8359
Wilderness Watch
P.O. Box 9623
Moscow, Idaho 83843
Tel: (208) 310-7003
danajohnson@wildernesswatch.org

Matthew K. Bishop, *pro hac vice*
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
Tel: 406-324-8011
bishop@westernlaw.org

Peter M.K. Frost, *pro hac vice*
Western Environmental Law Center
120 Shelton McMurphey Blvd., Suite 310
Eugene, Oregon 97401
Tel: 541-359-3238
frost@westernlaw.org

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WILDEARTH GUARDIANS, et al., | Case No. 1:19-cv-00203-CWD |
| Plaintiffs, | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COUNT 1 [Dkt. 38]** |
| v. | |
| U.S. FOREST SERVICE, et al., | |
| Defendants. | |

Table of Contents.

Table of Authorities ..........................................................................................................ii

Facts .............................................................................................................................. 1

Standard of Review ....................................................................................................... 8

Argument ...................................................................................................................... 9

A.    The Only Lawful Agency Action is to Reinitiate Consultation ............................ 9

    1.    Defendants' Rescission of the BiOp and ITS is Unlawful ...................................... 12

    2.    "Agency Action" Existed from 1993 to the Present................................................ 14

    3.    Defendants' Attempt to Rescind the BiOp is an Unlawful *Post Hoc* Rationale ......... 18

B.    The Court Should Deny Defendants' Motion to Dismiss, and Order Them to Produce their Administrative Records .......................................................................... 19

Conclusion ................................................................................................................... 20

Table of Authorities.

Cases:

*All. for the Wild Rockies v. Probert*,
  412 F. Supp. 3d 1188 (D. Mont. 2019) ............................................................ 11

*Ariz. Cattle Growers' Ass'n v. U.S. Fish and Wildlife Serv.*,
  273 F.3d 1229 (9th Cir. 2001) ....................................................................... 11

*Augustine v. United States*,
  704 F.2d 1074 (9th Cir. 1983) ....................................................................... 20

*Branch v. Tunnell*,
  14 F.3d 449 (9th Cir. 1994) ............................................................................. 9

*Defenders of Wildlife v. EPA*,
  420 F.3d 946 (9th Cir. 2005) ......................................................................... 17

*Dep't of Homeland Sec. v. Regents of the Univ. of California*,
  140 S. Ct. 1891 (2020) ............................................................................ 14, 18

*DOE #1 v. Trump*,
  423 F. Supp. 3d 1040 (D. Or. 2019) .............................................................. 20

*Douglas Timber Operators, Inc. v. Salazar*,
  774 F. Supp. 2d 245 (D.D.C. 2011) ............................................................... 13

*Encino Motorcars, LLC v. Navarro*,
  136 S. Ct. 2117 (2016) .................................................................................. 18

*Farrakhan v. Gregoire*,
  590 F.3d 989 (9th Cir. 2010) ......................................................................... 16

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ...................................................................................... 19

*FDIC v. McSweeney*,
  976 F.2d 532 (9th Cir. 1992) ......................................................................... 16

*Friends of the River v. U.S. Army Corps of Eng'rs*,
  870 F. Supp. 2d 966 (E.D. Cal. 2012) ................................................... 9, 19, 20

*Friends of the Wild Swan, Inc. v. U.S. Forest Service*,
  910 F. Supp. 1500 (D. Or. 1995) ................................................................... 19

*Fund for Animals, Inc. v. Thomas,*
  932 F. Supp. 368 (D.D.C. 1996) ..........................................................7

*Fund for Animals, Inc. v. Thomas,*
  127 F.3d 80 (D.C. Cir. 1997) ................................................ 7, 8, 16

*Hal Roach Studios, Inc. v. Richard Feiner & Co.,*
  896 F.2d 1542 (9th Cir. 1990) ..........................................................9

*Johnson v. Riverside Healthcare Sys., LP,*
  534 F.3d 1116 (9th Cir. 2008) ..........................................................9

*Karuk Tribe v. U.S. Forest Serv.,*
  681 F.3d 1006 (9th Cir. 2012) ........................................................14

*Lexmark Int'l v. Static Control Components,*
  134 S. Ct. 1377 (2014) .....................................................................9

*Michigan v. EPA,*
  576 U.S. 743 (2015) .......................................................................18

*Nat. Res. Def. Council v. Houston,*
  146 F.3d 1118 (9th Cir. 1998) ........................................................15

*Nat'l Wildlife Fed'n v. Norton,*
  2005 WL 2175874 (E.D. Cal. Sept. 7, 2005) ....................................15

*Ramsey v. Kantor,*
  96 F.3d 434 (9th Cir. 1996) ...........................................................15

*San Francisco Baykeeper, Inc. v. Tosco Corporation, Diablo Servs., Inc.,*
  309 F.3d 1153 (9th Cir. 2002) ........................................................11

*SEC v. Chenery Corp.,*
  332 U.S. 194 (1947) .......................................................................18

*Sierra Club v. Babbitt,*
  65 F.3d 1502 (9th Cir. 1995) ..........................................................15

*Summers v. Schriro,*
  481 F.3d. 710 (9th Cir. 2007) ........................................................16

*Turtle Island Restoration Network v. Nat'l Marine Fisheries Serv.,*
  340 F.3d 969 (9th Cir. 2003) .........................................................14

*United States v. 14.02 Acres*,
    547 F.3d 943 (9th Cir. 2008) ............................................................................. 1

*United States v. Daniels*,
    902 F.2d 1238 (7th Cir. 1990) ........................................................................... 16

*United States v. Emor*,
    785 F.3d 671 (D.C. Cir. 2015) ............................................................................ 9

*Western Watersheds Project v. Matejko*,
    468 F.3d 1099 (9th Cir. 2006) ..................................................................... 16, 17

*Whisnant v. United States*,
    400 F.3d 1177 (9th Cir. 2005) ............................................................................ 9

