ORAL ARGUMENT SCHEDULED SEPTEMBER 4, 1997

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 96-5298

THE FUND FOR ANIMALS, INC., ET AL.,
Plaintiffs-Appellants,

v.

MICHAEL DOMBECK, CHIEF, UNITED STATES FOREST SERVICE, ET AL.,
Defendants-Appellees.

ON APPEAL FROM THE UNITED STATES
DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

FINAL ANSWERING BRIEF FOR FEDERAL APPELLEES

LOIS J. SCHIFFER
Assistant Attorney General
Environment & Natural
Resources Div.

OF COUNSEL:

KATHRYN KOVACENETTI
Attorney
Office of General Counsel
U.S. Dept. of Agriculture
Washington, DC 20250

MICHAEL T. ROBINSON
ELLEN J. DURKEE
JEFFREY C. DOBBINS
Attorneys
Department of Justice
P.O. Box 23795
Washington, DC 20026
(202) 514-4358

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

1. Parties and amici:  The parties appearing in the proceeding below and in this Court are listed in the opening brief of appellants The Fund for Animals, Inc., et al. Michael Dombeck is the present Chief of the United States Forest Service, and should be substituted for Jack Ward Thomas in the caption of the case pursuant to Fed. R. App. P. 43(c)(1).

2. Rulings Under Review: The opinion of the district court (Honorable Thomas Penfield Jackson) granting summary judgment against appellants is published at 932 F. Supp. 368 (D.D.C. 1996), and reproduced in the Joint Appendix ("JA") at 134-39.  The final decision challenged by appellants—a final policy adopted as a change to the Forest Service Manual—is published at 60 Fed. Reg. 14720 (1995), and reproduced at JA 561-64 (A.R. Doc. 165).

3. Related Cases: Counsel is unaware of any related cases.


JEFFREY C. DOBBINS
Attorney, Appellate Section
Environment & Natural Resources Div.
Department of Justice
P.O. Box 23795, L'Enfant Station
Washington, D.C.  20026
Phone: (202) 514-4358

# TABLE OF CONTENTS

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Glossary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

Statement of Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Issues Presented . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A. Statutory Background. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    B. The Forest Service and the States. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    C. The National Environmental Policy Act. . . . . . . . . . . . . . . . . . . . . . . . . . 6

    D. Bear Baiting and the National Forests. . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    E. Bear Baiting in the Wyoming National Forests . . . . . . . . . . . . . . . . . . . . 10

    F. The Present Litigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Summary of Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    I. NEPA Analysis Was Not Required Where, as Here, The Forest Service
       Merely Reaffirmed The Traditional, Congressionally-mandated Policy
       Leaving Regulation of Hunting Practices to The States . . . . . . . . . . . . . . 20

       A. NEPA and State Management of Hunting Practices. . . . . . . . . . . . . . 20

       B. The Policy is not a "Major Federal Action," and the Case Law Supports
          That Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

       C. The Fund Has Demonstrated No Reason For Treating This Policy As a
          Major Federal Action. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

    II. If NEPA Analysis Was Necessary, The Environmental Assessment
       Conducted by The Forest Service Was Adequate . . . . . . . . . . . . . . . . . . 32

    III. The Forest Service Complied With The ESA . . . . . . . . . . . . . . . . . . . . . 41

       A. The ESA and the Consultation Process. . . . . . . . . . . . . . . . . . . . . . . . 41

       B. The Consultation in this Case. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

       C. The Fund's Objections to the Consultation Process Are Meritless. . . 45

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

Addendum

Certificate of Service & Certificate of Word Count

# TABLE OF AUTHORITIES

<u>CASES</u>

Andrus v. Sierra Club, 442 U.S. 347 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . 7
Baltimore Gas & Electric Co. v. Natural Resources
    Defense Council, Inc., 462 U.S. 87 (1983) . . . . . . . . . . . . . . . . . . . 34
Bennett v. Spear, 117 S. Ct. 1154 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
Boswell Memorial Hospital v. Heckler, 749 F.2d 788 (D.C. Cir. 1984) . . . . . . . . . . . 38
Bunch v. Hodel, 793 F.2d 129 (6th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . 27
Cal-Almond, Inc. v. Department of Agriculture, 67 F.3d 874 (9th Cir. 1995) . . . . . . . 38
Calvert Cliffs Coordinating Committee, Inc. v.
    Atomic Energy Commission, 449 F.2d 1109 (1971) . . . . . . . . . . . . . . . . . . 6
Coalition on Sensible Transportation, Inc. v. Dole, 826 F.2d 60 (D.C. Cir. 1987) . . . . 34
Committee for Automobile Responsibility v. Solomon,
    603 F.2d 992 (D.C. Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36
*Cross-Sound Ferry Services, Inc. v. ICC, 873 F.2d 395 (D.C. Cir. 1989),
    after remand, 934 F.2d 327 (D.C. Cir. 1991) . . . . . . . . . . . . . . . . . . . 28, 29
Crow Tribe of Indians v. Repsis, 73 F.3d 982 (10th Cir. 1995) . . . . . . . . . . . . . . 22
Davidson v. Prudential Insurance Co., 953 F.2d 1093 (8th Cir. 1992) . . . . . . . . . . . 39
*Defenders of Wildlife v. Andrus, 627 F.2d 1238 (D.C. Cir. 1980) . . . . . . . . 22, 24, 30
Environmental Defense Fund v. Massey, 986 F.2d 528 (D.C. Cir. 1993) . . . . . . . . . . . 6
Florida Audubon Society v. Bentsen, 94 F.3d 658 (D.C. Cir. 1996) . . . . . . . . . . . . 33
Fund for Animals v. Babbitt, 89 F.3d 128 (2d Cir. 1996) . . . . . . . . . . . . . . . . . 29
Fund for Animals v. Thomas, 932 F. Supp. 368 (D.D.C. 1996) . . . . . . . . . . 2, 3, 17, 32
Geer v. Connecticut, 161 U.S. 519 (1896) . . . . . . . . . . . . . . . . . . . . . . . . . 21
Goos v. ICC, 911 F.2d 1283 (8th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . 26, 29
Hughes v. Oklahoma, 441 U.S. 322 (1979) . . . . . . . . . . . . . . . . . . . . . . . . 6, 21
James Madison Ltd. v. Ludwig, 82 F.3d 1085 (D.C. Cir. 1996) . . . . . . . . . . . . . . . 45
Molokai Homesteaders Cooperative Association v. Morton,
    506 F.2d 572 (9th Cir. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
National Audubon Society v. Hester, 801 F.2d 405 (D.C. Cir. 1986) . . . . . . . . . . 34, 42
Natural Resource Defense Council v. Herrington,
    768 F.2d 1355 (D.C. Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 33
Natural Resources Defense Council, Inc. v. Berklund,
    609 F.2d 553 (D.C. Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
North Slope Borough v. Andrus, 642 F.2d 589 (D.C. Cir. 1980) . . . . . . . . . . . . . . 41

*Authorities upon which this brief principally relies are marked with an asterisk.

Sabine River Authority v. U.S. Department of Interior,
    951 F.2d 669 (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
Sierra Club v. Babbitt, 65 F.3d 1502 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . 26
Sierra Club v. Penfold, 857 F.2d 1307 (9th Cir. 1988) . . . . . . . . . . . . . . . . . . . 27
Southwest Center for Biological Diversity v. Forest Service,
    100 F.3d 1443 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
*State of Alaska v. Andrus, 591 F.2d 537 (9th Cir. 1980) . . . . . . . . . . 24, 25, 26, 27, 29


FEDERAL STATUTES & REGULATIONS

28 U.S.C. 2401 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45
26 Stat. 1095, 1103 (1892) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
Administrative Procedure Act (APA)
    5 U.S.C. 702-06 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 33
Alaska National Interest Lands Conservation Act
    16 U.S.C. 3111-16 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 21
Endangered Species Act
    16 U.S.C. 1532, et seq. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    16 U.S.C. 1535(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    16 U.S.C. 1536(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
    16 U.S.C. 1540(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
Federal Land Policy and Management Act
    43 U.S.C. 1732(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
Multiple Use and Sustained Yield Act of 1960
    16 U.S.C. 528 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
National Environmental Policy Act
    43 U.S.C. 4332(2)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim
National Forest Management Act of 1976
    16 U.S.C. 1604(e)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
Organic Administration Act of 1897
    30 Stat. 32 (1897) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 3, 4
Sikes Act of 1974
    16 U.S.C. 670k(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
Wild and Scenic Rivers Act
    16 U.S.C. 1284(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
Wilderness Act of 1964
    16 U.S.C. 1133(d)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

36 C.F.R. 251.50 ............................................... 5, 10,11
36 C.F.R. 261.8 ................................................... 31
36 C.F.R. 261.11 ................................................. 11
Regulations Governing NEPA Process, 40 C.F.R. pt. 1500
    40 C.F.R. 1501.3(b) ........................................ 32
    40 C.F.R. 1501.4 ........................................ 7,33
    40 C.F.R. 1508.9 .......................................... 36
    40 C.F.R. 1508.18 ......................................... 30
Regulations Governing ESA Process, 50 C.F.R. pt. 402 ..................... 41
    50 C.F.R. 402.12 ...................................... 41, 42
    50 C.F.R. 402.13 .................................. 20, 42, 44, 45
    50 C.F.R. 402.14 .................................. 20, 41, 45, 46

57 Fed. Reg. 57417 (1992) ......................................... 12
59 Fed. Reg. 11765 (1994) ......................................... 13
59 Fed. Reg. 17758 (1994) ...................................... 14, 31
60 Fed. Reg. 14720 (1995) ................................ 2, 14, 23, 35

Forest Service Manual § 2643.1 (1994) ........................ 5, 10, 22, 41

## STATE STATUTES & REGULATIONS

Alaska Admin. Code tit. 5, §92.085 (1996) .............................. 9
Idaho Code §13.01.17.100 (1996) ..................................... 9
Me. Rev. Stat. tit. 12, § 7451 (1996) ................................. 9
Minn. R. 6232.3200 (1997) .......................................... 9
N.H. Code Admin. R. Ann. Fis. 1102.12, 1102.14 ........................ 9
N.H. Rev. Stat. §207:3-d (1995) ...................................... 9
Utah Admin. Code R657-33-14 ........................................ 9
Wis. Admin. Code §10.07(1)(g) (1997) ................................. 9

# GLOSSARY

APA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Administrative Procedures Act
CEQ . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Council on Environmental Quality
EA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . environmental assessment
EIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . environmental impact statement
ESA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Endangered Species Act
FONSI . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . finding of no significant impact
FSM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Forest Service Manual
FWS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . United States Fish & Wildlife Service
MOU . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Memorandum of Understanding
NEPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . National Environmental Policy Act
SIR . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . supplemental information report

## STATEMENT OF JURISDICTION

The government concurs in appellants' statement of jurisdiction.

