Dana M. Johnson, Idaho Bar #8359
Wilderness Watch
P.O. Box 9623
Moscow, Idaho 83843
Tel: (208) 310-7003
danajohnson@wildernesswatch.org

Matthew K. Bishop, *pro hac vice*
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
Tel: 406-324-8011
bishop@westernlaw.org

Peter M.K. Frost, *pro hac vice*
Western Environmental Law Center
120 Shelton McMurphey Blvd., Suite 310
Eugene, Oregon 97401
Tel: 541-359-3238
frost@westernlaw.org

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WILDEARTH GUARDIANS, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>U.S. FOREST SERVICE, et al.,<br><br>    Defendants. | Case No. 1:19-cv-00203-CWD<br><br>**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION TO FILE AMENDED AND SUPPLEMENTAL COMPLAINT** |

Pursuant to Local Rule Civ. 7.1(b)(1), Plaintiffs WildEarth Guardians et al. ("Guardians") hereby respectfully file this brief in support of their motion seeking leave under Rule 15(a)(2) & (d) to file an amended and supplemental complaint.

Standard of Review.

Rule 15(a)(2) provides that "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." FED. R. CIV. P. 15(a)(2). "[T]his mandate is to be heeded." *Foman v. Davis*, 371 U.S. 178, 182 (1982). In turn, Rule 15(d) provides that "[o]n motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." FED. R. CIV. P. 15(d). Generally, a court will grant a motion to amend or supplement a complaint unless the opposing party can show "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [or] futility of amendment. . . ." *Foman*, 371 U.S. at 182. Of the *Foman* factors, undue prejudice is the most important, and the burden is on the opposing party to show prejudice. *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1948, 1052 (9th Cir. 2003).

Background.

Guardians repeats what it knows about the underlying facts in this case, and agency actions since it was filed, so the Court may fully consider whether to grant Guardians leave to file a supplemental and amended complaint.

"Baiting" in the context of hunting means to use food, salt, or scented items to attract wildlife. *Use of Bait in Hunting*, 59 Fed. Reg. 11,765, 11,766 (Mar. 14, 1994). Through the early

1990s, eleven states, including Idaho and Wyoming, authorized hunters to use bait. *Id*. From the 1960s through 1992, some national forests required both individual hunters and commercial guides who served hunters to obtain a special use permit to use bait. *Id*.; Dkt. 40-1 at 9. For example, because "Wyoming had no regulations covering the placement and removal of baits[,]" certain national forests in Wyoming—including the Bridger-Teton, the Bighorn, and the Shoshone, all of which include habitat for grizzly bears—required hunters and guides to obtain special use permits to use bait, or issued closure orders to prohibit bait in certain areas. Dkt. 40-1 at 9; Dkt. 40-7 at 9–10.

In March 1992, the Regional Foresters for the Rocky Mountain and Intermountain Regions decided to discontinue requiring special use permits in national forests in Wyoming, and to instead issue a joint "closure order prohibiting black bear baiting" in national forests in Wyoming except where allowed, and with certain conditions. 59 Fed. Reg. at 11,766.[1] Two groups sued Defendant U.S. Forest Service ("Forest Service") for switching from special use permits to closure orders in Wyoming without preparing a National Environmental Policy Act ("NEPA") analysis as to effects on black bears. *Id*. To settle the case, the Forest Service agreed to consider under NEPA whether to eliminate requiring special use permits for baiting in national forests in Wyoming. *Id*.

On February 19, 1993, the Forest Service issued an EA under NEPA. Dkt. 40-7. The proposed action in the EA is for the Forest Service to "regulate noncommercial bear baiting" in national forests in Wyoming by entering into a Memorandum of Understanding ("MOU") with Wyoming that requires the state to adopt rules for baiting. *Id*. at 17–18. Guardians does not

---

[1]   The areas the Forest Service closed to baiting under special use authorizations and under the subsequent joint closure order were "very similar." Dkt. 40-7 at 4.

Plaintiffs' Brief in Support of Motion to File Amd. and Supp. Complaint, Case No. 1:19-cv-00203-CWD        2

possess the MOU, but alleges in its proposed pleading that it exists. The EA also requires "mitigation measures" for all considered alternatives, including: (1) no bear baiting in the grizzly bear "recovery zone" and (2) outside of the zone, no bear baiting where the Forest Service issues an order prohibiting "the improper storage of food in grizzly bear habitat." *Id*. at 18–19.

