Dana M. Johnson, Idaho Bar #8359
Wilderness Watch
P.O. Box 9623
Moscow, Idaho 83843
Tel: (208) 310-7003
danajohnson@wildernesswatch.org

Matthew K. Bishop, *pro hac vice*
Western Environmental Law Center
103 Reeder's Alley
Helena, Montana 59601
Tel: 406-324-8011
bishop@westernlaw.org

Peter M.K. Frost, *pro hac vice*
Sangye Ince-Johannsen, *pro hac vice*
Western Environmental Law Center
120 Shelton McMurphey Blvd., Suite 340
Eugene, Oregon 97401
Tel: 541-359-3239; 541-778-6626
frost@westernlaw.org; sangyeij@westernlaw.org

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WILDEARTH GUARDIANS, et al.,<br><br>        Plaintiffs,<br><br>    v.<br><br>U.S. FOREST SERVICE, et al.,<br><br>        Defendants. | Case No. 1:19-cv-00203-CWD<br><br>**PLAINTIFFS' BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND INJUNCTIVE RELIEF** |

Table of Contents.

Table of Contents. ........................................................................................................... i

Table of Authorities. ....................................................................................................... ii

Background. ....................................................................................................................1

    A.  The Grizzly Bear. ...............................................................................................1

    B.  Federal Defendants and the Use of Bait in Grizzly Habitat. ...............................3

    C.  Overlap Between State Baiting and Grizzly Presence. .......................................8

    D.  Forest Service Implementation of the National Bait Policy. ...............................9

    E.  Use of Bait and Grizzly Mortalities. .................................................................11

    F.  Purported Rescission of the National Bait Policy BiOp and ITS. .....................12

Jurisdiction. ...................................................................................................................12

Standard of Review. .......................................................................................................12

Argument. .......................................................................................................................13

    A.  Federal Defendants' Attempt to Rescind the BiOp and ITS Was Unlawful. ....13

        1.  "Agency Action" Under ESA Section 7(a)(2) Has Existed Since 1993. .....13

        2.  *Fund for Animals v. Thomas.* .......................................................................17

    B.  Federal Defendants Have Unlawfully Failed to Reinitiate Consultation. ...........18

    C.  The Court Should Order Federal Defendants to Reinitiate Consultation and Order the Forest Service to Close Certain Areas to Baiting. ...........................................19

Conclusion. ....................................................................................................................20

Table of Authorities.

Cases:

*Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv*., 789 F.3d 1075 (9th Cir. 2015) .......................20

*Crow Indian Tribe v. United States*,
     No. 17-v-89-M-DLC, 2018 WL 4145908 (D. Mont. Aug. 30, 2018) ..............................20

*Crow Indian Tribe v. United States*, 965 F.3d 662 (9th Cir. 2020) ...................................2

*Friends of the Clearwater v. U.S. Forest Serv.*,
     No. 3:20-cv-00322-BLW, 2021 WL 3408595 (D. Idaho Aug. 4, 2021) ..........................19

*Fund for Animals v. Thomas*, 127 F.3d 80 (D.C. Cir. 1997) .........................................17

*Grand Canyon Trust v. U.S. Bureau of Reclamation*,
     No. 07-cv-8164, 2010 WL 2643537 (D. Ariz. June 29, 2010) .........................................19

*Greater Yellowstone Coalition, Inc. v. Servheen*, 665 F.3d 1015 (9th Cir. 2011) ..........................1

*Humane Soc'y of the U.S. v. Locke*, 626 F.3d 1040 (9th Cir. 2010) ...............................................13

*Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006 (9th Cir. 2012) .........................13, 14, 17

*MetroPCS, Inc. v. City and County of San Francisco*, 400 F.3d 715 (9th Cir. 2005) ..................12

*Nat'l Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508 (9th Cir. 1994) ....................................20

*Or. Nat. Res. Council v. Allen*, 476 F.3d 1031 (9th Cir. 2007)......................................................19

*Summers v. Schriro*, 481 F.3d. 710 (9th Cir. 2007) .....................................................................17

*W. Watersheds Project v. Matejko*, 468 F.3d 1099 (9th Cir. 2006).........................................17, 18

Statutes:

5 U.S.C. § 706................................................................................................................13, 19

16 U.S.C. § 1536(a)(2).....................................................................................................13, 14

16 U.S.C. § 1540(c) ..............................................................................................................12

16 U.S.C. § 1540(g)(1) ..........................................................................................................12

28 U.S.C. § 1331.....................................................................................................................12

Regulations:

50 C.F.R. § 402.02 ................................................................................................18

50 C.F.R. § 402.14(a) ...........................................................................................12

50 C.F.R. § 402.14(i) ............................................................................................18

50 C.F.R. § 402.16(a) ...........................................................................................18

Federal Register Notices:

*Amendment Listing the Grizzly Bear of the 48 Conterminous States as a Threatened Species*,
    40 Fed. Reg. 31,734 (July 28, 1975)...................................................................1

*Record of Decision Concerning Grizzly Bear Recovery in the Bitterroot Ecosystem*,
    65 Fed. Reg. 69,644 (Nov. 17,  2000)..............................................................2, 3

*Removing the Greater Yellowstone Ecosystem Population of Grizzly Bears from the Federal List
    of Endangered and Threatened Species*, 82 Fed. Reg. 30,502 (June 30, 2017) .........1, 2, 3

*Use of Bait in Hunting*, 59 Fed. Reg. 11,765 (Mar. 14, 1994).....................................3, 4

*Use of Bait in Hunting*, 60 Fed. Reg. 14,720 (Mar. 20, 1995)...........................8, 16, 18

Miscellaneous:

Fed. R. Civ. P. 56(a) ............................................................................................12

Pursuant to DIST. IDAHO LOC. CIV. R. 7.1(a), Plaintiffs WildEarth Guardians et al. (Guardians) hereby respectfully file this brief in support of their motion for summary judgment and injunctive relief.