*White v. Lee*,
    227 F.3d 1214 (9th Cir. 2000) .................................................................. 8, 9, 19


Statutes:

5 U.S.C. § 706(2)(A) ................................................................................... 18, 19

16 U.S.C. § 1536(a)(2) ...................................................................................... 14


Regulations:

36 C.F.R. § 251.50(c) .......................................................................................... 1

36 C.F.R. § 261.10(a) .......................................................................................... 1

50 C.F.R. § 402.02 ............................................................................................. 15

50 C.F.R. § 402.14(a) ........................................................................................ 11

50 C.F.R. § 402.14(i)(4) ..................................................................................... 11

50 C.F.R. § 402.14(m) ................................................................................... 12, 13

50 C.F.R. § 402.14(m)(1) ............................................................................... 12, 13

50 C.F.R. § 402.14(m)(2) ............................................................................... 12, 13

50 C.F.R. § 402.14(m)(3) ............................................................................... 12, 13

50 C.F.R. § 402.16 .................................................................................. 11

50 C.F.R. § 402.16(a) ....................................................................... 11, 13, 19

50 C.F.R. § 402.16(a)(1) ........................................................................ 10

50 C.F.R. § 402.16(a)(2) ........................................................................ 10

Federal Register:

51 Fed. Reg. 19,926 (June 3, 1986) ......................................................... 13

59 Fed. Reg. 11,765 (Mar. 14, 1994) ................................................... 1, 2, 4

59 Fed. Reg. 11,765 (April 14, 1994) ........................................................ 5

60 Fed. Reg. 14,720 (March 20, 1995) ........................................ 5, 6, 7, 15, 17

69 Fed. Reg. 41,946 (July 13, 2004) .......................................................... 1

Pursuant to Dist. Idaho Loc. Civ. R. 7.1(c), Plaintiffs WildEarth Guardians et al. ("Guardians") hereby respectfully oppose the Motion to Dismiss Count 1 filed by Defendants U.S. Forest Service ("Forest Service") and U.S. Fish and Wildlife Service ("FWS"). Dkt. 38.

Facts.

"Baiting" in the context of hunting means to use food, salt, or scented items to attract wildlife. *Use of Bait in Hunting*, 59 Fed. Reg. 11,765, 11,766 (Mar. 14, 1994). Through the early 1990s, eleven states, including Idaho and Wyoming, authorized hunters to use bait. *Id*. From the 1960s through 1992, some national forests required both individual hunters and commercial guides who served hunters to obtain a special use permit to use bait. *Id*.; Plfs.' Ex. 1 at 9,[1] Dkt. 12, Plfs.' Amended Cmpl. ("AC") ¶ 17.[2] For example, because "Wyoming had no regulations covering the placement and removal of baits[,]" certain national forests in Wyoming—such as the Bridger-Teton, the Bighorn, and the Shoshone, all of which include grizzly bear habitat— required hunters and guides to obtain special use permits to use bait, or issued closure orders to prohibit bait in certain areas. AC ¶ 17; Plfs.' Ex. 1 at 9; Plfs.' Ex. 7 at 9–10.

---

[1]  Guardians files seven exhibits—all Forest Service or FWS documents—to provide a complete background for the Court. Guardians respectfully requests that the Court take judicial notice of them. *United States v. 14.02 Acres*, 547 F.3d 943, 955 (9th Cir. 2008) (a court "may take judicial notice of matters of public record and consider them without converting a Rule 12 motion into one for summary judgment. Judicial notice is appropriate for records and reports of administrative bodies.") (internal citations omitted).

[2]  Defendants represent that "Forest Service regulations have, since at least 1980, exempted 'hunting' from the requirements for special use authorization . . . ." Dkt. 38-1, Defs.' Mem. in Support of Motion to Dismiss Count 1, 4 ("Defs.' Mem.") (citing 36 C.F.R. § 251.50(c)). That is only partially correct. First, the regulation exempts only "[n]oncommercial recreational" hunting. 36 C.F.R. § 251.50(c). By contrast, if a hunter hires a guide, the guide must possess a special use authorization. *Land Uses; Special Uses Requiring Authorization*, 69 Fed. Reg. 41,946, 41,948 (July 13, 2004). Hiring guides is common; Wyoming at least once required non-resident hunters to hire a guide to hunt in certain areas. Plfs.' Ex. 7 at 7. Second, if a hunter builds a structure, like a "shooting stand" at a bait station, which the Forest Service states "often" occurs, a special use authorization is required. Plfs.' Ex. 7 at 3; *see* 36 C.F.R. § 261.10(a).

In March 1992, the Regional Foresters for the Rocky Mountain and Intermountain Regions decided to discontinue requiring special use permits in national forests in Wyoming, and to instead issue a joint "closure order prohibiting black bear baiting" in national forests in Wyoming except where allowed, and with certain conditions. 59 Fed. Reg. at 11,766.[3] Two groups sued the Forest Service for switching from special use permits to closure orders in Wyoming without preparing a National Environmental Policy Act ("NEPA") analysis as to effects on black bears. *Id*. To settle the case, the Forest Service agreed to consider under NEPA whether to eliminate requiring special use permits for baiting in national forests in Wyoming. *Id*.

On February 19, 1993, the Forest Service issued an EA under NEPA. Plfs.' Ex. 7. The proposed action in the EA is for the Forest Service to "regulate noncommercial bear baiting" in national forests in Wyoming by entering into a Memorandum of Understanding ("MOU") with Wyoming that requires the state to adopt rules for baiting. *Id*. at 17–18. The EA also requires "mitigation measures" for all considered alternatives, including: (1) no bear baiting in the grizzly bear "recovery zone" and (2) outside of the zone, no bear baiting where the Forest Service issues an order prohibiting "the improper storage of food in grizzly bear habitat." *Id*. at 18–19.