## ISSUES PRESENTED

1) Whether the district court properly concluded that the Forest Service was not required to conduct NEPA analysis when the Forest Service decision merely reaffirmed statutory requirements and long-standing federal policy deferring to state regulation of hunting on federal lands.

2) Whether the Forest Service acted in an arbitrary and capricious manner when it concluded that the Policy at issue would not significantly affect the quality of the human environment, thereby satisfying the requirements of NEPA, if any such requirements existed.

3) Whether the Forest Service acted in an arbitrary and capricious manner when it concluded, after informally consulting with the U.S. Fish and Wildlife Service, that the decision at issue was not likely to adversely affect endangered species, thereby satisfying the requirements of the Endangered Species Act.

## STATEMENT OF THE CASE

One century ago, Congress enacted the first statute providing for federal management of the National Forests. See Organic Administration Act of 1897, 30 Stat. 32, 34-36 (1897). In that Act, Congress explicitly affirmed that states retained their traditional police powers over the activities of individuals within those forests. See id., at

-1-

36 (codified at 16 U.S.C. §480). Since that time, even as Congress has expanded the purposes for which the National Forests are to be managed, it has consistently reaffirmed that states, not the federal government, are primarily responsible for the regulation of hunting and fishing on those lands. The Policy at issue in this case—an amendment to the Forest Service Manual—merely reaffirmed the Forest Service's existing commitment to this long-standing policy, and made clear that it applied to the hunting of animals over bait. See 60 Fed. Reg. 14720 (1995). The Policy also provided a process pursuant to which the Forest Service could act to protect federal interests if the state regulation of hunting on National Forests failed to protect those interests.

Dissatisfied with the Forest Service's reaffirmation of the states' primary responsibility over hunting, and specifically with regard to the baiting of wildlife, The Fund for Animals, along with several other organizations and two individuals (collectively, the "Fund" or "Plaintiffs"), filed this suit against the Forest Service in the United States District Court for the District of Columbia. They alleged that the Forest Service had violated the Administrative Procedure Act ("APA"), 5 U.S.C. 702-06, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. 4321 *et seq.*,[1] by failing to conduct an adequate environmental analysis before issuing the Policy. They also alleged that the Forest Service violated the Endangered Species Act ("ESA"), 16 U.S.C. 1532, *et*

---

[1] Pertinent statutes and regulations are reproduced in the addendum to this brief.

-2-

*seq.*, by failing to formally consult with the Fish and Wildlife Service regarding the effect that the Policy might have on endangered species. The State of Wyoming intervened on the side of the United States.

On cross-motions for summary judgment, the district court ruled in favor of the United States and Wyoming. Fund for Animals v. Thomas, 932 F. Supp. 368 (D.D.C. 1996). After reviewing the arguments presented by each side, the court concluded that the defendants "have the better of the argument," and implicitly adopted the Forest Service's argument that its Policy did not amount to "major federal action." Id., at 371. The court also appeared to reject the plaintiffs' arguments that the Forest Service had failed to comply with the ESA. This appeal followed.

## STATEMENT OF FACTS

A. Statutory Background.— Although Congress first authorized the President to reserve forest land for federal purposes in 1892, 26 Stat. 1095, 1103 (1892), it was not until 1897 that Congress established goals and committed federal resources to the active management of those forests. 30 Stat. 32, 34-36 (1897). The forests were to be established to "improve and protect the forest within the reservation," "secur[e] favorable conditions of water flows," and "furnish a continuous supply of timber" for the United States. Id., at 35. Congress clearly signaled, however, that this federal management was not intended to strip states of their traditional police powers over their citizens, and affirmed that the State retained its civil and criminal jurisdiction over persons within

-3-

national forests.  See 30 Stat., at 36 (codified as amended at 16 U.S.C. 480).  From its

earliest days, that jurisdiction has been understood to include state authority over hunting

and fishing practices on the National Forests.

Even as Congress expanded the Forest Service's mission to include the

administration of the National Forests for "wildlife and fish purposes" under the Multiple

Use and Sustained Yield Act of 1960, 16 U.S.C. 528, it reiterated that nothing in the act

"shall be construed as affecting the jurisdiction or responsibilities of the several States

with respect to wildlife and fish on the national forests."  Id.  The National Forest

Management Act of 1976 explicitly incorporated the 1960 Act.  16 U.S.C. 1604(e)(1).

And the Federal Land Policy and Management Act of 1976 emphasized that "nothing in

this Act shall be construed as authorizing the Secretary concerned to require Federal

permits to hunt and fish on * * * lands in the National Forest System and adjacent waters

or as enlarging or diminishing the responsibility and authority of the States for

management of fish and resident wildlife." 43 U.S.C. 1732(b).  Similar provisions in

other more specialized statutes further emphasize Congress' commitment to state

management of hunting practices on federal lands.  See Wilderness Act of 1964, 16

U.S.C. 1133(d)(7); Sikes Act of 1974, 16 U.S.C. 670k(g); Wild and Scenic Rivers Act, 16

U.S.C. 1284(a).  Although Congress has explicitly legislated to the contrary in certain

limited instances, see, e.g., Endangered Species Act of 1973, 16 U.S.C. 1535(f); Alaska

National Interest Lands Conservation Act, 16 U.S.C. 3111-16, such legislation highlights

the general rule that states retain traditional control over hunting practices even on federal lands.

    B.  The Forest Service and the States. — In its management of the National Forests, the Forest Service explicitly recognizes this traditional state authority over hunting practices.  While Forest Service regulations generally require "special use permits" for activities other than the disposal of timber, mining, or grazing (which are managed by other regulations), 36 C.F.R. 251.50(a), the regulations also provide that no permits are required for "the noncommercial use or occupancy of National Forest System Lands or facilities for camping, picnicking, hiking, fishing, *hunting*, horse riding, boating, or similar recreational activity." Id., at 251.50(c) (emphasis added).  Furthermore, the Forest Service Manual, which sets forth for local resource managers even more detailed policies governing the administration of the forests, has long provided that, as long as they are "not in conflict with federal" law, "State Fish & Wildlife laws and regulations apply on National Forest System lands." Forest Service Manual 2643.1 (JA 119);[2/] see also id., at 2610.3 (JA 117) (recognizing "role of States to manage wildlife and fish populations within their jurisdictions").

_____

[2/]The Administrative Record includes three volumes of documents and four volumes of comments, as well as a supplemental information report and administrative decision issued while the case was pending in the district court.  Documents in the Administrative Record are denoted "A.R. Doc. __."  If the document is reprinted in whole or part in the deferred joint appendix, the citation also includes a reference to the same, as "JA __."

Of course, federal law preempts clearly conflicting state law, even in the area of wildlife management. See, e.g., Hughes v. Oklahoma, 441 U.S. 322, 325-336 (1979). In an effort to minimize those conflicts, managers of the National Forests in each state have executed Memorandums of Understanding with their state counterparts. See A.R. Docs. 167-183 (MOUs for states that permit the hunting of bear over bait). In these agreements, the Forest Service recognizes the states as "responsible for establishing the regulations under which populations of wildlife and fish will be managed," while the state recognizes the Forest Service as responsible for managing the habitat for that wildlife. See, e.g., A.R. Doc. 182, at 1, 2 (JA 566, 567) (MOU with State of Wyoming). The MOUs establish a process pursuant to which the state and Forest Service consult with each other about changes that could affect the other's jurisdiction within the National Forests. Throughout the early documents in the administrative record, this process can be seen at work, as the National Forest managers worked with state officials to ensure that baiting of animals in the forests would not interfere with federal management priorities. See, e.g., A.R. Docs. 6, 7, 8 (JA 141-166).

C. The National Environmental Policy Act. — In 1969, Congress enacted NEPA to establish a consistent process through which federal agencies should consider the consequences of their actions upon the environment. See generally Environmental Defense Fund v. Massey, 986 F.2d 528, 532 (D.C. Cir. 1993); Calvert Cliffs' Coordinating Committee, Inc. v. Atomic Energy Commission, 449 F.2d 1109 (1971).