In March 1993, the Forest Service prepared a Biological Evaluation under Section 7(a)(2) of the Endangered Species Act ("ESA") to assess whether the proposed alternative in the EA would affect ESA-listed species, including grizzly bears. Dkt. 40-2 at 1 (reciting history). Guardians does not possess the Biological Evaluation, but alleges in its proposed pleading that it exists. On April 6, 1993, the Forest Service requested formal consultation with Defendant U.S. Fish and Wildlife Service ("Fish and Wildlife") under Section 7(a)(2) to obtain its opinion as to the effects of its actions on ESA-listed species. *Id*. Guardians does not possess the document requesting consultation, but alleges in its proposed pleading that it exists.

On April 14, 1993, Fish and Wildlife issued a BiOp. Dkt. 40-2. The BiOp states that "baiting for black bears within the range of the grizzly bear" can result in mortality to grizzlies, if a hunter mistakes a grizzly for a black bear, if a grizzly attempts to defend a food source from what it perceives as a competitor, or if a hunter perceives that a grizzly threatens the hunter's safety. Dkt. 40-2 at 4. The BiOp states grizzlies may become "conditioned" to the foods used for bait, and seek them elsewhere, and become "problem" bears requiring "management actions." *Id*. The BiOp states that between 1967 and 1993, five grizzlies were reportedly killed at black bear bait sites in Wyoming. *Id*. at 5. The BiOp notes the mitigation measures in the 1993 EA, including "[c]losing the proposed grizzly bear recovery area and all areas covered by a special order prohibiting improper storage of food in grizzly bear habitat (mitigation measures common to all alternative[s]) will have a beneficial affect [*sic*] on grizzly bears." *Id*. at 2. Based on the

mitigation measures, Fish and Wildlife found that none of the alternatives in the 1993 EA would jeopardize the continued existence of the grizzly bear. Dkt. 40-2 at 6.

However, Fish and Wildlife found a "remaining potential for incidental take of grizzly bears" due to baiting, so it issued an Incidental Take Statement ("ITS") that includes conditions it deemed "critical to fulfillment of [the Forest Service's] responsibilities" under Section 7(a)(2). Dkt. 40-2 at 6–7. The ITS includes mandatory terms and conditions. First, the Forest Service must "[e]liminate the use of processed human, livestock or pet foods, and fruits and vegetables produced for human consumption, as bear baits in any areas regularly used by grizzly bears[.]" *Id*. at 7. Second, the Forest Service must "[e]liminate the requirement that hunters, outfitters or guides who report a grizzly bear on a legally placed bait remove the bait." *Id*.[2] Third, "[t]he [Forest Service] has a continuing duty to regulate the activity covered by this incidental take statement." *Id*. Finally, Fish and Wildlife found that "[a]lthough there is a remote possibility that a grizzly bear may be taken as a result of black bear baiting on [Forest Service] lands in Wyoming, [FWS] does not anticipate that such take will occur. Therefore, no incidental take is allowed. Should any take occur, the [Forest Service] must reinitiate formal consultation with [FWS] and provide the circumstances surrounding the take." *Id*.

In April 1993, the Forest Service issued a Decision Notice under NEPA to adopt an alternative from the EA. 59 Fed. Reg. at 11,766 (noting Decision Notice). Guardians does not possess the Decision Notice, but alleges in its proposed pleading that it exists. It appears based on the documents and chronology that the Forest Service entered into a MOU with Wyoming requiring the state to adopt rules related to baiting and grizzly bears. Dkt. 40-1 at 2 (Table of

---

[2]   FWS stated that removal of bait "should be accomplished by individuals experienced with grizzly bear behavior." Dkt. 40-2 at 7.

Contents noting "Appendix E Wyoming Game and Fish Commission/Forest Service Memorandum of Understanding"); *see also Id*. at 4. Guardians does not possess any MOU, but alleges in its proposed pleading that it exists.

At some juncture, the Forest Service "implemented a closure order prohibiting the use of bait for black bear hunting in the grizzly bear recovery zone, in the food restriction areas on the Wind River Ranger District, Shoshone National Forest, and prohibited hunting of black bears with non-natural baits in grizzly habitat not covered by other closure orders." Dkt. 40-4 at 1.