Background.

A.      The Grizzly Bear.

The grizzly bear (*Ursus arctos horribilis*) is "one of the American West's most iconic wild animals." *Greater Yellowstone Coalition, Inc. v. Servheen*, 665 F.3d 1015, 1019 (9th Cir. 2011). Grizzlies are "both revered and feared as a symbol of wildness, independence, and massive strength." *Id*. Before the arrival of Europeans, grizzlies lived throughout the western United States and in most of Alaska, numbering approximately 50,000 individuals. *Removing the Greater Yellowstone Ecosystem Population of Grizzly Bears from the Federal List of Endangered and Threatened Species*, 82 Fed. Reg. 30,502, 30,508 (June 30, 2017). Subsequently, human settlement and government bounty programs extirpated 31 of 37 grizzly populations, and left grizzlies in less than two percent of the species' historic range in the lower 48 states. *Id*. In 1975, the U.S. Fish and Wildlife Service (FWS) listed grizzly bears in the lower 48 states as threatened with extinction under the Endangered Species Act (ESA). *Amendment Listing the Grizzly Bear of the 48 Conterminous States as a Threatened Species*, 40 Fed. Reg. 31,734 (July 28, 1975). One factor FWS cited as a reason to list grizzlies is that in the relatively few places where populations did occur, they were "isolated from other populations so that they cannot be reinforced, either genetically or by movement of individual bears." *Id*.

The 1982 Grizzly Bear Recovery Plan groups ESA-listed grizzlies into six "recovery ecosystems." Plfs' Ex. A at 31. The Plan states that to delist the species in the lower 48 states, FWS would need to "[e]stablish recovery of at least three populations in three distinct grizzly

bear ecosystems." *Id*. at 11. Since listing, grizzly populations have grown in the Greater Yellowstone Ecosystem (GYE) in northwestern Wyoming, eastern Idaho, and southeastern Montana, and in the Northern Continental Divide Ecosystem (NCDE) in north-central Montana. *Crow Indian Tribe v. United States*, 965 F.3d 662, 672 (9th Cir. 2020). That is not the case, however, in the Bitterroot Ecosystem in central Idaho, which FWS found "has the best potential for grizzly bear recovery," because it "offers excellent potential to support a healthy population of grizzly bears" that would "boost long-term survival and recovery prospects for this species in the contiguous United States." *Record of Decision Concerning Grizzly Bear Recovery in the Bitterroot Ecosystem*, 65 Fed. Reg. 69,644 (Nov. 17, 2000). Currently, there are no known resident grizzlies in the Bitterroot Ecosystem. Plfs' Ex. B, *Species Status Assessment for the Grizzly Bear (Ursus arctos horribilis) in the Lower-48 States: A Biological Report*, U.S. Fish and Wildlife Serv., at 6 (Jan. 2022).

Nonetheless, in 2017, FWS found that "grizzly bears have nearly doubled their occupied range since the early 1980s" in the lower 48 states, primarily onto lands outside of the GYE and NCDE recovery zones, bringing them closer to the Bitterroot Ecosystem. 82 Fed. Reg. at 30,511. For example, in 2020, FWS published a map depicting the grizzly recovery zones, a larger area surrounding the GYE and NCDE recovery zones denoted as "Estimated current distribution," and a still larger area denoted as "Grizzly bears 'may be present.'" Plfs' Ex. C. More recently, in 2021, FWS updated its map to show recovery zones, the estimated current distribution of grizzlies, and documented individual "outliers" from estimated distribution during the years 2011 to 2021. Plfs' Ex. D (appended to this brief).

As noted, the movement and survival of grizzlies between recovery ecosystems matters in terms of the genetic health of grizzlies within populated ecosystems, 82 Fed. Reg. at 30,535,

and also in terms of any recolonization of unpopulated areas such as the Bitterroot Ecosystem. 65 Fed. Reg. at 69,644. FWS "recognize[s] the GYE grizzly bear population could be a possible source population to re-colonize the Bitterroot Ecosystem to the west." 82 Fed. Reg. at 30,536. Similarly, in 2021, FWS noted "the NCDE and [Bitterroot Ecosystem] are less than 5 km (3 mi) apart and multiple verified sightings have occurred" between them. Plfs' Ex. B at 55.

This case concerns the overlap between where grizzlies may be present on national forest lands in Idaho and Wyoming and where those states allow the use of bait for hunting on those lands. FWS has found that "[t]he primary factors affecting grizzly bears at both the individual and ecosystem levels are excessive human-caused mortality and human activity that reduces the quality and quantity of habitats, which increases the potential for human-caused mortality, both directly and indirectly." *Id*. at 7. FWS has also found that hunting over bait "can be a source of mortality (due to mistaken identity killings) and conflicts (due to conditioning to human foods)." *Id*. at 128. Moreover, independent of grizzly killings, FWS has also noted that "[m]anagement removal of nuisance bears, particularly food-conditioned bears, has been the second highest cause (31 percent) of human-caused mortalities in the [GYE] from 1992 to 2001." Forest Service Administrative Record (FS AR) 374.