In March 1993, the Forest Service prepared a Biological Evaluation under Section 7(a)(2) of the Endangered Species Act ("ESA") to assess whether the proposed alternative in the EA would affect ESA-listed species, including grizzly bears. Plfs.' Ex. 2 at 1 (reciting history).[4] On

---

[3]   The areas the Forest Service closed to baiting under special use authorizations and under the subsequent joint closure order were "very similar." Plfs.' Ex. 7 at 4.

[4]   Guardians does not possess the 1993 Biological Evaluation.

April 6, 1993, the Forest Service requested formal consultation with FWS under Section 7(a)(2) to obtain its opinion as to the effects of its actions on ESA-listed species. *Id*.[5]

On April 14, 1993, FWS issued a BiOp. *Id*.; AC ¶ 19. The BiOp states that "baiting for black bears within the range of the grizzly bear" can result in mortality to grizzlies, if a hunter mistakes a grizzly for a black bear, if a grizzly attempts to defend a food source from what it perceives as a competitor, or if a hunter perceives that a grizzly threatens the hunter's safety. Plfs.' Ex. 2 at 4. The BiOp states grizzlies may become "conditioned" to the foods used for bait, and seek them elsewhere, and become "problem" bears requiring "management actions." *Id*. The BiOp states that between 1967 and 1993, five grizzlies were reportedly killed at black bear bait sites in Wyoming. *Id*. at 5. The BiOp notes the mitigation measures in the 1993 EA, including "[c]losing the proposed grizzly bear recovery area and all areas covered by a special order prohibiting improper storage of food in grizzly bear habitat (mitigation measures common to all alternative[s]) will have a beneficial affect [*sic*] on grizzly bears." *Id*. at 2. Based on the mitigation measures, FWS found that none of the alternatives in the 1993 EA would jeopardize the continued existence of the grizzly bear. AC ¶ 19; Plfs.' Ex. 2 at 6.

However, FWS found a "remaining potential for incidental take of grizzly bears" due to baiting to hunt black bears, so it issued an Incidental Take Statement ("ITS") that includes conditions it deemed "critical to fulfillment of [the Forest Service's] responsibilities" under Section 7(a)(2). AC ¶ 21; Plfs.' Ex. 2 at 6–7. The ITS includes mandatory terms and conditions. First, the Forest Service must "[e]liminate the use of processed human, livestock or pet foods, and fruits and vegetables produced for human consumption, as bear baits in any areas regularly used by grizzly bears[.]" Plfs.' Ex. 2 at 7. Second, the Forest Service must "[e]liminate the

---

[5]   Guardians does not possess the document requesting consultation.

requirement that hunters, outfitters or guides who report a grizzly bear on a legally placed bait remove the bait." *Id*.[6] Third, "[t]he [Forest Service] has a continuing duty to regulate the activity covered by this incidental take statement." *Id*. Finally, FWS found that "[a]lthough there is a remote possibility that a grizzly bear may be taken as a result of black bear baiting on [Forest Service] lands in Wyoming, [FWS] does not anticipate that such take will occur. Therefore, no incidental take is allowed. Should any take occur, the [Forest Service] must reinitiate formal consultation with [FWS] and provide the circumstances surrounding the take." *Id*.

Subsequently, the Forest Service "implemented a closure order prohibiting the use of bait for black bear hunting in the grizzly bear recovery zone, in the food restriction areas on the Wind River Ranger District, Shoshone National Forest, and prohibited hunting of black bears with non-natural baits in grizzly habitat not covered by other closure orders." Plfs.' Ex. 4.

In April 1993, the Forest Service issued a Decision Notice under NEPA to adopt an alternative from the EA. 59 Fed. Reg. at 11,766 (noting Decision Notice). Guardians does not possess the Decision Notice, so it is not clear which alternative was adopted, but it appears the Forest Service in fact entered into a MOU with Wyoming requiring the state to adopt rules related to baiting and grizzly bears. *See* Plfs.' Ex. 1 at 2 (Table of Contents noting "Appendix E Wyoming Game and Fish Commission/Forest Service Memorandum of Understanding") & 4.

The Forest Service then faced "the threat of another [law]suit," Plfs.' Ex. 1 at 8, so it decided that "national direction was needed to end the conflict and controversy." 59 Fed. Reg. at 11,766. At that juncture, the Forest Service rescinded its EA and Decision Notice. *Id*.; Plfs.' Ex.

---

[6]   FWS stated that removal of bait "should be accomplished by individuals experienced with grizzly bear behavior." Plfs.' Ex. 2 at 7.

4. However, its prior closure orders remained in effect, and it also closed to baiting "an additional area on the Greybull District, Shoshone National Forest[.]" Plfs.' Ex. 4.

In April 1994, the Forest Service published an interim national policy that generally leaves to states whether to authorize bait in national forests, subject to oversight and regulation by the Forest Service. 59 Fed. Reg. 11,765 (April 14, 1994). In March 1995, the Forest Service prepared another EA to consider permanently adopting the national policy. Plfs.' Ex. 1. The 1995 EA states the purpose of the policy is two-fold: to "clarify that baiting is a hunting method that is authorized by the States and regulated by the States, as well as to establish procedures that will be used by the Forest Service when State regulations conflict with Federal laws, regulations, and policies." Plfs.' Ex. 1 at 7. The 1995 EA states: "There is a need to ensure that State regulations governing baiting protect Federal resources, and, failing sufficient State protection, that the Forest Service provide such protection." *Id.*

The proposed action in the 1995 EA is to amend the Forest Service manual to adopt the national policy to allow states to regulate bait, subject to Forest Service oversight and regulation. *Id.* at 11–13; 60 Fed. Reg. 14,720 (March 20, 1995). The policy states: "Where States permit the use of bait for attracting resident game, this activity is allowed on National Forest Service lands, subject to State hunting laws and regulation, unless the authorized officer determines on a site-specific basis that there is a need to prohibit or restrict the practice." 60 Fed. Reg. at 14,723. The Forest Service stated it would monitor State regulations" to ensure they "protect Federal interests." *Id.* at 14,721. The Forest Service explained that if the "use of bait conflicts with Federal law or regulations, forest plan direction, or other uses or users . . . the authorized officer could prohibit or restrict the use of bait, in an area, by issuing a closure order." *Id.* Before issuing a closure order, the officer "would first consult with the State fish and wildlife agency to see if

the conflict could be resolved without a closure or restrictive order," but "the Forest Service would close specific areas to baiting if conflicts cannot be resolved . . . ." *Id.* at 14,720–21. The Forest Service stated "the authorized officer must close an area to baiting" if certain circumstances arise, including if "State laws and regulations conflict with Federal law, such as the Endangered Species Act." *Id.* at 14,721.