NEPA requires federal agencies to prepare a detailed "environmental impact statement" ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 43 U.S.C. 4332(2)(C). Under the NEPA regulations promulgated by the Council on Environmental Quality ("CEQ") and applicable to all federal agencies, see Andrus v. Sierra Club, 442 U.S. 347, 358 (1979), however, an agency need not conduct a comprehensive EIS if a preliminary examination of the proposed decision, called an "environmental assessment" ("EA"), reveals that the proposed action would not have a significant effect on the environment. 40 C.F.R. 1501.4 (describing process); id., at 1508.9 (defining EA). If that is the case, the agency can issue a "FONSI," or "finding of no significant impact." Id., at 1508.13 (defining FONSI). See generally Natural Resource Defense Council v. Herrington, 768 F.2d 1355, 1430 (D.C. Cir. 1985).

D. Bear Baiting and the National Forests. — A primary issue in this case is the degree to which the Forest Service complied with the requirements of NEPA while issuing a national Policy addressing a hunting practice known as "baiting." "Baiting," when used in reference to the hunting for wildlife, means placing some form of attractant—generally items such as food, salt, or manufactured scents—in a particular location in an effort to attract the wildlife to the hunter, rather than to have the hunter travel through the environment searching for the wildlife.

Although the decision that the Fund is challenging addressed the baiting of all wildlife in National Forests throughout the nation, this particular controversy arose out of

the hunting of black bears over bait in National Forests in Wyoming.  In unregulated bear baiting, hunters might place bait—traditionally either human foods, or portions or even entire carcasses from game or farm animals—at a fixed location, and wait for bears to arrive.  The views of those who oppose hunting over bait are ably represented by the appellants' brief.  Fund Br. 8-12.  Proponents argue that baiting, in addition to minimizing the effort necessary to kill big game, provides hunters with a better opportunity to see the animal that they are hunting, to identify its species, age, and whether it has cubs, and gives hunters a cleaner shot at the animal than would be true if they were searching, rather than waiting, for it.

The environmental, recreational, and ethical disputes over baiting for animals have in recent years drawn increased attention from users of public lands throughout the nation.  That attention has demonstrated the degree to which the regulation of this practice has been a uniquely state-managed affair.  Many states have recently reviewed their regulation of bear baiting and either enacted regulations or revised existing ones.  See, e.g., A.R. Docs. 6, 8 (JA 141-42; 144-66) (regarding the revision and adoption of baiting regulations in Idaho, Utah, and Wyoming).  Furthermore, in the last five years, voters in four states have approved initiatives that have halted bear baiting altogether.  (Colorado in 1992, Oregon in 1994, and Washington and Massachusetts in 1996 (although there are no national forests in Massachusetts)).  In 1996, Oregon voters rejected an effort to repeal the state ban on bear baiting.  The trend is not wholly against

-8-

baiting; in 1996, voters in both Idaho and Michigan rejected initiatives that would have banned baiting in their states. As of today, this method for attracting bears is permitted by nine of the fifty states. (Alaska, Idaho, Maine, Michigan, Minnesota, New Hampshire, Utah, Wisconsin, and Wyoming).

In each of those states, the agency responsible for managing hunting and fishing has established regulations (occasionally the legislature has also enacted statutes) imposing conditions upon the practice of bear baiting. See, e.g., JA525 (Wyoming code, reprinted in addendum at 26); Alaska Admin. Code tit. 5, §92.085 (1996); Idaho Code §13.01.17.100 (1996); Me. Rev. Stat. tit. 12, § 7451 (1996); Minn. R. 6232.3200 (1997); N.H. Rev. Stat. §207:3-d (1995); Utah Admin. Code R657-33-14 to -16 (1996); Wis. Admin. Code §10.07(1)(g) (1997).[2/] Although the regulations vary from state to state, they typically govern the type and amount of bait that can be used, when and where it can be placed, how it should be marked, and the construction of structures such as blinds. For example, the Wyoming regulations limit the general location, time of year, and time of day during which animals can be taken over bait, limit the number of bait stations in a particular area, require that bait stations be clearly identified with the hunter's name,

---

[2/]Counsel has been unable to locate the text of regulations governing baiting in Michigan; although they are known to exist, they are not available on-line. New Hampshire has administrative regulations governing baiting in addition to the statute. See N.H. Code Admin. R. Ann. Fis. 1102.12, 1102.14. The statutes and regulations cited in the text are reproduced in the addendum to this brief.

require that stations be located more than 200 yards from water sources and established roads and trails, limit the type of bait that can be used, the amount that can be used (to 200 pounds), and require it to be enclosed in a container on the site. They also establish other rules designed to protect grizzly habitat. See JA 526, 528. Although these regulations, if followed, would prevent the conflicts between hiking and hunting that the Fund describes in its brief, Fund Br. 8-12, the Fund fails even to mention their existence.

The Fund's description of bear baiting practices represents one side of the debate over the ethics of bear baiting and its effect on bear populations and the environment generally that has been ever more noticeable in recent years. In the midst of this debate, the Forest Service has adhered to the federal government's long-standing position that disputes like this are matters for state regulation. Consequently, the Forest Service has long concluded that it will step in only when baiting threatened to conflict with federal interests, and has generally left this determination to local managers. With the exception of bear baiting, managers within the National Forest system have always considered the hunting of animals over bait to be a hunting practice that did not require a special use permit as an exception under 36 C.F.R. 251.50(c).

E. <u>Bear Baiting in the Wyoming National Forests</u>. — Given the traditional role of the States in regulating hunting and hunting methods, the Forest Service's specific policy of deference to state hunting regulations, FSM § 2643.1 (JA 119), and the explicit exclusion of hunting from the requirement of special use authorizations, 36 C.F.R.

-10-

§ 251.50(c), National Forests have generally not required permits for baiting within their boundaries. There has, however, been one exception: a few National Forests in Idaho, Utah, and Wyoming (as well as one forest in Oregon) required special use authorizations for the placement of "bear bait" at various times throughout the last few decades. See A.R. Doc. 110 (JA 392-93). This permit requirement was viewed by local managers primarily as an effort to control litter and debris, which are explicitly prohibited by federal regulation, see 36 C.F.R. 261.11, and not viewed as a way of superseding the State's regulation of hunting. See generally JA 163, 396. By the end of 1992, however, the issuance of special use authorizations to control the placement of bear bait had ended in all National Forests. A.R. Doc. 110 (JA 392-93) (also noting single exception in Utah in 1993); see also Supplemental Information Report (prepared during period of remand and lodged with the Court on March 8, 1996) (JA 69-71).

In part because of the complete absence of baiting regulations in Wyoming prior to the 1992-93 hunting season, special use permits were relied upon more heavily there than in most other states. See generally A.R. Doc. 44, at 2 (JA 263); A.R. Doc. 13 (JA 168-88) (special use permits for Wyoming forests); A.R. Doc. 19 (JA 230-43) (Wyoming regulations in early 1992, including no regulation of baiting). In March 1992, however, the Forest Service issued a closure order that prohibited bear baiting in Wyoming's National Forests "unless baiting was in compliance with the requirements of the order pertaining to placement and disposal of baits." AR Doc. 161 at 1 (JA 552); A.R. Doc. 14

-11-

(closure order) (JA 189-92). Plaintiff Fund For Animals sued, claiming that the Forest Service should have prepared an EIS or an EA on its decision to utilize closure orders rather than special use permits. A.R. Doc. 17 (JA 193). Subsequently, the parties settled the case upon the Forest Service's agreement to rescind the closure order and reinstate the procedure of issuing special use authorizations in Wyoming. See A.R. Docs. 24, 25, 26 (discussing and implementing settlement); JA 247 (rescinding closure order). The Forest Service also agreed to prepare an EA and consider public comment before making a decision on any procedural changes regarding the use of bear baiting on National Forest lands. See 57 Fed. Reg. 57417 (1992) (announcing intent to prepare EA) (JA 250).

The Forest Service then completed an EA proposing to eliminate the use of special use permits in Wyoming and regulate bear baiting through an MOU with the Wyoming Game and Fish Commission. This MOU, among other things, prohibited and/or greatly restricted the practice of bear baiting in areas occupied by grizzly bears. JA 277-78, 292-94. The Forest Service released the draft EA for public comment. JA 259-87.

The Forest Service also initiated formal consultation with the U.S. Fish and Wildlife Service given the possibility that the policy would adversely affect grizzly bears. A.R. Doc. 46 (JA 291-319); A.R. Doc. 48 (JA 324-25). (A more complete description of the steps taken by the Forest Service to comply with the ESA is provided in Part III of the Argument, infra.) In its biological opinion, the FWS concluded that the possibility that a grizzly bear may be taken as a result of bear baiting was "remote," but nonetheless

-12-

imposed some additional restrictions on the Forest Service's proposed Wyoming baiting policy. A.R. Doc. 51 at 7 (JA 338). The Forest Service released its decision notice containing the baiting policy for Wyoming in April, 1993. A.R. Doc. 48 (JA 321-31).

The new policy did not settle ongoing disputes. In light of the continuing controversy over baiting policy, and in response to letters from the Fund challenging the Wyoming policy, A.R. Doc. 62 (JA 347-52), the Forest Service concluded that it would be necessary to develop a consistent national policy on the hunting of wildlife over bait in all the National Forests. The Forest Service therefore rescinded the Wyoming policy and announced that it would solicit public review and comment on a national baiting policy. JA 353-54, 361. In the interim, the Forest Service prohibited the use of bear baits on the Wyoming National Forests. Ibid.