The Forest Service faced "the threat of another [law]suit," Plfs' Ex 1 at 8, so it decided that "national direction was needed to end the conflict and controversy." 59 Fed. Reg. at 11,766. The Forest Service rescinded its EA and Decision Notice. *Id*.; Dkt. 40-4. However, its prior closure orders remained in effect, and it also closed to baiting "an additional area on the Greybull District, Shoshone National Forest[.]" Dkt. 40-4 at 1.

In April 1994, the Forest Service published an interim national policy that generally leaves to states whether to authorize bait in national forests, subject to oversight and regulation by the Forest Service. 59 Fed. Reg. 11,765 (April 14, 1994). In March 1995, the Forest Service prepared an EA to consider permanently adopting the national policy. Dkt. 40-1. The 1995 EA states the purpose of the policy is two-fold: to "clarify that baiting is a hunting method that is authorized by the States and regulated by the States, as well as to establish procedures that will be used by the Forest Service when State regulations conflict with Federal laws, regulations, and policies." Dkt. 40-1 at 7. The 1995 EA states: "There is a need to ensure that State regulations governing baiting protect Federal resources, and, failing sufficient State protection, that the Forest Service provide such protection." *Id*. at 5.

The proposed action in the 1995 EA is to amend the Forest Service manual to adopt the national policy to allow states to regulate bait, subject to Forest Service oversight and regulation. *Id*. at 11–13; 60 Fed. Reg. 14,720 (March 20, 1995). The policy states: "Where States permit the use of bait for attracting resident game, this activity is allowed on National Forest Service lands, subject to State hunting laws and regulation, unless the authorized officer determines on a site-specific basis that there is a need to prohibit or restrict the practice." 60 Fed. Reg. at 14,723. The Forest Service stated it would monitor State regulations" to ensure they "protect Federal interests." *Id*. at 14,721. The Forest Service explained that if the "use of bait conflicts with Federal law or regulations, forest plan direction, or other uses or users . . . the authorized officer could prohibit or restrict the use of bait, in an area, by issuing a closure order." *Id*. Before issuing a closure order, the officer "would first consult with the State fish and wildlife agency to see if the conflict could be resolved without a closure or restrictive order," but "the Forest Service would close specific areas to baiting if conflicts cannot be resolved . . . ." *Id*. at 14,720–21. The Forest Service stated "the authorized officer must close an area to baiting" if certain circumstances arise, including if "State laws and regulations conflict with Federal law, such as the Endangered Species Act." *Id*. at 14,721.

Pursuant to Section 7(a)(2), on February 13, 1995, the Forest Service wrote Fish and Wildlife that it was "in the process of preparing a National Policy on bear baiting[.]" Dkt. 40-4 at 1. The Forest Service wrote that "as a result of the mitigation measures in the EA and the reasonable and prudent [measures] in the [BiOp], we implemented a closure order prohibiting the use of bait for black bear hunting in the grizzly bear recovery zone," and prohibited baiting in grizzly habitat not covered by other closure orders. *Id*. The Forest Service wrote that it had reviewed its 1993 Biological Evaluation, its existing closure orders, the BiOp, and state

regulations on baiting, and stated "it is our opinion that the National Policy, when issued, would not change the conditions or situations that were present when the original [BiOp] was issued." *Id*. The Forest Service noted its "plan to continue with the closure orders that are in place[.]" *Id*. The Forest Service concluded: "We ask that you review the original [BiOp] in light of this proposed new policy, and the actions we have taken, to determine if you concur that the actions we have taken to protect the grizzly bear are still adequate." *Id*.

On February 27, 1995, Fish and Wildlife responded by noting the Forest Service complied with the condition in the ITS and closed the grizzly bear recovery zone to baiting, and also prohibited the use of non-natural baits in other areas occupied by grizzly bears. Dkt. 40-5 at 1. Fish and Wildlife noted that Wyoming had required hunters to report use of bait by a grizzly to state agency personnel, who would remove the bait. *Id*. Fish and Wildlife concluded: "The proposed National Policy appears to be consistent with our biological opinion of April 13, 1993, and no information has become available to suggest that additional terms and conditions are necessary at this time." *Id*. at 2.