B.     Federal Defendants and the Use of Bait in Grizzly Habitat.

"Baiting" in the context of hunting means to use "food or scent to attract wildlife." *Use of Bait in Hunting*, 59 Fed. Reg. 11,765, 11,766 (Mar. 14, 1994). Through the early 1990s, ten states, including Idaho and Wyoming, authorized hunters to use bait to hunt black bears. FS AR 163. From the 1960s through 1992, some units of the national forest system in Wyoming that included habitat for grizzlies required hunters to obtain special use permits to use bait. *Id*. In March 1992, the Forest Service decided to discontinue requiring special use permits in national

forests in Wyoming, and instead to consider issuing closure orders prohibiting baiting except where allowed. 59 Fed. Reg. at 11,766. Groups sued the Forest Service for switching from special use permits to closure orders without analyzing effects on black bears under the National Environmental Policy Act (NEPA). *Id*. The parties settled, and the Forest Service agreed to prepare a NEPA analysis to consider whether to require special use permits for baiting in national forests in Wyoming. *Id*.

On February 19, 1993, the Forest Service published an Environmental Assessment (EA) to evaluate the effects of baiting in national forests in Wyoming. The proposed action and preferred alternative in the EA is to generally "regulate noncommercial bear baiting on National Forest System lands through State Game Regulations." FS AR 56. On March 25, 1993, the Forest Service published a Biological Evaluation under Section 7(a)(2) of the ESA that considered effects on grizzlies of the preferred alternative in the 1993 EA, and explained more fully the proposed actions:

> The proposed action and preferred alternative is to discontinue issuing special use permits to authorize bear baiting locations, close all designated Wilderness to bear baiting, beginning in 1994, and through a Memorandum of Understanding with the Wyoming Game and Fish Commission regulate noncommercial black bear baiting on National Forest System lands through Wyoming Game and Fish Commission Trophy Game Regulations (alternative 4). In addition to these Trophy Game Regulations listed below, the following mitigation measures are for all alternatives, including the preferred (Alternative 4), until such time as they become State Regulations . . . .

FS AR 72. The "mitigation measures" common to all alternatives in the EA (and conservation measures listed in the Biological Evaluation) included: (1) prohibiting baiting in the GYE recovery zone and (2) outside of the recovery zone, prohibiting baiting where the Forest Service otherwise prohibits "the improper storage of food in grizzly bear habitat." FS AR 57–58. On April 2, 1993, the Forest Service issued a Decision Notice to adopt the proposed alternative from the 1993 EA. FS AR 103–15.

On April 6, 1993, the Forest Service requested formal consultation with FWS to obtain its opinion as to effects of the proposed actions in the 1993 EA on listed species, including grizzlies. FWS AR 74.[1] On April 14, 1993, FWS issued a Biological Opinion (BiOp). FWS AR 74–83. The BiOp states that "baiting for black bears" that "occurs within the range of the grizzly bear" can result in mortality to grizzlies, if a hunter mistakes a grizzly for a black bear or perceives a grizzly threatens the hunter's safety. FWS AR 77. The BiOp states grizzlies may become "conditioned" to foods used in baiting, and seek them elsewhere, and become "problem" bears requiring "management actions." *Id*. The BiOp states that between 1967 and 1993, five grizzlies were "reported shot" at black bear bait sites in Wyoming. FWS AR 78. The BiOp finds the mitigation measures in the 1993 EA, including "[c]losing the proposed grizzly bear recovery zone and all areas covered by a special order prohibiting improper storage of food in grizzly bear habitat (mitigation measures common to all alternative[s]) will have a beneficial affect [*sic*] on grizzly bears." FWS AR 75. Based on the mitigation measures, FWS found that none of the alternatives in the 1993 EA would jeopardize the continued existence of grizzlies. FWS AR 79.

However, FWS found a "remaining potential for incidental take of grizzly bears" due to the use of bait to hunt black bears, so it issued an Incidental Take Statement (ITS) that includes mandatory terms it deemed "critical to fulfillment of [the Forest Service's] responsibilities" under Section 7(a)(2) of the ESA. FWS AR 79–80. Relevant to this case, first, the Forest Service must "[e]liminate the use of processed human, livestock or pet foods, and fruits and vegetables produced for human consumption, as bear baits in any areas regularly used by grizzly bears[.]" FWS AR 80. Second, the Forest Service "has a continuing duty to regulate the activity covered

---

[1]  The Forest Service's April 6, 1993 letter requesting consultation is not in either agency's administrative record.

by this incidental take statement." *Id*. Third, FWS found that "[a]lthough there is a remote possibility that a grizzly bear may be taken as a result of black bear baiting on [Forest Service] lands in Wyoming, [FWS] does not anticipate that such take will occur. Therefore, no incidental take is allowed. Should any take occur, the [Forest Service] must reinitiate formal consultation with [FWS] and provide the circumstances surrounding the take." *Id*.

   Facing "new challenges to the [Forest Service's] position in the form of administrative appeals," the Forest Service decided in May 1993 that "national direction was needed to end the conflict and controversy." FS AR 260. On July 29, 1993, the Forest Service rescinded its 1993 EA and Decision Notice, and issued a joint closure order prohibiting bear baiting in national forests in Wyoming pending national direction as to bait. FS AR 130.

   With the joint closure order in effect in Wyoming, the Forest Service anticipated a forthcoming national bait policy would allow baiting to recur. *Id*. On July 29, 1993, the regional foresters for the Rocky Mountain and Intermountain Regions of the Forest Service wrote the Chief: "Should the National Policy permit the continuation of black bear baiting, we will re-establish the closure orders related to grizzly bear habitat in accordance with the mitigation measures in the Decision Notice and non-discretionary measures in the Biological Opinion issued by the Fish and Wildlife Service. That part of the environmental analysis process and Decision Notice that relates to grizzly bear habitat, the Biological Evaluation, and Biological Opinion will be re-instated [*sic*] and considered adequate to protect" grizzlies. *Id*.