Pursuant to Section 7(a)(2), on February 13, 1995, the Forest Service wrote FWS that it was "in the process of preparing a National Policy on bear baiting[.]" Plfs.' Ex. 4. The Forest Service wrote that "as a result of the mitigation measures in the EA and the reasonable and prudent [measures] in the [BiOp], we implemented a closure order prohibiting the use of bait for black bear hunting in the grizzly bear recovery zone," and prohibited baiting in grizzly habitat not covered by other closure orders. *Id.* The Forest Service wrote that it had reviewed its 1993 Biological Evaluation, its existing closure orders, the BiOp, and state regulations on baiting, and stated "it is our opinion that the National Policy, when issued, would not change the conditions or situations that were present when the original [BiOp] was issued." *Id.* The Forest Service noted that its "plan to continue with the closure orders that are in place[.]" *Id.* The Forest Service concluded: "We ask that you review the original [BiOp] in light of this proposed new policy, and the actions we have taken, to determine if you concur that the actions we have taken to protect the grizzly bear are still adequate." *Id.*

On February 27, 1995, FWS responded by noting the Forest Service complied with the condition in the ITS and closed the grizzly bear recovery zone to baiting, and also prohibited the use of non-natural baits in other areas occupied by grizzly bears. Plfs.' Ex. 5 at 1. FWS noted that Wyoming had required hunters to report use of bait by a grizzly to state agency personnel, who would remove the bait. *Id.* FWS concluded: "The proposed National Policy appears to be

consistent with our biological opinion of April 13, 1993, and no information has become available to suggest that additional terms and conditions are necessary at this time." *Id.* at 2.

Finally, on March 14, 1995, FWS responded to an "undated" Forest Service letter delivered to FWS on February 24, 1994 [*sic*].[7] Plfs.' Ex. 6. FWS noted that the national policy required the Forest Service to monitor state baiting regulations, "and to establish administrative closures to baiting where necessary to protect federally listed species." *Id*. FWS refers to other documents "clarifying certain issues" and noting "revisions to the proposed policy agreed to by our respective staffs[.]"[8] *Id*. FWS noted the status of Forest Service closure orders. *Id*. FWS concurred with the Forest Service that its national policy "is not likely to adversely affect federally listed species." *Id*.

On March 20, 1995, the Forest Service adopted the national policy as a rule. 60 Fed. Reg. 14,720. Eight entities sued, alleging the Forest Service violated NEPA by preparing only an EA for the new national rule, and violated the ESA by failing to engage in formal consultation as to its effects. *Fund for Animals, Inc. v. Thomas*, 932 F. Supp. 368, 370 (D.D.C. 1996). The Forest Service defended its EA by asserting its rule was not a "major federal action" under NEPA. *Id.* at 370. It defended the ESA claim by noting it engaged in informal consultation with FWS, and FWS agreed formal consultation was unnecessary. *Id*. at 370. The district court ruled in favor of the Forest Service on both claims. *Id*. at 371. The D.C. Circuit affirmed. *Fund for Animals, Inc. v. Thomas*, 127 F.3d 80 (D.C. Cir. 1997). The D.C. Circuit assumed without deciding that the national rule constitutes federal "action" under NEPA, but held that it did not constitute "major"

[7] Guardians does not possess the undated letter, but the year of the delivery appears to be wrong, since FWS responded on March 14, 1995. Plfs.' Ex. 6 at 1.

[8] Guardians does not possess these documents.

federal action requiring an EIS. *Id*. at 83–84. The court also ruled the Forest Service met its duties under Section 7(a)(2) through informal consultation. *Id*. at 84.

Currently, among the contiguous states, only Idaho and Wyoming allow use of bait to hunt black bears in national forests. AC ¶ 15. Further, Idaho and Wyoming allow use of bait in areas in national forests that grizzly bears may inhabit. *Id*. Moreover, since the Forest Service adopted its national rule, and since it consulted with FWS to obtain its BiOp and ITS, Guardians alleges numerous grizzly bears have been killed by black bear hunters using bait in national forests in Idaho and Wyoming. AC ¶¶ 35–37, 40, 44, 45. Guardians also alleges these mortalities are likely incomplete, because some preliminary grizzly mortality reports do not disclose whether bait was used, and some do not precisely report locations, to determine whether a death occurred in a national forest. AC ¶¶ 58 & 61. However, Guardians alleges that in 2018, Idaho Fish and Game staff killed two grizzlies in eastern Idaho that became attracted to or dependent on human food sources. AC ¶ 63. And, in June 2019, a grizzly bear was discovered in the Kelly Creek drainage in the Nez Perce-Clearwater National Forests in Idaho. AC ¶ 59. The grizzly was seen by a licensed hunter who was stocking a black bear bait site with food. *Id*. The State of Idaho urged black bear hunters to be cautious when selecting bears as targets in the area. *Id*.