Almost a year later, on March 4, 1994, the Forest Service adopted an interim baiting policy and solicited public comment on a permanent national baiting policy. JA 356-58; 59 Fed. Reg. 11765 (1994) (JA 360-63). The interim policy permitted the practice of baiting without special use authorizations when consistent with state hunting regulations but retained authority for the Forest Service to close areas when necessary to protect resources and/or to comply with federal environmental laws. JA 361-62. Two weeks later, Plaintiff Fund for Animals filed another lawsuit challenging, among other things, the absence of a public comment period prior to the implementation of the interim policy.

-13-

To resolve that litigation peaceably the Forest Service agreed to rescind the "interim policy" and reinstate the prohibition on baiting in Wyoming pending the final adoption of a national baiting policy. JA 391; 59 Fed. Reg. 17758 (1994) (JA 395-98). The Forest Service also agreed to continue (as it was already in the process of doing) to solicit public comment on a proposed final policy. See 59 Fed. Reg. at 17758 (JA 395). Before reaching its decision on the final policy, the Forest Service considered over 1,200 public comments and, in response to those comments, made some modifications to the proposed national baiting policy. 60 Fed. Reg. 14720 (1995) (JA 561); JA 488-516. The Forest Service then prepared an comprehensive Environmental Assessment assessing the impact of the Policy on the environment. See A.R. Doc. 160 (JA 471-551).

Recognizing that the policy would have a minimal impact on the environment given that it amounted (with the exception of Wyoming) to little more than a clarification of existing policy, the Forest Service concluded that the Policy would have no significant impact on the human environment, and issued a decision notice to that effect. A.R. Doc. 161 (JA 555-56). The Forest Service also solicited and received from the FWS statements concurring in the Service's conclusion that the new policy was unlikely to affect listed species under the ESA. See A.R. Doc. 160 (Appendix B) (JA 518-23).

On March 20, 1995, following notice and comment, the Forest Service amended its Manual to include a national policy with respect to the use of bait in the hunting of all resident game. 60 Fed. Reg. 14720 (1995) (JA 561-64). The Policy first reiterated long-

-14-

understood principles regarding the management of hunting practices on federal lands,

stating in pertinent part:

> Hunting, fishing and trapping of fish and wildlife and
> associated practices on National Forest System lands are
> subject to State fish and wildlife laws unless one or both of
> the following apply:
>
> 1) State fish and wildlife laws and regulations conflict with
> Federal laws; or
>
> 2) State laws and activities would permit activities that
> conflict with land and resource management responsibilities
> of the Forest Service or that are inconsistent with direction in
> forest plans.

Id., at 14723 (JA 564). The Policy then clarified the uncertainties of many years by
explicitly providing that

> The use of bait for the purpose of taking resident game
> on National Forest System lands is a hunting practice.
>
> The practice is prohibited * * * where State hunting
> regulations prohibit its use. Where States permit the use of
> bait for attracting resident game, this activity is allowed on
> National forest System lands, subject to State hunting laws
> and regulation, unless the authorized officer determines on a
> site-specific basis that there is a need to prohibit or restrict the
> practice.

Ibid. Finally, the Policy established a uniform procedure to be used throughout the nation

in the event that state control over baiting and other hunting practices failed to protect

forest resources, users, and other federal interests. The Policy first requires an authorized

Forest Service officer to "continually monitor State hunting regulations with regard to the

-15-

use of bait." Ibid.  The Policy then establishes the following procedure to be followed

where the authorized officer determines that baiting must be restricted or prohibited:

>    a. The officer shall immediately inform the State fish and
>    wildlife agency of the determination; and

>    b. If after consultation and coordination, the State is unable to
>    resolve the matter with the Forest Service, the authorized
>    officer shall close the area to baiting or otherwise restrict
>    baiting by issuing an order [closure order] pursuant to Part
>    261 of Title 36 of the Code of Federal Regulations (36 C.F.R.
>    Part 261).

F.  The Present Litigation. — Shortly after the national Policy was issued, the

Fund and several other plaintiffs sued for a third time in the United States District Court

for the District of Columbia.  Their complaint alleged violations of the APA, NEPA, and

the ESA.  JA 13.  The district court granted the State of Wyoming's motion to intervene

as a party on the side of the federal government in late 1995.  JA 6.  The court also

allowed the Wildlife Conservation Fund of America to participate as amicus curiae on the

side of the United States and Wyoming.  JA 8.

After the Administrative Record was filed, the plaintiffs moved for summary

judgment.  While that motion was pending, the United States filed a motion with the

district court seeking a "voluntary remand to March 14, 1996" so that the agency could

conduct a supplemental review of its March, 1995, decision in light of information that

had come to light during litigation.  JA 56-58.  The Fund objected.  On May 9, 1996,

before the district court ruled on the motion, the United States lodged with the court a

-16-

"Supplemental Information Report" and "Administrative Decision" that corrected certain factual misstatements in the March, 1995, final decision and the accompanying environmental assessment. JA 63-71. On May 12, the District Court granted the United States' motion for a voluntary remand, thereby permitting the additional material to be included in the administrative record. JA 115-16. The United States then moved for summary judgment.

On August 8, 1996, the district court denied the Fund's motion for summary judgment and granted the United States' motion for summary judgment. After reviewing the history of state regulation over hunting practices on federal lands as well as the arguments set forth by each side, the court concluded that "[o]n balance the Court finds defendants to have the better of the argument." 932 F. Supp. 368, 370 (D.C. Cir. 1996) (JA 138). If the Fund wants to halt hunting in the National Forests, the court concluded, it should take its arguments to another forum—specifically, Congress. Until Congress signals its intent to have the Forest Service control hunting practices on National Forest lands, the court believed, it was well within the Forest Service's discretion to refuse to take control over such practices. 932 F. Supp. at 370-71 (JA 138-39).

This appeal followed.

## SUMMARY OF ARGUMENT

When the Forest Service issued the national Policy in 1995, only Wyoming hunters were in any way limited by federal authority from hunting for wildlife over bait in

-17-

the National Forests.  In every other state, any prior Forest Service reliance on special use permits had been abandoned.  And even in Wyoming, the ban that was in effect was explicitly adopted as a temporary measure pending the promulgation of the national Policy.

After reviewing all the evidence—the comments of concerned individuals, the baiting regulations that had been enacted in most states, and the range of possible ways in which federal interests could be protected—the Forest Service concluded that duplicate federal regulation of baiting was not only unnecessary given the regulatory system that the states had in place, but it contradicted the very principle of state control over hunting practice that Congress and the courts had emphasized for so long.  If the ability of local managers to protect federal interests could be clarified and standardized, the Forest Service concluded, both federal and state interests could be protected while ensuring that there was essentially no effect on the environment.

NEPA requires an environmental impact statement only when a "major federal action" will "significantly affect the quality of the human environment."  43 U.S.C. 4332(2)(C).  In this case, the Forest Service's decision was not a "major federal action," and even if it was, the Service properly concluded that it would not "significantly affect the quality of the human environment."  The Forest Service decision at issue in this case is not a "major federal action" because the Policy merely reaffirms that long-standing, Congressionally-mandated policy regarding the authority of states over hunting practices

-18-

in national forests. That is not the sort of "major federal action" for which NEPA requires environmental review. Unless federal interests have been threatened, federal participation in the management of hunting has traditionally been limited to an advisory role. The decision explicitly to include the baiting of animals within that tradition is not a decision implicating the sort of active federal participation that is necessary to trigger NEPA review. As a result, the district court properly concluded that the Forest Service was not required to conduct NEPA review at all.

Even if some environmental review was necessary under NEPA, the environmental assessment completed by the Forest Service met that obligation. The only issue under evaluation in that EA was whether state, as opposed to federal, management of hunting over bait would "substantially affect the quality of the human environment." The Forest Service reasonably concluded that it would not. State regulations governing bear baiting are nearly identical to (and in some cases even stricter than) the conditions that some federal managers had placed upon bear baiting in National Forests. If anything, the national policy provided environmental benefits by establishing, for the first time, a uniform national policy obligating forest managers to take steps to prevent baiting if state regulations failed adequately to protect federal interests. Under these circumstances, the EA produced by the Forest Service was sufficient under NEPA. Neither the temporary ban on baiting in Wyoming forests nor the remand for additional information merit a contrary conclusion.

-19-

Finally, the Forest Service complied with the Endangered Species Act when it issued the national policy at issue here. The United States Fish and Wildlife Service had already engaged in formal consultation with the Forest Service regarding the Wyoming policy when the Forest Service decided to move forward with a national policy. The FWS concluded that the Wyoming policy could move forward. Regarding the national Policy, the Forest Service concluded that the policy was "not likely to adversely affect" listed species given the limited effect that it would have on management decisions outside of Wyoming. The USFWS concurred in the decision, and this informal consultation was sufficient under FWS regulations. See 50 C.F.R. 402.13(a), 402.14(b).

## ARGUMENT

### I
### NEPA ANALYSIS WAS NOT REQUIRED WHERE, AS HERE, THE FOREST SERVICE MERELY REAFFIRMED THE TRADITIONAL, CONGRESSIONALLY-MANDATED POLICY LEAVING REGULATION OF HUNTING PRACTICES TO THE STATES

A. NEPA and State Management of Hunting Practices. — The National Environmental Policy Act provides that federal agencies must prepare a comprehensive environmental impact statement only for "major federal actions." 43 U.S.C. 4332(2)(C). The only "action" in this case was the Forest Service's decision to leave to the states, rather than the federal government, the regulation of hunting practices on National Forest lands. That decision merely reaffirmed the Forest Service's commitment to the long-established policy, mandated by Congress, that allows states to exercise their traditional

-20-

police powers over the wildlife on National Forests and the hunting of that wildlife. Under these circumstances, case law and common sense demonstrate that there is no federal "action" at issue—let alone a "major" federal action.