On March 14, 1995, Fish and Wildlife responded to an "undated" Forest Service letter delivered to Fish and Wildlife on February 24, 1994 [*sic*]. Dkt. 40-6. Guardians does not possess the undated letter, but alleges in its proposed pleading that it exists (and notes that the year of the delivery appears to be wrong, since Fish and Wildlife responded on March 14, 1995). Dkt. 40-6 at 1. In its response, Fish and Wildlife noted that the national policy required the Forest Service to monitor state baiting regulations, "and to establish administrative closures to baiting where necessary to protect federally listed species." *Id*. Fish and Wildlife refers to other documents "clarifying certain issues" and noting "revisions to the proposed policy agreed to by our respective staffs[.]" *Id*. Guardians does not possess these documents, but alleges in its proposed

pleading that they exist. Fish and Wildlife noted the status of Forest Service closure orders. *Id*. Fish and Wildlife concurred with the Forest Service that its national policy "is not likely to adversely affect federally listed species." *Id*.

On March 20, 1995, the Forest Service adopted the national policy as a rule. 60 Fed. Reg. 14,720. Eight entities sued, alleging the Forest Service violated NEPA by preparing only an EA for the new national rule, and violated the ESA by failing to engage in formal consultation as to its effects. *Fund for Animals, Inc. v. Thomas*, 932 F. Supp. 368, 370 (D.D.C. 1996). The Forest Service defended its EA by asserting its rule was not a "major federal action" under NEPA. *Id*. at 370. It defended the ESA claim by noting it engaged in informal consultation with Fish and Wildlife, and Fish and Wildlife agreed formal consultation was unnecessary. *Id*. at 370. The district court ruled in favor of the Forest Service on both claims. *Id*. at 371. The D.C. Circuit affirmed. *Fund for Animals, Inc. v. Thomas*, 127 F.3d 80 (D.C. Cir. 1997). The D.C. Circuit assumed without deciding that the national rule constitutes federal "action" under NEPA, but held that it did not constitute "major" federal action requiring an EIS. *Id*. at 83–84. The court also ruled the Forest Service met its duties under Section 7(a)(2) as to consultation. *Id*. at 84.

Currently, among the contiguous states, only Idaho and Wyoming allow use of bait to hunt black bears in national forests. AC ¶ 15. Further, Idaho and Wyoming allow use of bait in areas in national forests that grizzly bears may inhabit. *Id*. Moreover, since the Forest Service adopted its national rule, and since it consulted with FWS to obtain its BiOp and ITS, Guardians alleges numerous grizzly bears have been killed at bait sites in national forests in Idaho and Wyoming. AC ¶¶ 35–37, 40, 44, 45. Guardians also alleges these mortalities are likely incomplete, because some preliminary grizzly mortality reports do not disclose whether bait was used, and some do not precisely report locations, to determine whether a death occurred in a

national forest. AC ¶¶ 58 & 61. However, Guardians alleges that in 2018, Idaho Fish and Game staff removed or killed grizzlies in eastern Idaho that became attracted to or dependent on human food sources. AC ¶ 63. And, in June 2019, a grizzly bear was discovered in the Kelly Creek drainage in the Nez Perce-Clearwater National Forests in Idaho. AC ¶ 59. The grizzly was seen by a licensed hunter who was stocking a black bear bait site with food. *Id*. The State of Idaho urged black bear hunters to be cautious when selecting bears as targets in the area. *Id*.

After Guardians filed this lawsuit, the states of Idaho and Wyoming filed motions to intervene. Dkt. 18 & Dkt. 23. In their proposed answers, Wyoming would admit three grizzlies have been killed at bait stations on Forest Service lands in Wyoming since the Forest Service adopted the national policy, Dkt. 18-2 ¶ 1, and Idaho would admit one grizzly grizzly has been killed at a bait station on Forest Service lands in Idaho since the Forest Service adopted the national policy. Dkt. 23-2 ¶ 45.

On June 26, 2020, the Forest Service and Fish and Wildlife traded letters dated the same day and agreed the Forest Service's actions related to bear baiting in national forests in the 1990s now constitutes "Agency inaction (unexercised discretion)" that did not require consultation under Section 7(a)(2) in the first place. Dkt. 38-2 at 3. Accordingly, the Forest Service sought to withdraw its consummated request for consultation on "the Region 2 policy and the national policy," and asked Fish and Wildlife to "withdraw" the BiOp. *Id*. Fish and Wildlife then did so. Dkt. 38-3 at 1.

Argument.