   On February 13, 1995, the Forest Service wrote FWS that it was "in the process of preparing a National Policy on bear baiting[.]" FWS AR 164. The Forest Service wrote: "As a result of the mitigation measures in the [1993] EA and the reasonable and prudent alternatives in the [BiOp], we implemented a closure order prohibiting the use of bait for black bear hunting in

the [GYE] recovery zone, in the food restrictions areas on the Wind River Ranger District,

Shoshone National Forest, and prohibited hunting of black bears with non-natural baits in grizzly

habitat not covered by the other closure orders." *Id*. The Forest Service noted that "[t]he [1993]

EA was rescinded but the closure orders are still in effect." *Id*. The Forest Service added that in

"accordance with one of the conservation recommendations [in the BiOp], an additional area on

the Greybull District, Shoshone National Forest, has been closed since the [BiOp] was issued."

*Id*. The Forest Service concluded: "We ask that you review the original [BiOp] in light of this

proposed new policy, and the actions we have taken, to determine if you concur that the actions

we have taken to protect the grizzly bear are still adequate." *Id*.

On February 27, 1995, FWS responded to the Forest Service's letter, noting the Forest

Service complied with the BiOp and ITS and closed the GYE recovery zone to baiting, as well as

prohibiting use of non-natural baits in other areas grizzlies occupy. FWS AR 165. FWS

concluded: "The proposed National Policy appears to be consistent with our biological opinion

of April 14, 1993, and no information has become available to suggest that additional terms and

conditions are necessary at this time." FWS AR 166.

The Forest Service then performed notice and comment rulemaking under the

Administrative Procedure Act (APA) and, on March 14, 1995, issued an EA under NEPA to

consider adopting a national bait policy. FS AR 155–248. When it prepared the 1995 EA, the

Forest Service attached the BiOp to it, and stated that the BiOp will be "re-evaluated" to

determine if it is "still applicable under the new policy." FS AR 189.

The national bait policy states: "Where States permit the use of bait for attracting resident

game, this activity is allowed on National Forest Service lands, subject to State hunting laws and

regulation, unless the authorized officer determines on a site-specific basis that there is a need to

prohibit or restrict the practice." *Use of Bait in Hunting*, 60 Fed. Reg. 14,720, 14,723 (Mar. 20, 1995). The Forest Service stated it would "monitor State regulations" to ensure they "protect Federal interests." *Id*. at 14,721. The Forest Service explained that if "bait conflicts with Federal law or regulations, forest plan direction, or other uses or users . . . the authorized officer could prohibit or restrict the use of bait, in an area, by issuing a closure order." *Id*. at 14,720. Before issuing a closure order, the officer "would first consult with the State fish and wildlife agency to see if the conflict could be resolved without a closure or restrictive order," but "the Forest Service would close specific areas to baiting if conflicts cannot be resolved . . . ." *Id*. at 14,720–21. The Forest Service stated "the authorized officer must close an area to baiting" if circumstances arise, including if "State laws and regulations conflict with Federal law, such as the Endangered Species Act." *Id*. at 14,721.

On March 14, 1995, FWS responded to a letter from the Forest Service "requesting concurrence" with the Forest Service's finding that its "proposed national policy on use of bait during hunting on National Forest Service lands is not likely to adversely effect [*sic*] federally listed species." FWS AR 167. FWS noted the national bait policy required the Forest Service to monitor state baiting regulations, "and to establish administrative closures to baiting where necessary to protect federally listed species." *Id*. FWS referred to other documents "clarifying certain issues," and noted the two agencies' staff had agreed to "revisions to the proposed policy." *Id*. Ultimately, FWS concurred with the Forest Service under Section 7(a)(2) that the policy "is not likely to adversely affect federally listed species," including grizzlies. *Id*.

On March 20, 1995, the Forest Service issued a Decision Notice and adopted by rule the national bait policy. FS AR 259–65.

C.     Overlap Between State Baiting and Grizzly Presence.

Currently, among the lower 48 states, only Idaho and Wyoming allow the use of bait to hunt black bears. (Dkt. 56 ¶ 19; Dkt. 69 ¶ 19). Further, Idaho and Wyoming allow use of bait in areas in national forests grizzly bears may inhabit. As noted, the distribution of grizzlies has grown outside of GYE and NCDE recovery zones, and individual grizzlies have been verified between the acknowledged distribution of grizzlies and the Bitterroot Ecosystem. Plfs' Ex. D. In 2019, the Forest Service noted numerous areas within even the acknowledged distribution of grizzlies in Idaho and Wyoming where the states authorize the use of bait. FS AR 1473 (in the Idaho portion of GYE, "grizzly distribution extends well beyond the [primary conservation area] into areas of ID where baiting is allowed"); *id*. (in the Wyoming portion of the same ecosystem, "there are significant areas within occupied grizzly bear range where baiting is allowed"); *id*. (in northern Idaho, grizzlies "occasionally occur" outside of where baiting is prohibited near the Selkirk and Cabinet-Yaak Ecosystems). More specifically, in June 2019, a grizzly was documented near a bait site during the hunting season in the Kelly Creek drainage of the Nez Perce-Clearwater National Forests in Idaho, within the Bitterroot Ecosystem. Plfs' Ex. E at 2. As another example, Idaho allows bear baiting in game management unit 61 in the Caribou-Targhee National Forest in eastern Idaho, where a grizzly sow and her cub were recently documented. Declaration of Dave Stricklan ¶ 17.