Standard of Review

Defendants file their motion under Rules 12(b)(1) and 12(b)(6). Dkt. 38; Dkt. 38-1, Defs.' Mem. at 9–10. Defendants assert this case is moot, because they have "rescinded" the BiOp, and because Guardians now lacks standing to sue. Defs.' Mem. at 10–12, 13. "Because standing and mootness both pertain to a federal court's subject-matter jurisdiction under Article III, they are properly raised in a motion to dismiss under Federal Rule of Civil Procedure 12(b)(1), not Rule 12(b)(6)." *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). Further, because

Defendants file extrinsic evidence to support the Rule 12(b)(1) motion, it appears to be a factual attack. *Whisnant v. United States*, 400 F.3d 1177, 1179 (9th Cir. 2005). "If the moving party asserts a factual attack, a court may resolve the factual disputes by 'look[ing] beyond the complaint to matters of public record, without having to convert the motion into one for summary judgment.'" *Friends of the River v. U.S. Army Corps of Eng'rs*, 870 F. Supp. 2d 966, 972 (E.D. Cal. 2012) (quoting *White*, 227 F.3d at 1242).

Defendants also assert Guardians' reinitiation claim "does not state a claim for relief against [the Forest Service]," and also "should be dismissed for failure to state a claim for relief against FWS." Defs.' Mem. at 20.[9] Under Rule 12(b)(6), "dismissal may be based on either a 'lack of cognizable legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.'" *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121 (9th Cir. 2008) (citation omitted). In considering a 12(b)(6) motion, the Court must view the "complaint in the light most favorable to" the plaintiff, and "accept[] all well-pleaded factual allegations as true, as well as any reasonable inference drawn from them." *Id.* at 1122 (citation omitted). "Generally, a district court may not consider any material beyond the pleadings in ruling on a Rule 12(b)(6) motion." *Branch v. Tunnell*, 14 F.3d 449, 453 (9th Cir. 1994) (quoting *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990)).

Argument.

A.    The Only Lawful Agency Action is to Reinitiate Consultation.

---

[9]   Defendants characterize this defense as a "Lack of Statutory Standing." Defs.' Mem. at 19. As the D.C. Circuit has stated, "[s]tatutory standing is not really about standing at all, in the sense that it limits a 'court's statutory or constitutional *power* to adjudicate the case.' . . . In other words, statutory standing 'is itself a merits issue.'" *United States v. Emor*, 785 F.3d 671, 677 (D.C. Cir. 2015) (emphasis original) (quoting *Lexmark Int'l v. Static Control Components*, 134 S. Ct. 1377, n.4 & 1387 (2014)).

The Court should not dismiss this case, because based on the facts alleged in the amended complaint, and the documents that corroborate or supplement those allegations, the only lawful action for Defendants is to reinitiate consultation. The Court can issue effective relief by ordering Defendants to reinitiate consultation, and Guardians has stated a claim for such relief. As a result, the case is not moot, and Guardians has statutory standing.

In the amended complaint, Guardians alleges reinitiation of consultation is required for two independent reasons. First, Guardians alleges that numerous grizzly bears have been killed by black bear hunters using bait in national forests in Idaho and Wyoming. AC ¶¶ 35–37, 40, 44, 45. Guardians further alleges that reported grizzly bear deaths at bait stations are under-inclusive, because some deaths are not reported. *Id.* ¶ 58. Accordingly, Guardians alleges the amount or extent of take in the ITS has been exceeded. *Id.* ¶ 76 (citing 50 C.F.R. § 402.16(a)(1)).[10]

Second, Guardians alleges that FWS once found there was only a "remote possibility" of grizzlies being killed at bait stations in national forests in Wyoming, but that has been disproven, and that studies published since the BiOp now show unanticipated harmful effect of baiting on grizzlies. *Id.* ¶¶ 19, 75. Accordingly, Guardians alleges "new information" reveals the effects of the action may affect grizzlies in a manner or to an extent not previously considered. *Id.* ¶ 75 (citing 50 C.F.R. § 402.16(a)(2)).

Turning to Guardians' legal claim that Defendants have failed to reinitiate consultation, they have only one lawful course of action: to reinitiate consultation. The Ninth Circuit has noted that "[i]n general, Incidental Take Statements set forth a 'trigger' that, when reached, results in

---

[10]   As previously noted, applicant-intervenors Wyoming and Idaho would admit that since the national rule was adopted, three grizzly bears have been killed at bait stations in national forests in Wyoming, Dkt. 18-2 ¶ 1, and one grizzly bear has been killed at a bait station in a national forest in Idaho. Dkt. 23-2 ¶ 45.

an unacceptable level of incidental take, invalidating the safe harbor provision, and *requiring* the parties to re-initiate consultation." *Ariz. Cattle Growers' Ass'n v. U.S. Fish and Wildlife Serv.*, 273 F.3d 1229, 1249 (9th Cir. 2001) (emphasis added). When a trigger is reached, the Forest Service and/or FWS must reinitiate consultation: "Reinitiation of consultation *is required* and *shall be requested* by the Federal agency or by the Service . . . ." 50 C.F.R. § 402.16(a) (emphases added). Similarly, 50 C.F.R. § 402.14(i)(4) provides: "If during the course of the action the amount or extent of incidental taking . . . is exceeded, the Federal agency *must* reinitiate consultation *immediately*." (emphases added). As one court has observed, "the regulatory language differs between initiation consultation, *see* 50 C.F.R. § 402.14(a), and reinitiation of consultation, 50 C.F.R. § 402.16. Section 402.14 merely *allows* the Fish and Wildlife Service to request consultation. Reinitiation under § 402.16, on the other hand, *obligates* either the action agency or the Fish and Wildlife Service to act." *All. for the Wild Rockies v. Probert*, 412 F. Supp. 3d 1188, 1201 (D. Mont. 2019) (emphases original). Here, based upon the amended complaint, the sole lawful act the agencies may undertake is to reinitiate consultation.