The Forest Service's national policy can only be examined in light of Congress' clearly expressed intent that states, not federal agencies, be primarily responsible for the management of hunting practices within their borders. As more fully described in the statement of facts, see supra at 3-5, Congress has from the creation of the National Forests left the management of wildlife and the taking of that wildlife in state hands. When Congress intends federal control to supersede that of the states, it makes its intentions explicit. See, e.g., Alaska National Interest Lands Conservation Act, 16 U.S.C. 3111-16.

The federal courts have also recognized this state authority, recognizing that it flows not only from Congress's clear statements, but from common law understandings about the relationship between a sovereign and the natural resources within its borders. In Geer v. Connecticut, 161 U.S. 519 (1896), the Supreme Court reviewed the long history of state control over wildlife, and emphasized that the states have long been understood to retain control over the hunting and taking of wildlife. Id., at 522, 523, 528. Although the Court has since rejected Geer's ultimate conclusion—that state authority over wildlife created a continuing property interest that permitted the state to control the export of wildlife to other states, see Hughes v. Oklahoma, 441 U.S. 322, 325-336 (1979)

-21-

(overruling <u>Geer</u>)—the federal courts have continued to emphasize the understanding that it is the states that retain control over hunting practices. See, e.g., <u>Crow Tribe of Indians v. Repsis</u>, 73 F.3d 982, 990 (10th Cir. 1995); <u>Defenders of Wildlife v. Andrus</u>, 627 F.2d 1238, 1248 (D.C. Cir. 1980).

The Forest Service has also consistently recognized this understanding. Long before this bear baiting dispute arose, the section of the Forest Service Manual amended by the Policy at issue here provided that "State fish and wildlife laws and regulations apply on National Forest System lands when not in conflict with federal laws." FSM 2643.1 (JA 119).

In general, Forest Service policy throughout individual forests complied fully with this understanding. Indeed, it appears that the only baiting practice subject to federal oversight was bear baiting. Even then, the Forest Service regulation was founded not on a belief that bear baiting was something other than a hunting practice, but on concerns about the collateral effects—such as litter—that unregulated baiting could have on National Forests. This perspective regarding bear baiting is clearly seen in the role that regional Forest Service managers took in the early 1990s when addressing state hunting commissions that were in the process of reviewing state practices regarding bear baiting. See, e.g., A.R. Docs. 6, 8, 9 (JA 141-66). The efforts by the Forest Service to persuade rather than coerce demonstrate a clear understanding regarding the appropriate role for federal agencies in the management of hunting practices.

-22-

B. The Policy is not a "Major Federal Action," and the Case Law Supports That Conclusion. — The Policy at issue here is simply one of the latest steps in this long line of federal policies deferring to state regulation of hunting on federal lands. The Policy merely clarifies the Forest Service's understanding that baiting is a "hunting practice subject to State regulation." 60 Fed. Reg. at 14723 (amendment to Forest Service Manual formalized at §2643.12) (JA 564). At the same time that the Policy clarifies the federal/state relationship regarding baiting, its closure provisions consolidate into one national approach the variety of methods used by Forest Service officers to address federal concerns that can result from hunting over bait.

The district court properly concluded that the Policy is not a "major federal action" requiring NEPA review. The focus of the policy is not intended to affect how baiting is regulated in practice, but rather to clarify *who* is primarily responsible for that regulation. The district court properly concluded that this Policy did not amount to a "major federal action" because there was no reason to expect that such a clarification had any likelihood of affecting the environment. The only environmental effects that might occur would flow from state, not federal action, and as a result, the decision was not subject to NEPA review.

This decision is clearly supported by the case law. Among the most relevant decisions are two from 1980, including one by this Court, that addressed the State of Alaska's plan to conduct a hunt for wolves from airplanes over federal lands. See

-23-

Defenders of Wildlife v. Andrus, 627 F.2d 1238 (D.C. Cir. 1980); State of Alaska v. Andrus, 591 F.2d 537 (9th Cir. 1980). Several environmental organizations alleged that the Secretary of the Interior had the authority to stop the hunt, that his failure to use that authority amounted to a "major federal action" requiring NEPA review, and that the NEPA review had not been conducted. Both this Court and the Ninth Circuit disagreed. (The decision was addressed in both circuits because Alaska, which was not a party to the D.C. litigation, sought declaratory relief in the U.S. District Court for the District of Alaska.)

In the appeal from the decision from the District Court for the District of Columbia, this Court concluded that the Secretary's decision to defer to Alaska's traditional control over wildlife did not require NEPA review. Defenders of Wildlife v. Andrus, 627 F.2d 1238 (D.C. Cir. 1980). The real environmental effects were the result of state action, the Court noted. Drawing on the law of criminal conspiracy, this Court held that the action of a third party could be imputed to a federal agency for NEPA purposes only if the federal agency committed at least some "'overt act' in furtherance of that other party's project." Id., at 1244. Where, as there, the Secretary was "wholly passive" with respect to the state action, id., at 1245, and where no "overt act" had been taken, there was no "major federal action."

The Fund argues that because the Forest Service was not "wholly passive" in this case and because it "overtly acted" to abdicate control over baiting, the Policy must be a

-24-

major federal action requiring NEPA review. The Fund both reads too much and too little into this Court's decision in Andrus. First, nothing in the decision states that an agency is subject to NEPA review just because it was not "wholly passive." Second, nothing in the decision states that NEPA review should automatically occur merely because an agency has taken some "overt act." To trigger NEPA review, the act must be "in furtherance of the other party's project." The decision to reaffirm traditional state control over hunting does not lead directly to environmental harm, and does not in any way "further" the regulatory decisions of states which may have environmental effects.

The Ninth Circuit's decision in Andrus further supports our position. Because the "decision" of the Secretary to defer to the state activity was not an action that involved federal funding or otherwise required federal participation, the court noted, it was not a "major federal action." 591 F.2d at 541-42. Unless the federal action somehow amounts to a "'go ahead' signal" encouraging the action that may lead to environmental harm, the court concluded, it is not a "major federal action" under NEPA. Id. at 540. In those circumstances—and in the case of the wolf hunt—the decision was at most "marginally federal." Id. at 541.

Just as the federal government gave no "go-ahead signal" to the state in the Andrus cases, it has given no signal encouraging baiting in these cases. Indeed, as the Fund points out, some Forest Service officials have encouraged states to eliminate baiting altogether. See Fund Br. 11. The Fund suggests that because the federal action is itself

-25-

an "overt act," it is subject to NEPA review.  But the statement clarifying that the baiting

of bears is subject to state and not federal control does not lead to or even threaten a

substantive change in the policies that might "significantly affect the quality of the human

environment."  Any future "on-the-ground" effects of the policy flow not from a "signal"

given to the states by the federal government, but from the states themselves.  The states

may or may not choose to permit hunting over bait within their borders; the decision is

wholly their own.  See Goos v. ICC, 911 F.2d 1283, 1294-96 (8th Cir. 1990) (when

determining whether agency decision was "major federal action," courts should consider

agency's "legal and factual control" over the practice that could have an effect on the

environment).[4]

Furthermore, as should be clear from the Andrus cases, the mere fact of ongoing

federal oversight over state regulation of hunting does not amount to "major federal

action."  To paraphrase a Ninth Circuit decision from the early years of NEPA, "the

---

[4]Some insight into the applicability of NEPA to the Forest Service's decision here can
also be found in the cases ruling that NEPA does not apply when the agency's decision is
constrained by law.  See generally Goos v. ICC, 911 F.2d 1283, 1295-96 (8th Cir.1990);
see also Natural Resources Defense Council, Inc. v. Berklund, 609 F.2d 553, 558 (D.C.
Cir. 1979); Sierra Club v. Babbitt, 65 F.3d 1502, 1512 (9th Cir. 1995).  Because the
Forest Service retains some discretion over the precise manner in which it chooses to
address federal concerns within the context of state management, these cases do not apply
directly.  Nonetheless, the cases properly recognize that to the extent that the Forest
Service's decision to leave management to the states was constrained by Congressional
directives, it makes little sense to require environmental analysis under NEPA.  See A.R.
Doc. 160, at 6 (JA 478) (environmental analysis "limited by" principle of state control
over hunting practices).

continuing right of the Secretary to inject himself into the affairs of the [State]" in order to ensure the protection of federal interests "cannot realistically be classified as 'Federal action,' let alone 'major' federal action." Molokai Homesteaders Coop. Ass'n v. Morton, 506 F.2d 572, 580 (9th Cir. 1974); see also Sierra Club v. Penfold, 857 F.2d 1307, 1313-15 (9th Cir. 1988) (federal oversight and substantive review of mining activity did not constitute "major federal action" absent ongoing control over mining).

Other decisions conform to the principle that federal inaction gives rise to NEPA obligations only where the federal agency has control over, significant participation in, or a duty to act regarding, the action that may affect the environment. In Bunch v. Hodel, 793 F.2d 129 (6th Cir. 1989), for instance, the court concluded that federal inaction (there, failing to oppose a state action drawing down water levels in a lake) required NEPA review, but only because both the underlying lease agreement and the history of federal management indicated that federal control over the lake's water level had been "exclusive and uninterrupted." Distinguishing the Andrus decisions, the court noted that in those cases the State of Alaska—not the federal government—"had the responsibility and authority to manage resident game species." See id., at 135. Similarly, in this case it is the states that have the responsibility for wildlife management, and there is no history of "exclusive and uninterrupted" federal control. Absent a connection linking federal behavior and environmental effects, there is no "federal action" as defined by NEPA.