Guardians seek to file an amended and supplemental complaint to do two things. First, to continue to allege that numerous grizzly bears have been killed at bait stations on Forest Service lands in Idaho and Wyoming, and that, as a result, the Forest Service and Fish and Wildlife are

required to reintiate consultation. 50 C.F.R. § 402.16(a); 50 C.F.R. § 402.14(i)(4). As noted, at least the states of Wyoming and Idaho would admit that more grizzlies than allowed under the incidental take statement have been killed at such bait stations. Exceeding the amount or extent take in an incidental take statement requires reinitiation of consultation. 50 C.F.R. § 402.16(a). Further, Guardians separately alleges that what has factually transpired since the BiOp related to the deaths of grizzly bears at bait stations in Idaho and Wyoming, and published reports about how the use of bait affects grizzly bears, constitute new information that also requires reinitiation of consultation. 50 C.F.R. § 402.16(b).

Second, Guardians seeks to challenge the Forest Service's and Fish and Wildlife's actions on June 26, 2020, when they traded letters rescinding the BiOp. Guardians would allege that the agencies' actions are unlawful because it appears they misapprehend what occurred factually in 1993 and 1995 as predicates for federal agency actions that led to the consultations. As an example, agency documents state that the Forest Service and the State of Wyoming entered into an MOU related to the use of bait in national forests in Wyoming. Dkt. 40-7 at 17-18. As another example, agency documents state that the Forest Service issued closure orders and took other actions to comply with terms and conditions in the Incidental Take Statement, and that those actions remain in effect. Dkt. 40-5. Generally, the agencies have not disclosed all of the factual predicates for their consultations in 1993, in 1995, or in their proceedings thereafter. Instead, the evidentiary bases for all of Guardians' claims would be revealed by the agencies' answer to the proposed amended and supplemental complaint, by disclosure of agency documents through production of their administrative records, and by discovery if necessary.[3]

---

[3] Guardians' reinitiation claim is properly brought pursuant to the citizens suit provision of the ESA. *Salmon Spawning & Recovery Alliance v. Gutierrez*, 545 F.3d 1220, 1229-30 (9th Cir.

The agencies' administrative records, which their counsel has indicated exist, should include not only all relevant documents in 1993 and 1995, but also documents related to their actions in 2020 to rescind the BiOp. Based upon full disclosure of these records, Guardians would allege the agencies' actions were unlawful because agency action under Section 7(a)(2) existed, and continues to exist, as to the use of bait for noncommercial hunting in national forests in Idaho and Wyoming. Further, Guardians would allege that the ESA regulations the agencies cited as authority for their actions, 50 C.F.R. § 402.14(m)(2) & (m)(3), do not authorize a BiOp to be rescinded after consultation is complete.

As the Court is aware, Rule 15(d) "permits the filing of a supplemental pleading which introduces a cause of action not alleged in the original complaint and not in existence when the original complaint was filed." *Cabrera v. City of Huntington Park*, 159 F.3d 374, 382 (9th Cir. 1998) (quoting *United States v. Reiten*, 313 F.2d 673, 674 (9th Cir. 1963)). When Guardians filed suit, there was no potential cause of action challenging the agencies' rescission of the BiOp, because it had not occurred.

Moreover, as the Ninth Circuit has stated, "[t]he clear weight of authority, . . . permits the bringing of new claims in a supplemental complaint to promote the economical and speedy disposition of the controversy." *Keith v. Volpe*, 858 F.2d 467, 473 (9th Cir. 1988). Here, granting leave to file the proposed amended and supplemental complaint promotes the economical and speedy disposition of the controversy, because claims related to the agencies' rescission of the BiOp are inextricable from the underlying case, and resolving the legality of the rescission is necessary to "resolve the entire controversy between" the parties—namely whether reinitiation

---

2008). Discovery is allowed as to citizens suit claims under the ESA. *Wash. Toxics Coal. v. EPA*, 413 F.3d 1024, 1034 (9th Cir. 2005).

of consultation is required. If the Court rules the rescission was lawful, that will "resolve the entire controversy between" the parties because the current, remaining claim would be moot. By contrast, if the Court rules that the rescission was unlawful, then the current remaining claim will not be moot. In short, granting Guardians leave file the proposed amended and supplemental pleading will promote judicial efficiency and serve the purpose of Rule 15(d) to "award complete relief . . . in one action, and to avoid the cost, delay, and waste of separate actions which must be separately tried and prosecuted." *Id*. (quoting *New Amsterdam Casualty Co. v. Waller*, 323 F.2d 20, 28–29 (4th Cir. 1963), *cert. denied*, 376 U.S. 963 (1964)).