D.    Forest Service Implementation of the National Bait Policy.

Since adopting its national bait policy, the Forest Service has implemented it when issuing closure orders prohibiting food storage in grizzly habitat in national forests in Idaho and Wyoming by exempting the use of bait to hunt black bears. FS AR 1474; Plfs' Ex. F, Ds' Disc. Responses at 9–10, #5 (noting the policy as a basis for "line officers" to make determinations related to the scope of food storage orders). As examples, on January 29, 2010, in order to

"reduce grizzly bear and human encounters and conflicts thereby providing for user safety and the protection of the grizzly bear," the Forest Service issued an "Occupancy and use" order prohibiting food storage within the Teton Basin, Ashton/Island Park, and Dubois Ranger Districts in the Caribou-Targhee National Forest in Idaho, but exempted "[p]ersons in the act of placing black bear baits for the lawful purpose of hunting black bears under state law and regulation." FS AR 1097–98. On June 14, 2016, in part to minimize or reduce conflicts between grizzlies and humans, the Forest Service prohibited food storage or processing in areas of the Shoshone and Bridger-Teton National Forests in Wyoming, but again exempted bait to hunt black bears. FS AR 1326–31; Plfs' Ex. F, Ds' Disc. Responses at 7, #11. On September 11, 2001, in part to minimize or reduce conflicts between grizzly bears and humans, the Forest Service prohibited food storage or processing in areas of the Sandpoint, Bonners Ferry, and Priest Lake Ranger Districts in the Idaho Panhandle National Forests in Idaho, but again exempted bait to hunt black bears. FS AR 1099–1103; Plfs' Ex. F, Ds' Disc. Responses at 6, #8. There are still other current and prior orders and exemptions. FS AR 1320–35; Plfs' Ex. F, Ds' Disc. Responses at 6 & 7, #10 (food closure order and baiting exemption in the Bridger-Teton National Forest in Wyoming); FS AR 1356–62.

Indeed, FWS acknowledged continued implementation of the national bait policy and the BiOp and ITS. In 2016, the Park Service reinitiated consultation with FWS on effects to grizzlies of a new bison and elk management plan in the Tetons. FWS AR 238–67. In its 2016 biological opinion, FWS noted the existing BiOp for the activity "Bear Baiting (Statewide Programmatic)," and noted the allowable "Incidental Take (IT) Exempted" due to baiting as "0." FWS AR 251. FWS stated the "level of incidental take" allowed in the bait policy BiOp and ITS and other

listed biological opinions and incidental take statements formed "the environmental baseline for this [2016] biological opinion." FWS AR 247.

E.     Use of Bait and Grizzly Mortalities.

Since the Forest Service adopted by rule its national bait policy, and since FWS issued the ITS authorizing no incidental take, at least four grizzly bears have been killed by licensed black bear hunters using bait in national forests in Idaho and Wyoming. First, Federal Defendants admit that on May 8, 2000, a licensed hunter seeking black bears and using bait killed a grizzly bear near Owl Creek in the Shoshone National Forest in Wyoming. (Dkt. 56 ¶ 49; Dkt. 69 ¶ 49.) Wyoming admits this grizzly mortality too. (Dkt. 75 ¶ 1.) Second, Federal Defendants admit that on May 26, 2003, a licensed hunter seeking black bears and using bait killed a grizzly bear near Middle Fork Owl Creek in the Shoshone National Forest in Wyoming. (Dkt. 56 ¶ 52; Dkt. 69 ¶ 52.) Wyoming admits this grizzly mortality too. (Dkt. 75 ¶ 1.) Third, Federal Defendants admit that on May 28, 2007, a licensed hunter seeking black bears and using bait killed a grizzly bear on Dutch Joe Creek in the Bridger-Teton National Forest in Wyoming. (Dkt. 56 ¶ 56; Dkt. 69 ¶ 56.) Wyoming admits this grizzly mortality too. (Dkt. 75 ¶ 1.) Fourth, Federal Defendants admit that on September 3, 2007, a licensed hunter seeking black bears and using bait killed a grizzly bear in the North Fork Clearwater watershed, in what was then the Clearwater National Forest and is now the Nez Perce Clearwater National Forest in Idaho. (Dkt. 56 ¶ 57; Dkt. 92 ¶ 57.) Idaho admits this grizzly mortality too. (Dkt. 74 ¶ 57.) At the time, this was the first grizzly verified in the Bitterroot Mountains since 1946. *Id.*

The number of grizzlies killed at black bear bait sites in national forests in Idaho and Wyoming since 1995 may be greater than these four, because some reports of grizzly mortalities caused by hunters do not disclose whether bait was present or do not precisely identify locations

to determine whether the incident took place in a national forest. For example, Wyoming admits that on April 24, 2001, a black bear hunter killed a grizzly near a bait site in Rock Springs Canyon in Wyoming (Dkt. 56 ¶ 50, Dkt. 75 ¶ 1), but the state mortality report does not identify whether the grizzly mortality occurred on Forest Service land. Plfs' Ex. G.

F.     Purported Rescission of the National Bait Policy BiOp and ITS.

After Guardians filed this case, alleging that the amount of "take" of grizzlies specified in the ITS has been exceeded, and that new information exists about effects on grizzlies of the use of bait in grizzly habitat, on June 26, 2020, the Forest Service and FWS exchanged letters dated the same day through which they sought to rescind the BiOp. FWS AR 293–96, 297–98.

Jurisdiction.