Instead of reinitiating consultation, Defendants traded letters "rescinding" the BiOp and "terminating" consultation, which they assert renders this case moot. Defs.' Exs. 1 & 2; Defs.' Mem. 10–19. To prove a case is moot, a defendant must show the court cannot order "any effective relief." *San Francisco Baykeeper, Inc. v. Tosco Corporation, Diablo Servs., Inc.*, 309 F.3d 1153, 1159 (9th Cir. 2002). Further, a defendant asserting mootness bears a "heavy burden of persuasion." *Id.* Defendants' attempt to moot this case fails, because the rescission is unlawful for at least three reasons: (1) Defendants have no authority to rescind a BiOp after consultation is complete, except by reinitiating consultation; (2) their rationale for rescinding the BiOp—that

there was no agency action and/or the agency action was never implemented—is legally and factually wrong; and (3) their attempt to moot this case is an impermissible *post hoc* rationale.[11]

      1.     <u>Defendants' Rescission of the BiOp and ITS is Unlawful.</u>

Defendants cite two regulations as legal authority for their decision to rescind the BiOp: 50 C.F.R. §§ 402.14(m)(2) & (m)(3). Defs.' Mem. at 3. The subheading for 50 C.F.R. § 402.14(m) is "Termination of consultation." The first provision provides: "Formal consultation is terminated with the issuance of the biological opinion." 50 C.F.R. § 402.14(m)(1). Accordingly, when the BiOp was issued in 1993, consultation was terminated. *Id.* As a result, 50 C.F.R. § 402.14(m)(2) & (m)(3) cannot be lawful bases for Defendants' actions because, as noted next, they both apply only before consultation is terminated.

50 C.F.R. § 402.14(m)(2) provides: "If during any stage of consultation a Federal agency determines that its proposed action is not likely to occur, the consultation may be terminated by written notice to the Service." That circumstance never occurred; there is no document suggesting the proposed action that resulted in the BiOp—a prospective MOU with Wyoming, and the issuance of closure orders as mitigation—were "not likely to occur." In fact, in 1994, after the BiOp was issued and after the Forest Service had withdrawn its decision notice, the Forest Service itself stated it had issued closure orders for parts of national forests within the grizzly bear recovery area, and for other areas where grizzlies may be found, and that those orders remained in effect. Plfs.' Ex. 4.

In turn, 50 C.F.R. § 402.14(m)(3) provides: "If during any stage of consultation a Federal agency determines, with the concurrence of the Director, that its proposed action is not likely to

---

[11] For the same reasons, Defendants' argument that Guardians lacks statutory standing to pursue this claim fails. *Contra* Defs.' Mem. at 19–20. Because the rescission was unlawful, the BiOp and ITS remain legally operative.

adversely affect any listed species or critical habitat, the consultation is terminated." That never

occurred either. Again, the Forest Service issued closure orders that demonstrably affected

grizzly bears. Plfs.' Ex. 4.

The regulatory history of 50 C.F.R. § 402.14(m)(2) & (3) shows that after consultation is

terminated, the only lawful course to change an existing BiOp is to reinitiate consultation. These

regulations were adopted jointly by FWS and the National Marine Fisheries Service ("Services")

in 1986. *Interagency Cooperation–Endangered Species Act of 1973*, 51 Fed. Reg. 19,926 (June

3, 1986). When the Services considered promulgating 50 C.F.R. § 402.14(m), they rejected

allowing "consultation" to continue after a BiOp is issued. They first proposed regulations

authorizing "further discussion" between agencies after a BiOp is issued, and proposed that 50

C.F.R. § 402.14(m)(1) provide "that consultation terminated with the issuance of a 'no jeopardy'

opinion *unless further discussion took place*[.]" *Id.* at 19,935 & 19,956 (emphasis added). In

their final rule, however, the Services deleted the "further discussion" provision, on the bases

"that all reviews and discussions [between the action agency and the Service] should occur prior

to the issuance of the biological opinion," that an extension for further discussion "extends

consultation beyond the statutory time limits," and that such an extension "lacks statutory

authority." *Id.* at 19,935. Instead, the Services stated that "[i]f revisions to the opinion are

necessary, *consultation can be reinitiated and a revised opinion issued*." *Id.* (emphasis added).

Accordingly, here, Defendants had only one lawful means for reconsidering whether

"agency action" existed as to baiting in national forests: to reinitiate consultation pursuant to 50

C.F.R. § 402.16(a). Because Defendants failed to do so, their purported rescission of the BiOp is

unlawful, and cannot render this case moot. *Douglas Timber Operators, Inc. v. Salazar*, 774 F.

Supp. 2d 245, 258–59 (D.D.C. 2011) (BLM lacked "inherent authority" to withdraw a NEPA

Record of Decision in order to correct legal error; where agency has regulatory procedures for amending its decisions, it cannot withdraw a decision without complying with such procedures).

  2.  <u>"Agency Action" Existed from 1993 to the Present.</u>

  As the Court is aware, a predicate for consultation under Section 7(a)(2) is "any action [by a federal agency] . . . (hereinafter in this section referred to as an 'agency action') . . . ." 16 U.S.C. § 1536(a)(2). The Ninth Circuit has "repeatedly held that the ESA's use of the term 'agency action' is to be construed broadly." *Karuk Tribe v. U.S. Forest Serv.*, 681 F.3d 1006, 1021 (9th Cir. 2012) (en banc). Whether "agency action" under Section 7(a)(2) existed requires two inquiries. *Id*. First, "whether [the] federal agency affirmatively authorized, funded, or carried out the underlying activity." *Id*. Second, "whether the agency had some discretion to influence or change the activity for the benefit of a protected species." *Id*. "There is 'agency action' whenever an agency makes an affirmative, discretionary decision about whether, or under what conditions, to allow private activity to proceed." *Id*. at 1011.