-27-

C. The Fund Has Demonstrated No Reason For Treating This Policy As a Major

Federal Action. — The Fund suggests several reasons why the Anders decisions are not

controlling here. None of the supposed distinctions have merit.

First, the Fund points out that the Forest Service decision effects a change by

lifting a temporary ban on the baiting of bears on National Forests in Wyoming. As

described in the statement of facts, however, see supra at 13, that ban was implemented

only in Wyoming, and only as a temporary measure pending the Forest Service's

development of a consistent national policy regarding baiting. The temporary

policy—which severely limited Wyoming's ability to manage hunting practices while

every other state in the nation continued to enjoy ongoing authority over identical

practices within its borders—certainly cannot be considered the baseline for determining

whether the Forest Service decision was "major."

In a related situation, this Court has implicitly recognized that an agency decision

to abdicate responsibility over a third party is not necessarily major federal action merely

because the agency had previously asserted jurisdiction over the actions of that party. In

Cross-Sound Ferry Services, Inc. v. ICC, the Court considered whether the ICC's

decision to abandon jurisdiction over a passenger ship plying the Long Island Sound was

a "major federal action" for purposes of NEPA. Before the ICC made that decision, it

had apparently exercised jurisdiction over the ship in question, issuing it temporary

authority to serve certain cross-sound routes in 1987 and 1988. See 873 F.2d 395, 396

-28-

(D.C. Cir. 1989). In mid-1988, however, the agency concluded that the ship was in fact exempt from ICC jurisdiction. A competitor sued, and this Court remanded for further proceedings. See id.. After remand, this Court relied on its decision in Andrus to conclude that the ICC's decision refusing to take jurisdiction over the ship was not a "major federal action" requiring NEPA review. 934 F.2d 327, 334 (D.C. Cir. 1991). Although the agency decision abandoned previously asserted jurisdiction, the court concluded that the decision fell "squarely within the 'inaction' rubric" of Andrus.

Similarly, the Forest Service decision to abandon preexisting direct federal oversight over baiting in National Forests in Wyoming did not amount to a "major federal action" because the underlying action itself remained one of "inaction"—of deference to Wyoming's regulations—rather than one of "action." As discussed above, a key element in evaluating whether an action is a "major federal action" is the extent of the agency's "legal and factual" control over the action in question. See Goos, 911 F.2d at 1294-96. Here, there is little question but that the control is in the hands of the states, not the Forest Service. Compare Fund for Animals v. Babbitt, 89 F.3d 128, 133 (2d Cir. 1996) (requiring NEPA analysis where federal actions "reflect[ed] an unambiguous involvement by the federal government in the design, magnitude, and conduct of a moose hunt").

The Fund also argues that the decision is "major" because it prohibits Forest Service officers from engaging in the "prospective" review and management of the practice of bear baiting through the issuance of special use permits. The Fund fails to

-29-

demonstrate, however, how this administrative change makes the national policy a "major"

federal action" for NEPA purposes.  An action is not "major" simply because it brings

about substantial change, regardless of where and to what that change occurs.  Rather, as

the CEQ regulations note, the requirement that an action be "major" serves to reinforce

the requirement that the action have a significant effect on the quality of the human

environment.  40 C.F.R. 1508.18 (relevance of "major"); id. at 1508.27 (defining

"significantly").  Unless the Fund can demonstrate that the change in the process had the

potential to significantly affect the quality of the human environment—that the act

"furthered" environmental injury, see Defenders of Wildlife v. Andrus, 627 F.2d at 1244

—the action was not a "major" federal action.

The Fund can demonstrate no such risk flowing from the national Policy.  The

change in Forest Service oversight does not alter the substance of baiting regulation, but

only who promulgates it.  Furthermore, the closure policy contained within the

regulations merely establishes a consistent federal process for ensuring that federal

interests will be considered in the course of regulating hunting practices.  Nothing

suggests that this change would risk the environment in any way.  At present, most state

baiting regulations closely track the requirements that had been used by the National

Forests' special use permits for bear baiting.  See, e.g., A.R. Doc. 160, at 7-9.  There is no

suggestion that those state regulations will significantly change to be less protective of the

environment, and even if they do, the policy requires Forest Service managers to

-30-

"continually monitor" state hunting regulations for threats to federal interests. JA 564. The policy further provides that a "site-specific restriction or prohibition *shall* occur when the authorized officer determines" that state law would fail to protect federal interests. Ibid. Forest Service employees may report violations of state law and may even cite hunters for violations of that law. See 36 C.F.R. 261.8; 59 Fed. Reg., at 17760 (JA 397). In other words, there is nothing in the federal action in this case that suggests that the environment will be any different under the new baiting Policy than it was before the Policy issued. Even if there is some effect, the closure provisions of the policy will ensure that National Forests are managed in a way that will protect their resources for all citizens. Under these circumstances, the Forest Service's decision to defer to state regulation of the hunting of animals over bait simply does not amount to a "major" federal action.

In the end, the Fund suggests, "the background of this dispute makes clear that the Forest Service constructed its policy * * * to ensure that the public has no right to 'decisions' regarding individual forests which would be subject to NEPA review." Fund Br. 37. But NEPA does not provide a "right" to environmental analysis every time an agency makes a decision. Rather, NEPA only requires agencies to prepare an EIS when undertaking a "major *federal action*" that "significantly affects the quality of the human

environment." 43 U.S.C. 4332(2)(C) (emphasis added).  Where, as here, that is not the case, the Fund cannot call upon NEPA to provide relief.[5/]

As the district court noted, and as is clear from the Fund's emphasis on the practice of baiting rather than means by which it is managed, see Fund Br. 8-12, the Fund's ultimate concern is whether hunting over bait should occur at all.  932 F. Supp. at 369.  In the Forest Service Policy at issue here, however, the only concern is who should make that kind of management decision.  The clear answer from Congress has been "the states," and by deferring to that decision, the Forest Service took no "major federal action," but merely clarified existing practice.

## II
## IF NEPA ANALYSIS WAS NECESSARY,
## THE ENVIRONMENTAL ASSESSMENT
## CONDUCTED BY THE FOREST SERVICE WAS ADEQUATE

Although NEPA was not applicable to the decision at issue here, the Forest Service nonetheless prepared an environmental assessment.  See 40 C.F.R. 1501.3(b) (encouraging agencies to conduct environmental analyses for planning purposes even though they may not be required under NEPA).  Thus, even if the decision to defer to

_____

[5/] The Fund argues that the EA in this case must have been necessary because the Council on Environmental Quality suggested that the EA conducted for the Wyoming-only policy was inadequate.  This is, of course, a non sequitur.  The CEQ's letter, A.R. Doc. 61 (JA 346), was not only concerned with a different policy—one specific to Wyoming—but an entirely different legal question—whether an environmental assessment, once performed, was adequate, not whether NEPA required it to be performed in the first instance.

-32-

state hunting regulations was a major federal action and triggered NEPA review, the decision below should still be affirmed because the Forest Service properly found that the national policy would have no significant impact on the human environment. See A.R. Doc. 160, 161 (JA 471-558). An environmental impact statement, therefore, was not required.

As noted above, NEPA does not require an agency to conduct a comprehensive EIS unless the proposed decision is a "*major* Federal action[] *significantly* affecting the quality of the human environment." 43 U.S.C. 4332(2)(C) (emphasis added). Interpreting the emphasized words, the NEPA regulations promulgated by CEQ provide that an agency need not conduct a comprehensive EIS if a preliminary examination of the proposed decision—the "environmental assessment" ("EA")—reveals that the proposed action would not have a significant effect on the environment. 40 C.F.R. 1501.4 (describing process); id., at 1508.9 (defining EA). If so, the agency can issue a "FONSI," or "finding of no significant impact." Id., at 1508.13 (defining FONSI). See generally Natural Resource Defense Council v. Herrington, 768 F.2d 1355, 1430 (D.C. Cir. 1985).

The decision to issue a FONSI rather than an EIS is a decision that is subject to review only under the APA. See 5 U.S.C. 706; Florida Audubon Society v. Bentsen, 94 F.3d 658, 665 (D.C. Cir. 1996) (en banc). Under the APA, this court's role in reviewing an agency decision not to conduct an EIS is limited to ensuring that "the agency has adequately considered and disclosed the environmental impact of its actions and that its

-33-

decision is not arbitrary or capricious." Baltimore Gas & Electric Co. v. Natural

Resources Defense Council, Inc., 462 U.S. 87, 97-98 (1983); see also National Audubon

Society v. Hester, 801 F.2d 405, 407 (D.C. Cir. 1986).  As a guide for its analysis, this

Court asks whether the agency decision has passed four checkpoints in its NEPA

analysis:

> First, the agency must have accurately identified the relevant environmental
> concern.  Second, once the agency has identified the problem it must have
> taken a "hard look" at the problem in preparing the EA.  Third, if a finding
> of no significant impact is made, the agency must be able to make a
> convincing case for its finding.  Last, if the agency does find an impact of
> true significance, preparation of an EIS can be avoided only if the agency
> finds that changes or safeguards in the project sufficiently reduce the impact
> to a minimum.