Guardians acknowledges that "[w]hile leave to permit supplemental pleading is 'favored,' it cannot be used to introduce a 'separate, distinct and new cause of action.'" *Planned Parenthood of Southern Arizona v. Neely*, 130 F.3d 400, 402 (9th Cir. 1997) (quoting *Keith*, 858 F.2d at 473; *Berssenbrugge v. Luce Mfg. Co.*, 30 F. Supp. 101, 102 (D. Mo. 1939)). Guardians meet this standard if they show "some relationship . . . between the newly alleged matters and the subject of the original action, [but] they need not all arise out of the same transaction." *Keith*, 858 F.2d at 474. Here, a clear relationship exists between the new factual allegations and the new legal claims, and the subject of the original action, so Guardians does not seek to introduce an impermissible "separate, distinct and new cause of action."

To promote judicial efficiency, the Court has allowed plaintiffs to file supplemental pleadings that allege new but not separate and distinct causes of action. For example, in *Miesen v. Connie Taylor Henderson*, 1:10-cv-00404-CWD, 2017 WL 1458191 (D. Idaho April 21, 2017), a representative shareholder sought to leave to file an amended and supplemental complaint clarifying factual allegations and asserting additional claims, in a derivative action against a corporation. *Id*. at *5. The Court granted the shareholder leave to file an amended and

supplemental complaint, ruling that "the newly alleged causes of action relate to the events that have happened since the original complaint was filed, and allowing these new allegations to be added to this lawsuit promotes judicial efficiency." *Id*. at *16–17. Similarly, in a second case, the Court allowed plaintiffs to file a supplemental pleading that "involves the same parties, and would resolve the entire controversy between them." *California Bank & Trust v. Shilo Inn*, 1:12-cv-00141-CWD, 2013 WL 501643 *5 (D. Idaho Feb. 8, 2013).

Moreover, this case is not like those where courts have denied leave to file an amended or supplemental complaint. *Contra Planned Parenthood*, 130 F.3d at 402–03 (district court abused its discretion when it granted plaintiffs leave to file a supplemental complaint after a final judgment had been rendered and no appeal was taken); *Western Watersheds Project v. U.S. Forest Serv.*, CV-05-189-E-BLW, 2009 WL 3151121, *1–2 (D. Idaho Sept. 26, 2009) (denying plaintiffs leave to file a supplemental complaint into a case after a final judgment was entered, with claims beyond the scope for which this Court had expressly retained jurisdiction); *Flathead Irrigation Dist. v. Jewell*, 121 F. Supp. 3d 1008, 1024 (D. Mont. 2015) (proposed claim against a new state defendant concerning passage of a state law was "wholly distinct" from initial claims focused on whether a federal agency's operation and management of a project on an Indian reservation comported with federal law); *Eid v. Alaska Airlines*, 621 F.3d 858, 874 (9th Cir. 2010) (affirming denial of leave to file a supplemental complaint adding claims arising from conduct occurring before plaintiffs filed their first complaint). Here, the Court has not entered a final judgment, and *Planned Parenthood* and *Western Watersheds Project* are inapposite. Moreover, as discussed above, the ESA and APA claims Guardians seek to bring challenging the rescission is not "wholly distinct" but inextricable from the existing ESA reinitiation claim. And

finally, these new claims arose from the agencies' actions after Guardians filed their prior pleadings—indeed, it arose from the agencies' unlawful attempt to moot the existing action.

B.  The Agencies Cannot Substantially Show That Any *Foman* Factor Exists.

Addressing the *Foman* factors, first, undue delay does not exist: Guardians seeks leave to file an amended and supplemental complaint shortly after any required period has elapsed for 60 days' notice to sue the Forest Service under the citizens suit provision of the ESA.[4] Further, under the local rules, this motion may be fully briefed before the hearing currently scheduled for December 3, 2020. *See* Dkt. 42.

Second, neither bad faith or dilatory motive exist on Guardians' part. As to dilatory motive, on October 15, 2020, counsel for Guardians first conferred with counsel for Defendants as to their position on this prospective motion; they thereafter traded emails, and their conferrals were completed today.

Third, neither the Forest Service nor Fish and Wildlife should suffer any prejudice, let alone undue prejudice, from a proceeding in which the Court considers whether the agencies' past and recent actions are lawful.

Conclusion.

The Court should grant Guardians leave to file an amended and supplemental complaint.

Date: October 26, 2020.            Respectfully submitted,

/s/ Peter M. K. Frost
Peter M. K. Frost, *pro hac vice*
Dana M. Johnson, Idaho Bar #8359

---

[4] Guardians served notice on August 6, 2020.