Guardians alleges Federal Defendants unlawfully sought to rescind the BiOp and failed to reinitiate consultation as the ESA requires. (Dkt. 56 ¶¶ 85–90); 50 C.F.R. § 402.14(a)). This Court has jurisdiction to review these claims pursuant to federal question jurisdiction and the citizen suit provision of the ESA. 28 U.S.C. § 1331; 16 U.S.C. §§ 1540(c) & (g)(1). Guardians has standing to assert these claims: it has been injured by Federal Defendants' actions, Federal Defendants have caused the injuries, and the Court can redress the injuries. Declarations of Dave Stricklan, Larry Campbell, and John Borstelmann.

Standard of Review.

To prevail on summary judgment under FED. R. CIV. P. 56(a), the moving party carries the initial burden to show that no genuine issues of material fact exist. *MetroPCS, Inc. v. City and County of San Francisco*, 400 F.3d 715, 720 (9th Cir. 2005) (citing *Celotex, Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Once the moving party has carried that burden, it then shifts to the non-moving party, who must present evidence that there is indeed a genuine issue for trial." *Id.*

Judicial review of agency actions under the ESA is governed by the APA. 5 U.S.C. § 706; *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012) (*en banc*).

Argument.

A.   Federal Defendants' Attempt to Rescind the BiOp and ITS Was Unlawful.

It should be undisputed that after the Forest Service adopted its national bait policy, licensed hunters using bait have killed grizzly bears in national forests in Idaho and Wyoming. It should also be undisputed that the national bait policy and the BiOp have remained in effect since 1995: Federal Defendants have relied upon or cited them as bases for their actions since then. The parties' dispute appears to present questions of law related to Federal Defendants' rationales for seeking to rescind the BiOp. The Forest Service asserts it never undertook "agency action" under Section 7(a)(2) related to baiting and grizzlies on two main grounds: (1) it "never implemented" the proposed action (including mitigation measures) in the 1993 EA that prompted the BiOp, and (2) the Forest Service agrees with the D.C. Circuit's "suggestion" that its "decision to refrain from future regulation of baiting may not constitute 'action' at all." FWS AR 293–95 (citing *Fund for Animals, Inc. v. Thomas*, 127 F.3d 80, nn. 3 & 6 (D.C. Cir. 1997)). Guardians addresses each rationale in turn.[2]

1.   "Agency Action" Under ESA Section 7(a)(2) Has Existed Since 1993.

As the Court is aware, consultation is required under Section 7(a)(2) when a federal agency authorizes, funds, or carries out "any action" that may affect a listed species. 16 U.S.C. §

---

[2]   Federal Defendants' attempt to rescind the BiOp also turns on an impermissible *post hoc* rationale offered for the first time during and because of this case. Rationales for agency decision-making appearing for the first time in litigation are *post hoc* explanations that cannot justify agency action. *Humane Soc'y of the U.S. v. Locke*, 626 F.3d 1040, 1049–50 (9th Cir. 2010) (internal citation omitted). Here, Federal Defendants seek to rescind the BiOp 28 years after it was issued, on the new theory that no "agency action" existed or followed to require it. FWS AR 294–95. Their interpretation attempts to evade judicial review and should be rejected.

1536(a)(2). Whether "agency action" exists under Section 7(a)(2) requires two inquiries. *Karuk Tribe*, 681 F.3d at 1021. First, "whether [the] federal agency affirmatively authorized, funded, or carried out the underlying activity." *Id*. Second, "whether the agency had some discretion to influence or change the activity for the benefit of a protected species." *Id*. In *Karuk Tribe*, the Ninth Circuit noted it has "repeatedly held that the ESA's use of the term 'agency action' is to be construed broadly," and that "[t]here is 'agency action' whenever an agency makes an affirmative, discretionary decision about whether, or under what conditions, to allow private activity to proceed." *Id*. at 1011 & 1030.

The Forest Service's first rationale for rescinding the BiOp is that the proposed action in the 1993 EA was to adopt a "proposed Region 2 policy" related to baiting that "was rescinded prior to implementation." FS AR 297. That is an incomplete representation of what happened.

The proposed action (alternative) in the 1993 EA was to "discontinue issuing special use permits to authorize bear baiting locations, close all designated Wilderness to bear baiting, beginning in 1994, and . . . regulate noncommercial black bear baiting on National Forest System lands through Wyoming Game and Fish Commission Trophy Game Regulations." FS AR 72. All alternatives in the EA considered "mitigation measures" including (1) prohibiting baiting in the GYE recovery zone and (2) prohibiting baiting outside the recovery zone in areas where the "the improper storage of food in grizzly bear habitat" is otherwise prohibited. FS AR 57–58.

After the Forest Service issued a Decision Notice to adopt the proposed action in the 1993 EA, and after FWS issued the BiOp evaluating the proposed action including mitigation measures, there were "new challenges to the [Forest Service's] position in the form of administrative appeals." FS AR 260. So, in May 1993, the Forest Service decided "national

direction was needed to end the conflict and controversy," and withdrew the 1993 Decision Notice. FS AR 260, 130.

However, that did not end the Forest Service's discretionary, affirmative actions related to effects on grizzlies of bait in national forests. First, the Forest Service issued a joint closure order prohibiting all bear baiting in national forests in Wyoming pending national direction as to bait. FS AR 130. After issuing that order, the Forest Service explicitly anticipated the prospect of a national bait policy allowing baiting to continue. *Id*. In that context, in July 1993, two regional foresters laid out their plans if such a policy were adopted: "Should the National Policy permit the continuation of black bear baiting, we will re-establish the closure orders related to grizzly bear habitat in accordance with the mitigation measures in the Decision Notice and non-discretionary measures in the Biological Opinion issued by the Fish and Wildlife Service. That part of the environmental analysis process and Decision Notice that relates to grizzly bear habitat, the Biological Evaluation, and Biological Opinion will be re-instated [*sic*] and considered adequate to protect" grizzly bears. *Id*.