  The Forest Service's many actions related to the use of bait in hunting on national forests constitute "agency action" under Section 7(a)(2). The Forest Service's practice of requiring special use permits in Wyoming before 1992 was affirmative, discretionary agency action. *Turtle Island Restoration Network v. Nat'l Marine Fisheries Serv.*, 340 F.3d 969, 970 (9th Cir. 2003) (NMFS's "continued issuance of fishing permits . . . constitutes ongoing agency action"). The Forest Service's decision to discontinue that practice and require procedures to address site-specific impacts from baiting was affirmative, discretionary agency action. *Cf. Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891, 1908 (2020) (Deferred Action on Childhood Arrival ("DACA") memorandum constituted agency action under the APA; DACA is more than a passive "non-enforcement policy" because it directs agency to establish

procedures to identify qualifying individuals). The Forest Service's decision to prepare an EA and apparently to enter into a MOU with Wyoming requiring state baiting rules constitutes affirmative, discretionary agency action. *Nat. Res. Def. Council v. Houston*, 146 F.3d 1118, 1125 (9th Cir. 1998) ("Clearly, negotiating and executing contracts is 'agency action.'"); *Sierra Club v. Babbitt*, 65 F.3d 1502, 1508 (9th Cir. 1995) ("[T]he execution of a reciprocal right-of-way agreement clearly would implicate Section 7(a)(2)."). The Forest Service's decision to adopt mitigation measures and issue closure orders for baiting in the grizzly bear recovery zone and other areas was affirmative, discretionary agency action. 50 C.F.R. § 402.02 (agency action subject to Section 7(a)(2) includes "actions intended to conserve listed species or their habitat").

Moreover, the Forest Service's decision that it would monitor for grizzly mortalities and regulate the use of baiting as necessary to avoid such mortalities was affirmative, discretionary agency action. As noted, when it adopted its national rule, the Forest Service stated it would "monitor State regulations" to ensure they continue to "protect Federal interests." 60 Fed. Reg. at 14,721. The Forest Service asserted its officers would "determine[] on a site-specific basis that there is a need to prohibit or restrict the practice." *Id*. at 14,723. In fact, the Forest Service stated its officers "must close an area to baiting" if certain events occur, including conflicts with laws "such as the Endangered Species Act." *Id*. at 14,721. The 1995 EA confirms these duties, stating the rule "*mandates corrective action* through cooperative effort with the States *or through Federal action*." Plfs.' Ex. 1 at 14 (emphases added).

Finally, the effect of the BiOp and the accompanying ITS is ostensibly to give Idaho and Wyoming immunity from take liability for licensing baiting for black bears that results in grizzly deaths, which also constitutes affirmative, discretionary agency action. *See Ramsey v. Kantor*, 96 F.3d 434, 444 (9th Cir. 1996); *Nat'l Wildlife Fed'n v. Norton*, 2005 WL 2175874 *6 (E.D. Cal.

Sept. 7, 2005) ("Issuance of an [incidental take permit] is an agency action that requires the Service to engage in . . . consultation and prepare a BiOp . . . .").

To support their argument that there was no agency action, Defendants cite two footnotes in *Fund for Animals, Inc. v. Thomas*, 127 F.3d 80, n.3 & n.6 (D.C. Cir. 1997), where the D.C. Circuit, in the context of ruling that the Forest Service did not violate the ESA by failing to formally consult with FWS, stated that "the Forest Service's decision to refrain from future regulation of baiting may not constitute 'action at all,'" in which case "there most probably would not have been 'agency action' to trigger the ESA consultation requirement." Defs.' Mem. at 15. It is not clear whether this issue was raised or briefed by any party, but regardless, the court did not discuss it further, and Defendants' reliance on this unconsidered dicta is misplaced. *Summers v. Schriro*, 481 F.3d. 710, 713 (9th Cir. 2007) (rejecting application of "unconsidered dictum"); *FDIC v. McSweeney*, 976 F.2d 532, 535 (9th Cir. 1992) ("Judicial assumptions concerning . . . issues that are not contested are not holdings.") (quoting *United States v. Daniels*, 902 F.2d 1238, 1241 (7th Cir. 1990), omission original).[12]

The Forest Service also relies on the Ninth Circuit's decision in *Western Watersheds Project v. Matejko*, 468 F.3d 1099 (9th Cir. 2006). In *Matejko*, the Ninth Circuit held that the Bureau of Land Management's ("BLM's") "acquiescence" to river and stream diversions on BLM-managed land by private parties holding vested rights-of-way to divert water, recognized under an 1866 statute and subsequently by federal statutes, regulations, and courts, was not

---

[12]   The footnotes in *Fund for Animals* are also dicta because the APA provides for judicial review of final agency action, which was issuance of the BiOp, not whether it should have been issued in the first place. Further, the Ninth Circuit has held that "[o]ut-of-circuit cases are not binding on this Court and therefore do not constitute 'controlling authority'" in the circuit. *Farrakhan v. Gregoire*, 590 F.3d 989, 1000 (9th Cir. 2010), *overruled on other grounds*, 623 F.3d 990 (9th Cir. 2010) (en banc).

"agency action" subject to the consultation requirement. *Id.* at 1103, 1107–10. The Ninth Circuit explained the BLM "was 'not an entity responsible for [the challenged] decisionmaking.'" *Id.* at 1109 (quoting *Defenders of Wildlife v. EPA*, 420 F.3d 946, 968 (9th Cir. 2005)). The court distinguished cases "[w]here the challenged action comes within the agency's decisionmaking authority *and remains so*," explaining that such actions do fall within the scope of Section 7(a)(2). *Id.* (quoting *Defenders*, 420 F.3d at 969, emphasis original). On the other hand, "there is no 'ongoing agency action' where the agency has acted earlier but specifically did not *retain* authority or was otherwise constrained by statute, rule, or contract." *Id.* (emphasis original).