Coalition on Sensible Transportation, Inc. v. Dole, 826 F.2d 60, 66-67 (D.C. Cir. 1987)

(citing Sierra Club v. Department of Transportation, 753 F.2d 120, 127 (D.C. Cir. 1985).

In this case, the Forest Service complied with each of these requirements when it

conducted an EA for the proposed national policy on baiting, A.R. Doc. 160 (JA 471),

and issued a FONSI concluding that the policy would not significantly affect the

environment, A.R. Doc. 161 (JA 555-56).  The Forest Service first clearly identified the

relevant area of concern.  In contrast to the Fund's efforts to improperly expand the

question in this case to include whether baiting should exist at all on National Forest

lands, the Forest Service has always understood the dispute to be limited to the proper

scope of federal oversight over state-managed hunting practices.  A.R. Doc. 160, at 6 (JA

-34-

478). The Service clearly stated that its environmental analysis had to be conducted within the context of the "principle that State regulation of hunting and fishing methods extends over [National Forest] lands." Ibid.

Once the problem was properly defined, the Forest Service appropriately limited the scope of its analysis to concerns addressing the environmental effects of differing degrees of Forest Service control over the use of bait in National Forests. The Service considered over 1200 comments from federal, state and local agencies, organizations and individuals. See 60 Fed. Reg. 14720 (JA 561); see also A.R. Vols. 4-7 (Comments 1-1282). These comments were considered by the Forest Service and discussed at length in the comment summary attached to the EA. JA 487-516.

The Forest Service not only considered the comments; it made changes to the process and the proposed policy in response to those comments. The decision to complete an EA in the first instance (rather than to rely on a categorical exclusion from NEPA, see JA 397) was based on the public comments received regarding the Policy. JA 478. The Service also modified the proposed policy to emphasize the requirement that officials continually monitor state regulations to help ensure that conflicts with federal law, regulations or policies be identified and remedied quickly and effectively. JA 562. The final document is precisely what CEQ regulations demand from an EA: It is a "concise" public document that serves to explain why the Forest Service concluded that

an EIS would be unnecessary, and includes a brief listing of the need for the proposal, possible alternatives, and environmental impacts. See 40 C.F.R. 1508.9.

The Forest Service concluded that the Policy at issue here would, in all likelihood, actually lead to environmental benefits. Those benefits flowed from the uniform process established by the Policy that describes the steps that local Forest Service officers can take to ensure that baiting will not improperly interfere with federal interests. JA 486. Beyond that beneficial effect, the EA concluded that there would be no significant effect on the human environment, largely because it anticipated that the Policy would not lead to a change in how hunting practices were regulated on National Forest lands.

In 1995, just before the Forest Service issued the national Policy, state agencies were responsible for promulgating and enforcing bear baiting regulations in National Forests. See, e.g., A.R. Doc. 8 (letter of 3/19/93 to B. Joslin) (JA 157); id. (3/26/93 letter to Idaho Forest Supervisors) (JA 163); A.R. Doc. 110 (JA 392-93). (The sole exception was Wyoming, where, as a temporary measure, the Forest Service prohibited baiting on National Forests.) After the Policy went into effect, state agencies continued to enforce those regulations. There was, in other words, no change in the status quo. Where the EA reveals that a federal action will not lead to a change in the status quo, the action necessarily will have "no significant impact" on the human environment, and the agency is not required to conduct an EIS. See Committee for Auto Responsibility v. Solomon, 603 F.2d 992, 1003 (D.C. Cir. 1979) (EA by the GSA demonstrated that the 1976 lease of

-36-

to an admission that the original EA was inadequate. The Fund further states that by allowing this additional information into the record, the district court "makes a mockery of elementary principles of administrative law and judicial review." Fund Br. 41. Citing decision after decision in which the courts have rejected explanations for agency action that were submitted to the district court *outside the administrative record*, the Fund argues that the SIR in this case was nothing more than an impermissible *post hoc* rationalization for its actions.

The main difficulty faced by the Fund, of course, is the fact that the district court granted the government's motion for a limited remand. The additional information is, therefore, part of the administrative record. See JA 68-71. While the Fund is correct that post-hoc rationalizations *outside the administrative record* are generally frowned upon as a basis for upholding the decision at issue, see Boswell Memorial Hospital v. Heckler, 749 F.2d 788, 792 (D.C. Cir. 1984), the Fund is unable to point to anything in that decision or any other that bars the district court from granting a temporary remand to the agency for purposes of supplementing the administrative record. Furthermore, the decision whether to grant such a motion is wholly within the district court's discretion. Cf. Cal-Almond, Inc. v. Dept. of Agriculture, 67 F.3d 874, 881-82 (9th Cir. 1995) (district court's refusal to remand to create supplemental record on primary jurisdiction grounds not abuse of discretion); Davidson v. Prudential Insurance Co., 953 F.2d 1093, (8th Cir. 1992) (reviewing effort to reopen administrative record in ERISA proceeding on

-38-

abuse of discretion grounds).  Although the Fund can allege that the decision makes a

mockery of the administrative process, and that the "remand" was "irrelevant," see Fund

Br. 42 n.7, its allegations are backed by no law.

In the end, there was nothing particularly remarkable about limited remand in this

case.  The district court granted the government's motion, the lodged supplemental

information report thereby became part of the administrative record, and the case returned

to the district court.

Nothing in case law or common sense requires or commends the approach

suggested by the Fund.  Where an agency concludes that it lacks some information, the

Fund seems to suggest, the agency cannot take prophylactic action in an effort to speed

the decisionmaking process along.  Rather, it is for some reason barred from requesting

the action until the decision can be made on the merits, at which point the court would

presumably tell the agency exactly what it already knows, and order it to proceed as it

would have under a voluntary remand.  Such a duplicative and unnecessary process

would be useful only for purposes of delay.  Here, the District Court avoided that process

and the attendant delay by ordering the limited remand.  Whether explained or not, that

order was eminently reasonable and certainly not an abuse of discretion.

In any event, the importance that the Fund attaches to this issue is perplexing in

light of the relatively minor changes that the SIR made to the conclusions in the EA.

First, the SIR reviewed the Forest Service's information regarding the historic practice of

issuing special use permits for baiting on National Forests, and concluded that the EA had failed to recognize that National Forests in Idaho and Utah had also issued special use permits prior to the decision to lift those special use requirements in 1992. SIR 3 (JA 70). The new information did not alter the EA to any substantial degree, however. As was already clear from the administrative record, baiting regulations in Utah and Idaho were quite similar to those in Wyoming, thereby minimizing the practical impact of the Policy. This was particularly true given that neither Utah nor Idaho were requiring permits for baiting as of the time of the EA, so the Policy did not change the status quo of deferring to state regulation. The SIR also confirmed that no National Forests had required special use permits for wildlife other than bears; as a result, the administrative decision properly concluded that no environmental effect would flow from the adoption of the Policy.

Nowhere in this litigation has the Fund been able to point to a way in which the Forest Service's new Policy would create on-the-ground environmental effects beyond those that existed previously. Given the absence of any obvious effect resulting from the Policy, the Forest Service's EA and FONSI concluding that there was no significant impact were clearly adequate.

III

THE FOREST SERVICE COMPLIED WITH THE ESA

A. The ESA and the Consultation Process. — In order to ensure that federal actions do not "jeopardize the continued existence of any endangered species," threatened species, or critical habitat, section 1536(a)(2) ("section 7(a)(2)") of the ESA requires that federal agencies consult with the FWS.  16 U.S.C. 1536(a)(2).  After reviewing the proposed action, the FWS issues a "'biological opinion' assaying the nature and extent of the jeopardy posed to [a] species by the 'agency action' and discussing therein the implications for section 7(a)(2)."  North Slope Borough v. Andrus, 642 F.2d 589, 607 (D.C. Cir. 1980).

The regulations governing the consultation process provide additional detail about how the FWS and the federal agency work together.  See 50 C.F.R. pt. 402.  The federal agency formally initiates consultation through the preparation of a biological assessment (or "biological evaluation")[6/] setting forth the species that may be affected by the proposed action and the effect that the action may have on listed and proposed species as well as critical habitat.  50 C.F.R. 402.12.  If the biological assessment concludes that the action "may adversely affect" threatened or endangered species or critical habitat, the regulations require "formal consultation," id., at 402.14(a), at the end of which the FWS

_____

[6/]Under Forest Service policies, the agency prepares a "biological evaluation" rather than a "biological assessment."  See Forest Service Manual 2670.31.  In all relevant respects, the two documents and the process used to develop them are identical.

-41-

will issue a "biological opinion" that will either permit the action under section 7(a)(2) of the Act (a "no jeopardy" opinion), or refuse to permit the action (a "jeopardy" opinion). Id., at 402.14(h).[2/] Even if the FWS issues a "no jeopardy" biological opinion, it is possible that endangered species might be taken (although not to such a degree that the species would be jeopardized). The FWS may, therefore, issue along with the biological opinion an "incidental take" statement. Id., at 402.14(i). That statement sets forth the conditions pursuant to which the agency will be freed of responsibility for "taking" a listed species. Ibid.

Of some importance to the Policy at issue in this case is the provision, contained within both the "informal consultation" and "formal consultation" regulations, that allows an agency to avoid formal consultation as long as it "determines, with the written concurrence" of the FWS, that the proposed action "is not likely to adversely affect listed species or critical habitat." id., at 402.13(a), 402.14(a) & (b)(1).