The Forest Service then exercised its discretion and adopted those measures: "As a result of the mitigation measures in the [1993] EA and the reasonable and prudent alternatives in the [BiOp], we implemented a closure order prohibiting the use of bait for black bear hunting in the [GYE] recovery zone, in the food restrictions areas on the Wind River Ranger District, Shoshone National Forest, and prohibited hunting of black bears with non-natural baits in grizzly habitat not covered by other closure orders," as well as closing an additional area. FWS AR 164.

Then, when the Forest Service issued the 1995 EA to consider the effects of adopting the national bait policy, it attached the BiOp, and explicitly stated the BiOp will be "re-evaluated" to determine if it is "still applicable under the new policy." FS AR 189. In other words, the Forest

Service was keenly aware the national bait policy itself constituted "agency action" requiring consultation under Section 7(a)(2), and it sought to fulfill this requirement through the BiOp.

Next, when the Forest Service consulted under Section 7(a)(2) with FWS on the national bait policy's effects on grizzlies, the Forest Service proposed that the BiOp would still be applicable under the new policy. The Forest Service explicitly asked FWS to "review the original [BiOp] in light of this proposed new policy, and the actions we have taken, to determine if you concur that the actions we have taken to protect the grizzly bear are still adequate." FWS AR 164. FWS responded by reciting the Forest Service's actions since 1993, FWS AR 165, and concluded: "The proposed National Policy appears to be consistent with our biological opinion of April 13, 1993, and no information has become available to suggest that *additional* terms and conditions are necessary at this time." FWS AR 166 (emphasis added). Ultimately, FWS concurred with the Forest Service's finding that the policy "is not likely to adversely affect" grizzlies. FWS AR 167. The bases for FWS's concurrence included the Forest Service's affirmative actions: it had "re-instated" mitigation measures from the 1993 EA and implemented the non-discretionary measures in the BiOp, as the regional foresters had written it would. *Id.*

The Forest Service's discretionary, affirmative decision to issue the national bait policy in 1995 also did not end its role related to bait in national forests and duty to be covered by consultation. The policy is in effect and mandates continuing actions: it states that the Forest Service will monitor for grizzly mortalities and continue to issue needed closure orders or other measures to "protect Federal interests," 60 Fed. Reg. at 14,721; that it will "determine[] on a site-specific basis that there is a need to prohibit or restrict" baiting, *id.* at 14,723; and that its officers "must close an area to baiting" if certain events occur, including conflicts with laws "such as the Endangered Species Act." *Id.* at 14,721. The 1995 EA confirms these duties, stating that the

national bait policy "*mandates* corrective action through cooperative effort with the States *or through Federal action*." FS AR 170 (emphases added).

Finally, the record evinces that not only the national bait policy remains in effect, since the Forest Service continues to implement it through site-specific food storage orders, but that the BiOp does too, evident in FWS's inclusion of it in 2016 as among the biological opinions concerning the amount or extent of permissible take of grizzly bears in the lower 48. FWS AR 247. In sum, the record belies the Forest Service's assertion it never undertook "agency action" under Section 7(a)(2) requiring consultation.

2.      *Fund for Animals v. Thomas.*

The Forest Service's second rationale for seeking to rescind the BiOP is that in *Fund for Animals v. Thomas*, 127 F.3d 80, 84 n.6 (D.C. Cir. 1997), the D.C. Circuit "suggested" that "[i]f promulgation of the [national bait] policy constituted 'inaction,' . . . there most probably would have been no 'agency action' to trigger the ESA consultation requirement." It is not clear whether the precise issue of the existence of "agency action" under Section 7(a)(2) was raised or briefed by any party in that case, and the D.C. Circuit did not discuss it further. The D.C. Circuit's unconsidered dictum is neither binding nor persuasive here. *See Summers v. Schriro*, 481 F.3d. 710, 712–13 (9th Cir. 2007). Equally important, it is not clear what evidence was before the D.C. Circuit on this issue. By contrast, here, both the Forest Service and FWS have lodged administrative records containing documents related to their actions under the ESA before and after the BiOp was issued. These administrative records establish plainly the existence of "agency action" as defined by this circuit. *See Karuk Tribe*, 681 F.3d at 1021.

The Forest Service's rationale also relies on *W. Watersheds Project v. Matejko*, 468 F.3d 1099, 1108 (9th Cir. 2006) for the proposition that the duty to consult under Section 7(a)(2)

"stems only from 'affirmative actions.'" FWS AR 295. In *Matejko*, the Ninth Circuit held that

the Bureau of Land Management's "acquiescence" to stream diversions on lands it managed, by

private parties holding vested rights-of-way to divert water under an 1866 statute and subsequent

authorities, was not "agency action" subject to the consultation under Section 7(a)(2). 468 F.3d

at 1103, 1107–10. *Matejko* is inapposite. Here, the Forest Service has not "acquiesced" to the use

of bait in national forests. In fact, it has affirmatively closed areas to baiting where it deemed it

appropriate to do so. And it has affirmatively committed to monitor baiting and any grizzly

mortalities, and to close additional areas in national forests if it deems it appropriate to do so. 60

Fed. Reg. at 14,723; FWS AR 12–13; *see also* 50 C.F.R. § 402.02 (agency action subject to

Section 7(a)(2) includes "actions intended to conserve listed species or their habitat"). Unlike in

*Matejko*, the Forest Service is the "entity responsible for the challenged decisionmaking," and

the use of bait in national forests has "come[] within the agency's decisionmaking authority *and

remains so*," under the terms of the national bait policy. *Cf. Matejko*, 420 F.3d at 970 (emphasis

added). For these same reasons, "discretionary Federal involvement or control over the action

has been retained [and] is authorized by law[.]" 50 C.F.R. § 402.16(a).