*Matejko* is inapposite. Here, the Forest Service has not merely "acquiesced" to use of bait in hunting in national forests. Rather, it regulated the practice through the use of special use permits on some forests in the past, and affirmatively issuing closure orders in specific areas. 60 Fed. Reg. at 14,720; Plfs.' Ex. 4. It also affirmatively committed to monitor the practice and to regulate it if necessary. 60 Fed. Reg. at 14,723 ("The authorized officer shall continually monitor State hunting regulations with regard to the use of bait. A site-specific restriction or prohibition on baiting shall occur when the authorized officer determines that one or more . . . circumstances exists . . . ."); Plfs.' Ex. 2 at 8. Here, unlike in *Matejko*, the Forest Service is the "entity responsible for the challenged decisionmaking." The regulation of the use of bait in hunting has "come[] within the agency's decisionmaking authority *and remains so*," under the express terms of the national rule and the BiOp.

Defendants' argument that the "agency action" consulted on was never implemented is wrong. *Contra* Defs.' Mem. at 5. The Forest Service appeared to at least enter into a MOU with Wyoming, Plfs.' Ex. 1 at 4, and its own document states that it implemented closure orders that remain in effect, prohibiting the use of bait in the grizzly bear recovery zone and in food

restriction areas, and prohibiting the use of non-natural baits elsewhere. Plfs.' Ex. 4. Moreover, the national rule has been implemented under the consultation and take immunity of the 1993 BiOp, as the agencies' informal consultation in 1995 makes clear: the Forest Service stated its opinion, and FWS concurred, "that the National [Rule], when issued, would not change the conditions or situations that were present when the original BiOp was issued," and requested that FWS "review the original [BiOp] in light of this proposed [national rule], and the actions we have taken," to determine whether the BiOp's determinations remained valid. Plfs.' Ex. 4 & 5.

Because Defendants' rescission of the BiOp is predicated on the erroneous conclusion that the Forest Service's actions in Wyoming, and later adoption of the national rule do not contitute "agency action" subject to the consultation requirement, the conclusion is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, 5 U.S.C. § 706(2)(A), and therefore cannot render this case moot.

3.      Defendants' Attempt to Rescind the BiOp is an Unlawful *Post Hoc* Rationale.

Defendants' decision to rescind the BiOp is an impermissible *post hoc* rationale advanced in this case to evade review by this Court. "It is a 'foundational principle of administrative law' that judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'" *Regents*, 140 S. Ct. at 1907 (quoting *Michigan v. EPA*, 576 U.S. 743, 758 (2015)). "Alternatively, the agency can 'deal with the problem afresh' by taking *new* agency action. An agency taking this route is not limited to its prior reasons but must comply with the procedural requirements for new agency action." *Regents*, 140 S. Ct. at 1908 (emphasis original) (quoting *SEC v. Chenery Corp.*, 332 U.S. 194, 201 (1947)). Moreover, an agency changing its policies "must . . . 'show that there are good reasons for the new policy.'" *Encino Motorcars,*

*LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).

Here, Defendants seek to rescind the BiOp 27 years after it was issued, on the new assertion that the proposed alternative in the 1993 EA was never implemented and therefore there was never any "agency action." In the Forest Service's letter, it candidly acknowledges the pending litigation against it as a reason for rescission. Defs.' Ex. 1 at 3. The Forest Service did not comply with the ESA's procedural requirements for modifying the biological opinion, 50 C.F.R. § 402.16(a), and therefore has not "deal[t] with the problem afresh" so as to overcome the prohibition on *post hoc* rationales. Nor has the Forest Service shown "good reasons" for its new position that there was no "agency action" within the meaning of Section 7(a)(2) and that the proposed action was never implemented. As a result, Defendants' actions are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, 5 U.S.C. § 706(2)(A), and therefore cannot render this case moot.

B.   The Court Should Deny Defendants' Motion to Dismiss, and Order Them to Produce their Administrative Records.

The Court should deny the motion to dismiss because at this stage of this case there is insufficient or incomplete evidence to determine whether the BiOp was based on "agency action" under Section 7(a)(2), as Guardians alleges in its amended complaint, AC ¶ 77. As noted, to decide a motion under Rule 12(b)(1), the Court "may resolve the factual disputes by 'look[ing] beyond the complaint to matters of public record, without having to convert the motion into one for summary judgment.'" *Friends of the River,* 870 F. Supp. 2d at 972 (quoting *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000)); *Friends of the Wild Swan, Inc. v. U.S. Forest Service*, 910 F. Supp. 1500, 1504 (D. Or. 1995) ("Because the court's power to hear the case is at stake, it is not limited to considering the allegations of the complaint. It may consider *extrinsic evidence*; and if

the evidence is undisputed, it may weigh the evidence and *determine* the facts in order to satisfy itself as to its power to hear the case.") (quotation and citations omitted; emphases original). Generally, the Court is "free to hear evidence regarding jurisdiction and to rule on that issue prior to trial, resolving factual disputes where necessary." *Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983).

Here, Guardians files as exhibits the few agency documents Guardians possesses that illuminate Defendants' actions related to bear baiting in grizzly habitat in national forests in Idaho and Wyoming in 1993 and 1995. Some documents show why agency action under Section 7(a)(2) occurred. Other documents (such as any MOU) are missing. Because Defendants have not answered the amended complaint, or filed their administrative records (which their attorney has written exist), neither Guardians nor the Court possesses a full evidentiary basis for determining whether agency action under Section 7(a)(2) existed in the first place. In this context, the Court should deny the motion to dismiss without prejudice, and require Defendants to file their answer, and produce and file their administrative records. *DOE #1 v. Trump*, 423 F. Supp. 3d 1040, 1046 (D. Or. 2019) (denying federal agencies' motion to dismiss because the court ruled it could not, without their administrative records, determine if "final agency action" under the APA existed); *Friends of the River*, 870 F. Supp. 2d at 976–77 (same).

Conclusion.

The Court should deny Defendants' motion to dismiss without prejudice and order them to produce their administrative records.

Date: August 28, 2020.                    Respectfully submitted,

                                           /s/ Peter M. K. Frost
                                           Peter M. K. Frost, *pro hac vice*
                                           Dana M. Johnson, Idaho Bar #8359