Decisions made under the ESA are generally reviewable under the statute's citizen suit provisions, see 16 U.S.C. 1540(g), or, in some circumstances, under the APA. See Bennett v. Spear, 117 S.Ct. 1154, 1167 (1997). In either case, appellate review of such decisions is conducted under the familiar arbitrary and capricious standard. See National Audubon Society v. Hester, 801 F.2d 405, 407 (D.C. Cir. 1986).

---

[2/] The FWS can also issue a "jeopardy" opinion including certain "reasonable and prudent alternatives," see 50 C.F.R. §402.14(h), which would permit the action as long as the alternatives were adopted.

B. The Consultation in this Case. — When the Forest Service developed the initial proposal for baiting in the forests of Wyoming, it also drafted a biological evaluation. The Forest Service then initiated formal consultation with the FWS after concluding that a policy deferring to Wyoming's baiting regulations "may adversely affect" the grizzly bear population in northwest Wyoming. A.R. Doc. 46, at 4 (JA 294). After reviewing the biological evaluation, the FWS issued a biological opinion concluding that the Policy was not "likely to jeopardize the continued existence of the grizzly bear." A.R. Doc. 51 at 6 (JA 337). The "no jeopardy" biological opinion also included an incidental take statement authorizing no incidental take, but which required the Forest Service to eliminate the use of human, livestock, or pet foods as bear bait in areas regularly used by grizzly bears. Id. at 7 (JA 338). It also suggested that hunters encountering a grizzly at a bait station should notify a state or federal government official trained in grizzly behavior, who would then remove the bait, rather than relying upon the hunter to do so. Ibid. The provisions of the biological opinion made their way into Wyoming's baiting regulations, which restrict baiting in known grizzly areas and require that hunters notify proper authorities when a grizzly turns up at their bait station. A.R. Doc. 100 (JA 371-73). In addition, the Forest Service issued orders closing portions of the National Forest to baiting and limiting the use of certain processed human foods in an effort to limit the risk to grizzlies. See A.R. Doc. 99 (JA 368-69).

-43-

After the Forest Service withdrew its proposed Wyoming policy and began consideration of a national policy, it began to consider the development of a new biological evaluation. In the course of that consideration, the Forest Service concluded that formal consultation would be unnecessary under the ESA regulations because the Policy was "not likely" to adversely affect endangered species or habitat. See 50 C.F.R. 402.13(a). The Forest Service reached this conclusion, because (as noted above, see supra, at 31, 37), the Policy merely maintained the status quo regulatory structure in states other than Wyoming, while the effect of the policy in Wyoming had been addressed in the preexisting biological evaluation. The Forest Service therefore requested "written approval" from the FWS regarding its conclusion that the national policy was "not likely to affect" listed species or critical habitat. A.R. Docs. 142, 143A (JA 456, 457). After additional discussions during informal consultation, see A.R. Docs. 153, 154, 155, 157 (JA 460-66), the FWS sent letters to the Forest Service concurring in its conclusion, thereby exempting the national policy from formal consultation requirements. A.R. Docs. 144, 158 (JA 458, 467, 521-23); see also Southwest Center for Biological Diversity v. Forest Service, 100 F.3d 1443, 1447-48 (9th Cir. 1996) (conclusion that action is "not likely to adversely affect" listed species "obviates the need for formal consultation under the ESA"). The Forest Service renewed its prior order banning baiting within known grizzly areas, and limiting the use of processed human food as bait in the forests adjoining those areas. A.R. Doc. 159 (JA 535-36); see also Declaration of Larry Mullen, Appendix

-44-

1 to Federal Reply in Support of Motion for Summary Judgment (May 23, 1996) (JA 131-33).

C. The Fund's Objections to the Consultation Process Are Meritless. — The process followed by the Forest Service and the FWS regarding the national Policy is a textbook example of the process explicitly anticipated by the provisions in 50 C.F.R. 402.13(a) and 402.14(b)(1). Nonetheless, the Fund suggests in its brief that they were wholly inadequate (although, notably, the Fund never alleges that they are either arbitrary or capricious). Fund Br. 44-50.

The Fund's first objections merely opine that the ESA must have been violated because no biological opinion or incidental take statement issued before the promulgation of the national Policy. The Fund dismisses the "informal consultation" process and exemption to the formal process that is explicitly set forth in the regulations, simply alleging only that because the statute makes no mention of exceptions to formal consultation, no other form of consultation is authorized under the language of the statute. Fund Br. 45-46 & n.8.

The Fund cannot escape the plain language of the regulations so easily. While we believe that the regulations would clearly survive a challenge to their reasonableness under the APA, the Fund's argument fails for another reason. APA challenges of regulations are subject to the six-year statute of limitations of 28 U.S.C. 2401. See James Madison Ltd. v. Ludwig, 82 F.3d 1085, 1094 (D.C. Cir. 1996). The regulations

-45-

governing informal consultation and the exemption for actions "not likely to adversely affect listed species" were promulgated in 1986, over ten years ago. See note following 50 C.F.R. 402.14. It is too late for the Fund to challenge these regulations today.

The Fund goes on to attack the Forest Service's conclusion—in which the FWS concurred—that the national Policy was not likely to adversely affect listed species or critical habitat. The Fund fails to demonstrate, however, that the decision was arbitrary and capricious. It alleges, for instance, that formal consultation must have been required for the national Policy given that the agencies participated in formal consultation when developing the Wyoming policy. A second Biological Opinion for Wyoming was clearly unnecessary, for any effects flowing from federal deference to state baiting regulations are fully addressed in the first opinion.

In addition, the Forest Service decision regarding listed species and critical habitat outside of Wyoming was clearly correct for at least two reasons. First, since at least 1992, no national forest outside of Wyoming required a special use permit for baiting. None of this changed under the new Policy, and as a result, there was no change to the way in which baiting is managed in those other states, and no effect on listed species or critical habitat. Second, the Policy also instituted the closure provisions, which, if anything, benefits listed species and habitats. Under the closure provisions, the Forest Service established an ongoing, nationally uniform process pursuant to which Forest

-46-

Service officers are obliged to close forests to hunting where baiting under state regulation threatens listed species. See JA 564.

In retrospect, the Fund's arguments are merely representative of the Fund's overall approach to this case. The plaintiffs' arguments have consistently treated the decision at issue as one of whether hunting over bait should exist at all in the National Forests, not merely who should regulate it. Similarly, they approach the case under the assumption that the Forest Service should have near-plenary authority over the regulation of hunting practices in National Forests. But there is a profound difference between the Fund's understanding of this case and what the case is actually about. Examined in its proper context, the relatively narrow scope of the decision at issue here becomes obvious, and the relatively limited effect that it will have on the environment becomes clear. In this circumstance, the Forest Service not only complied with NEPA and the ESA, but it over-complied by conducting an environmental assessment that was unnecessary.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

LOIS J. SCHIFFER
  Assistant Attorney General
  Environment & Natural
    Resources Div.

OF COUNSEL:

KATHRYN TOFFENETTI
Attorney
Office of General Counsel
U.S. Dept. of Agriculture
Washington, DC 20250

MICHAEL J. ROBINSON
ELLEN J. DURKEE
JEFFREY C. DOBBINS
  Attorneys
  Department of Justice
  P.O. Box 23795
  Washington, DC  20026
  (202) 514-4358

June 1997
90-1-4-4201

-48-

# ADDENDUM

National Environmental Policy Act,
43 U.S.C. 4332(1)-(2)(A)-(E) (1996) . . . . . . . . . . . . . . . . . . . . . 1
Endangered Species Act, 16 U.S.C. 1536(a)-(c) (1996) . . . . . . . . . . . . . . 2
Federal Land Policy and Management Act,
43 U.S.C. 1732(b) (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
Multiple Use and Sustained Yield Act of 1960, 16 U.S.C. 528 (1996) . . . . 4
Organic Administration Act of 1897, 30 Stat. 32 (1897)
as codified with amendments at 16 U.S.C. 480 (1996) . . . . . . . . . . 5
Wild and Scenic Rivers Act, 16 U.S.C. 1284(a) (1996) . . . . . . . . . . . . . , . 5
Wilderness Act of 1964, 16 U.S.C. 1133(d)(7) (1996) . . . . . . . . . . . . . . . . 5

Forest Service Regulations (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
36 C.F.R. 251.50 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
36 C.F.R. 261.8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
36 C.F.R. 261.11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
NEPA Regulations (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
40 C.F.R. 1501.4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
40 C.F.R. 1508.9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
40 C.F.R. 1508.18 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
ESA Regulations (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
50 C.F.R. 402.12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
50 C.F.R. 402.13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
50 C.F.R. 402.14 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Forest Service Manual § 2643.1 (before 1995 amendment) . . . . . . . . . . 11
Forest Service Manual § 2643.1-.12 (after 1995 amendment) . . . . . . . . . 12

State Bear Baiting Statutes & Regulations
Alaska Admin. Code tit. 5, §92.085 (1996) . . . . . . . . . . . . . . . . . . 14
Idaho Code §13.01.17.100 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . 16
Me. Rev. Stat. tit. 12, § 7451 (1996) . . . . . . . . . . . . . . . . . . . . . . . 17
Minn. R. 6232.3200 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
N.H. Rev. Stat. §207:3-d (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . 21
Utah Admin. Code R657-33-14 . . . . . . . . . . . . . . . . . . . . . . . . . . 22
Wis. Admin. Code §10.07(1)(g) (1997) . . . . . . . . . . . . . . . . . . . . . 24
Wyoming Regulations Governing Baiting of Bears (1994) . . . . . . 26