B.      Federal Defendants Have Unlawfully Failed to Reinitiate Consultation.

        Federal Defendants have unlawfully failed to reinitiate consultation for two reasons.

First, the amount or extent of take (zero) in the ITS has been exceeded. 50 C.F.R. § 402.16(a)(1).

"If during the course of the action the amount or extent of incidental taking . . . is exceeded, the

Federal agency must reinitiate consultation immediately." 50 C.F.R. § 402.14(i)(4).

        Separately, "new information" reveals the effects of bait policy may affect grizzlies in a

manner or to an extent not previously considered, in two respects. 50 C.F.R. § 402.16(a)(2).

First, in its BiOp, FWS premised the zero-take ITS and mitigation measures on only a "remote

possibility" of grizzlies being taken. FWS AR 80. However, repeat killings of grizzlies by

hunters at bait stations in national forests in Idaho and Wyoming calls this foundational

assumption into question. *See Grand Canyon Trust v. U.S. Bureau of Reclamation*, No. 07-cv-

8164, 2010 WL 2643537, at *11 (D. Ariz. June 29, 2010) (an unanticipated extent of take

constitutes new information triggering the reinitiation requirement). Second, the acknowledged

expanded distribution of grizzlies and verified outliers, Plfs. Ex. C & D, and the continued use of

bait in areas grizzlies occupy, FS AR 1097–98, 1326–31, 1099–1103, 1356–62, constitute "new

information" triggering the duty for FWS and the Forest Service to reinitiate consultation.

C.     The Court Should Order Federal Defendants to Reinitiate Consultation and Order the
       Forest Service to Close Certain Areas to Baiting.

       Based upon the foregoing and its prayer for relief in its supplemental and amended

complaint (Dkt. 56 at 51), Guardians respectfully requests that the Court:

1.     Declare unlawful and set aside Federal Defendants' purported rescission of the BiOp. 5

U.S.C. § 706(2).

2.     Order Federal Defendants to reinitiate consultation on the effects on grizzly bears of the

national bait policy. Guardians has proven take of grizzly bears by licensed hunters at bait

stations in national forests in Idaho and Wyoming since 1995. In turn, the BiOp specifically

provides: "Should *any* take occur, the [Forest Service] must reinitiate formal consultation with

[FWS] and provide the circumstances surrounding the take." FWS AR 80 (emphasis added); *see

Or. Nat. Res. Council v. Allen*, 476 F.3d 1031, 1034–35 (9th Cir. 2007) ("The agency must

immediately reinitiate consultation with the FWS if the amount or extent of incidental taking is

exceeded"). Guardians has also proven that new information reveals effects of the national policy

that was not considered in the BiOp. *Supra* p. 18–19; *see Friends of the Clearwater v. U.S.

Forest Serv.*, No. 3:20-cv-00322-BLW, 2021 WL 3408595, at *6–7, 11 (D. Idaho Aug. 4, 2021)

(ordering agencies to reinitiate consultation upon finding new information).

3.      Order the Forest Service to close to baiting the areas where it has issued food storage

closure orders to prevent interactions between humans and grizzly bears but exempted baiting,

do not prohibit it during all of the black bear hunting season, or otherwise do not prohibit it

where grizzlies may be present, including: (a) the areas covered by the storage orders at FS AR

1097–98 and 1326–31 that exempt "[p]ersons in the act of placing black bear baits for the lawful

purpose of hunting black bears under state law and regulation[;]" (b) the area covered by the

storage order at FS AR 1099–1103, where the use of bait is not prohibited during the black bear

hunting season in the spring, and where "[p]ersons with a permit specifically authorizing the

otherwise prohibited act or omission" are exempted; and (c) the areas identified by FWS as

where grizzlies "may be present" on national forests in Idaho and Wyoming but where bait is

allowed. This injunctive relief is appropriate and necessary to prevent irreparable harm: "[T]he

threat of death to individual grizzly bears . . . is sufficient" to establish irreparable harm under

the ESA. *Crow Indian Tribe v. United States*, No. 17-v-89-M-DLC, 2018 WL 4145908, at *1 (D.

Mont. Aug. 30, 2018); *see also Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075,

1091 (9th Cir. 2015) (proving irreparable harm under the ESA should not be "onerous"). Further,

the "balance of the hardships and the public interest tips heavily in favor of protected species."

*Nat'l Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508, 1511 (9th Cir. 1994).

Conclusion.

The Court should grant Guardians' motion for summary judgment and injunctive relief.

Date: May 2, 2022.                    Respectfully submitted,

/s/ Sangye Ince-Johannsen
Sangye Ince-Johannsen, *pro hac vice*
Peter M. K. Frost, *pro hac vice*
Matthew K. Bishop, *pro hac vice*
Dana M. Johnson, Idaho Bar #8359
Attorneys for Plaintiffs



*Figure 29.  Estimated distribution of grizzly bears in the NCDE (2011–2020 data), GYE (2006–2020 data), CYE (2005–2019 data), and SE (2005–2019 data), and verified grizzly bear outlier observations between the ecosystems based on data from 2011 to June 14, 2021.*