TODD KIM
Assistant Attorney General
U.S. Department of Justice
Environment & Natural Resources Division

SETH M. BARSKY, Deputy Assistant Attorney General
S. JAY GOVINDAN, Deputy Section Chief
ROBERT P. WILLIAMS
Sr. Trial Attorney (D.C. Bar No. 474730)
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 305-0206
Facsimile: (202) 305-0275
Email: robert.p.williams@usdoj.gov

***Attorneys for Defendants***

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WILDEARTH GUARDIANS, WESTERN WATERSHEDS PROJECT, and WILDERNESS WATCH, ) ) ) | **Case No. 1:19-cv-00203-CWD** |
| Plaintiffs, ) | |
| vs. ) | **FEDERAL DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT** |
| UNITED STATES FOREST SERVICE and UNITED STATES FISH & WILDLIFE SERVICE, ) ) ) | |
| Defendants, ) | |
| and ) | |
| IDAHO FISH & GAME COMMISSION, ) | |
| and ) | |
| STATE OF WYOMING, ) | |
| Defendant-Intervenors. ) | |

# TABLE OF CONTENTS

PAGE

I.    Introduction ................................................................................................................1

II.   Legal Background.........................................................................................................2

    A.   Endangered Species Act ...................................................................................2

        1.   Section 7(a)(2) and Consultation Requirements for Federal Actions............2

        2.   Section 9 Prohibition Against Unauthorized Take and Exemptions for Non-Jeopardizing Take ................................................................................4

        3.   Reinitiating Consultation on the Federal Action................................................5

        4.   Withdrawing a BiOp and ITS in the Absence of Federal Action.................5

III.  Factual Background ......................................................................................................6

    A.   USFS' National Policy of Deferring to State Regulation of Baiting ...............6

    B.   The D.C. Circuit's Review of USFS' National Policy in *Fund for Animals*.....................8

    C.   The Reinitiation Decision.................................................................................9

    D.   Closure Orders and Food Storage Orders .....................................................10

IV.   Standard of Review on the Merits .............................................................................11

V.    Argument....................................................................................................................13

    A.   USFS Rationally Determined that Its Policy of Deferring to State Regulation of Bear Baiting is Not Federal Action that Requires Consultation Under ESA Section 7(a)(2) ...................................................................................................13

        1.   The Reinitiation Decision Easily Meets the Standards for Change in ........13

            a.   The Reinitiation Decision Conforms to *Fund for Animals* .................15

            b.   The Reinitiation Decision Conforms to *Matejko* and Related Ninth Circuit Case Law Authority.........................................................17

    B.   Plaintiffs Fail to Show Either that the Reinitiation Decision Is Unlawful or that Reinitiation of ESA Consultation on the National Policy Is Required .....................22

        1.   The Reinitiation Decision Is New Final Agency Action Under the APA............................................................................................................22

2.      No Closure Order or Food Storage Order Has Authorized Bear
        Baiting or Caused any Incidental Take of Grizzly Bears.................................23

C.      Plaintiffs Are Not Entitled to their Requested Relief .......................................27

VI.   Conclusion..............................................................................................................................29

# TABLE OF AUTHORITIES

## Cases

*Alaska Oil & Gas Ass'n v. Pritzker,*
  840 F.3d 671 (9th Cir. 2016) ................................................................ 13, 14, 15, 22

*Amoco Prod. Co. v. Vill. of Gambell,*
  480 U.S. 531 (1987) ........................................................................................28

*Ariz. Cattle Growers' Ass'n v. BLM,*
  273 F.3d 1229 (9th Cir. 2001) ..........................................................................26

*Bennett v. Spear,*
  520 U.S. 154 (1997) .............................................................................. 12, 22

*Cal. Sportfishing Prot. All. v. FERC,*
  472 F.3d 593 (9th Cir. 2006) ..........................................................................19

*Conservation Force v. Salazar,*
  811 F. Supp. 2d 18 (D.D.C. 2011) ....................................................................23

*Ctr. for Biological Diversity v. HUD,*
  541 F. Supp. 2d 1091 (D. Ariz. 2008) ................................................................26

*Defs. of Wildlife v. Flowers,*
  No. CIV 02-195-TUC-CKJ, 2003 WL 22145708 (D. Ariz. Aug. 18, 2003) ................... 5, 6

*Fish Nw. v. Thom,*
  No. C21-570 TSZ, 2021 WL 4744768 (W.D. Wash. Oct. 12, 2021) ..............................15

*Friends of Alaska Nat'l Wildlife Refuges v. Haaland,*
  29 F. 4th 432, 441 (9th Cir. 2022) ............................................................ 13, 14, 15, 22

*Friends of Santa Clara River v. USACE,*
  887 F.3d 906 (9th Cir. 2018) ............................................................................3

*Fund for Animals v. Thomas,*
  127 F.3d 80 (D.C. Cir. 1997) ....................................................................passim

*Fund for Animals v. Thomas,*
  932 F. Supp. 368 (D.D.C. 1996) ................................................................ 16, 25

*Grand Canyon Tr. v. U.S. Bureau of Recl.,,*
  691 F.3d 1008 (9th Cir. 2012) ..........................................................................12

*Karuk Tribe of Cal. v. U.S. Forest Serv.,*
  681 F.3d 1006 (9th Cir. 2012) ..........................................................................20

*Lands Council v. McNair,*
  537 F.3d 981 (9th Cir. 2008) ..........................................................................12

*Marbled Murrelet v. Babbitt,*
  83 F.3d 1068 (9th Cir. 1996) ..........................................................................20

*Modesto Irrigation Dist. v. Gutierrez,*
    619 F.3d 1024 (9th Cir. 2010) ..............................................................................13

*Nat'l Ass'n of Home Builders v. Def. of Wildlife,*
    551 U.S. 644 (2007) ...................................................................................... 6, 13

*Nat'l Fam. Farm Coal. v. EPA,*
    966 F.3d 893 (9th Cir. 2020) ......................................................................... 3, 12

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.,*
    499 F.3d 1108 (9th Cir. 2007) ..............................................................................12

*River Runners for Wilderness v. Martin,*
    593 F.3d 1064 (9th Cir. 2010) ..............................................................................12

*San Luis & Delta-Mendota Water Auth. v. Jewell,*
    747 F.3d 581 (9th Cir. 2014) ................................................................................12

*Sierra Club v. Babbitt,*
    65 F.3d 1502 (9th Cir. 1995) .......................................................................... 20, 21

*Western Watersheds Project v. Matejko,*
    468 F.3d 1099 (9th Cir. 2006) .................................................................17, 18, 19

*WildEarth Guardians v. U.S. Forest Serv.,*
    No. 1:19-cv-00203-CWD, 2020 WL 2239975 (D. Idaho May 7, 2020) .......... 9, 17

*Winter v. Nat. Res. Def. Council,*
    555 U.S. 7 (2008) ................................................................................................28

**Statutes**

16 U.S.C. § 1532(19) ............................................................................................. 4, 21

16 U.S.C. § 1533(d) ............................................................................................... 4, 21

16 U.S.C. § 1536(a)(2) ...................................................................................2, 14, 19

16 U.S.C. § 1536(b)(4)(C)(i)-(ii) ................................................................................5

16 U.S.C. § 1536(o)(2) ................................................................................................5

16 U.S.C. § 1538(a)(1)(B), (C), (G) ..................................................................... 4, 21

16 U.S.C. § 1612 .........................................................................................................6

16 U.S.C. § 551 .........................................................................................................10

28 U.S.C. § 2401(a) ..................................................................................................23

42 U.S.C. § 4332(C) .................................................................................................16

5 U.S.C. § 704 ..........................................................................................................22

5 U.S.C. § 706 ............................................................................................................6

5 U.S.C. § 706(2)(A) ................................................................................................12

## Regulations

33 C.F.R. § 230.10 ...................................................................................................................16

36 C.F.R. § 251.50 .....................................................................................................................7

36 C.F.R. § 261.50(a) ...............................................................................................................10

36 C.F.R. § 261.50(e) ...............................................................................................................10

36 C.F.R. § 261.58 ....................................................................................................................10

50 C.F.R. § 402.02 ........................................................................................................3, 19, 26

50 C.F.R. § 402.03 .................................................................................................................2, 3

50 C.F.R. § 402.13(a) ...........................................................................................................3, 25

50 C.F.R. § 402.13(c) .............................................................................................................3, 4

50 C.F.R. § 402.14(a) ................................................................................................................3

50 C.F.R. § 402.14(a)-(b) ..........................................................................................................4

50 C.F.R. § 402.14(b)(1) ...........................................................................................................3

50 C.F.R. § 402.14(g)-(h) ..........................................................................................................4

50 C.F.R. § 402.14(i) .................................................................................................................5

50 C.F.R. § 402.14(i)(5) ............................................................................................................5

50 C.F.R. § 402.15(a) ................................................................................................................4

50 C.F.R. § 402.16(a) ..............................................................................................................21

50 C.F.R. § 402.16(a)(1)-(4) .....................................................................................................5

50 C.F.R. § 402.16(a)(2) ..........................................................................................................23

50 C.F.R. § 402.13(c) ................................................................................................................8

## Other Authorities

59 Fed. Reg. 11,765 (Mar. 14, 1994) ......................................................................................9

60 Fed. Reg. 14,720 (Mar. 20, 1995) ..........................................................................6, 7, 9, 18

I.       **Introduction**

Plaintiffs' complaint seeks to compel the U.S. Forest Service ("USFS") and the U.S. Fish & Wildlife Service ("FWS") to reinitiate Endangered Species Act ("ESA") Section 7(a)(2) consultation to consider the effects of hunting black bears with bait on National Forest System ("NFS") lands in Idaho and Wyoming on ESA-listed grizzly bears.  The problem with this claim is that black bear baiting is not a *federal* "action."  ESA Section 7(a)(2) and the requirement to consult apply strictly to actions that are authorized, funded, or carried out by federal agencies.  Here, when bear baiting occurs on NFS lands in Idaho and Wyoming, it is authorized by those states and carried out by private individuals.  As USFS does not authorize, fund, or carry out bear baiting, ESA consultation is not legally required.  Indeed, USFS and FWS fully investigated Plaintiffs' claim and – in June 2020 – determined that reinitiating their prior Section 7 consultation on USFS' national policy of deferring to state regulation of hunting practices on NFS lands, including the placement of bait (the "National Policy") is not required.  USFS concluded that the policy does not constitute an affirmative federal action within the meaning of ESA Section 7, but rather constitutes *inaction* that does not require consultation.  The agencies' determinations will be referred to collectively herein as the "Reinitiation Decision."

Notwithstanding the Reinitiation Decision, Plaintiffs claim reinitiation of consultation on the National Policy is required.  Plaintiffs' claim, however, is not supported by fact or law.  Plaintiffs make no showing that the National Policy itself is an "action" subject to Section 7 consultation.  Instead, Plaintiffs argue that the National Policy consultation must be reinitiated because of USFS closure orders.  No such closure orders remain in effect.  Moreover, the closure orders *restricted or prohibited* bear baiting when they were in effect; they did not authorize it.  Plaintiffs also argue that consultation must be reinitiated because of USFS food storage orders.  Such orders are unrelated to hunting, and do not authorize bear baiting.  Plaintiffs' legal theory is that, because of these orders,

USFS must reinitiate consultation on the National Policy according to an incidental take statement ("ITS") that was prepared in regards to a *different* USFS policy statement of deferral to state regulation of baiting on Wyoming NFS lands (hereinafter the "Region 2 Policy"). The Region 2 Policy was withdrawn in 1993. Plaintiffs' theory lacks factual and legal support. Plaintiffs simply cannot show that USFS authorizes bear baiting or that, if a private individual hunting black bears using bait on NFS lands where the states of Wyoming and Idaho have authorized the practice of bear baiting takes a grizzly bear, the take was caused by USFS' policy of deferring to the states.

It is not difficult to see that it is the *states' authorization* of bear baiting and *federal inaction* that is Plaintiffs' true complaint. Plaintiffs want USFS to close various areas to bear baiting where Wyoming and Idaho have authorized it, and they ask this Court to order USFS to do so. But USFS' *inaction* in this regard is not a federal action that requires ESA Section 7(a)(2) consultation. The Court should deny Plaintiffs' motion for summary judgment and grant summary judgment in favor of Federal Defendants.

## II.     Legal Background
### A.     Endangered Species Act
#### 1.     Section 7(a)(2) and Consultation Requirements for Federal Actions

Section 7(a)(2) of the ESA requires federal agencies ("action agencies") to ensure that any "action" they authorize, fund, or carry out "is not likely to jeopardize the continued existence of" a species listed under the ESA or "result in the destruction or adverse modification" of designated critical habitat. 16 U.S.C. § 1536(a)(2). To facilitate compliance with these requirements, a process has been established by regulation whereby action agencies consult with one or both of the expert agencies that are charged with administering the ESA (FWS or the National Marine Fisheries Service ("NMFS"), "consulting agencies"). At least two triggers must be present for consultation to be required. First, there must be a discretionary federal agency action. 50 C.F.R. § 402.03. "Action" is defined by regulation to mean "all activities or programs of any kind authorized, funded, or carried

out, in whole or in part, *by Federal agencies* in the United States or upon the high seas." *Id.* § 402.02 (emphasis added). Examples of agency action for Section 7 purposes include, but are not limited to, actions intended to conserve listed species or their habitat, the promulgation of regulations, granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid, or actions directly or indirectly causing modifications to the land, water, or air. *Id.* If there is no federal action, consultation is not required.

Second, it is required that the federal agency action "may affect" ESA-listed species or designated critical habitat. *Id.* §§ 402.14(a) , 402.02. "[I]f the action agency finds 'that its action will have no effect on listed species or critical habitat' . . . it need not consult with the expert [consulting] agencies." *Nat'l Fam. Farm Coal. v. EPA*, 966 F.3d 893, 922 (9th Cir. 2020); *accord Friends of Santa Clara River v. USACE*, 887 F.3d 906, 926 (9th Cir. 2018); Endangered Species Consultation Handbook (Mar. 1998)[1] at xvi ("no effect" defined); *accord id.* at 3-12 (stating that it is "not required" for an action agency to request written concurrence from the consulting agency that the proposed action will have no effect on listed species or critical habitat).

However, where a discretionary federal action "may affect" listed species or designated critical habitat, consultation is required in one of two forms: informal or formal. Informal consultation "includes all discussions, correspondence, etc., between the Service and the Federal agency . . . designed to assist the [action agency] in determining whether formal consultation . . . is required." 50 C.F.R. § 402.13(a). "If during informal consultation it is determined by the [action agency], with the written concurrence of [the consulting agency], that the action is not likely to adversely affect listed species or critical habitat, the consultation process is terminated, and no further action is necessary." *Id.* § 402.13(c); *accord id.* § 402.14(b)(1) . Thus, informal consultation

---

[1] Available at https://www.fws.gov/sites/default/files/documents/endangered-species-consultation-handbook.pdf (last visited June 16, 2022).

concludes with a letter of concurrence ("LOC") from the consulting agency to the action agency in its finding of "not likely to adversely affect."  The ESA Consultation Handbook defines "not likely to adversely affect" as meaning that the effects of the action are expected to be "discountable, insignificant, or completely beneficial," which are terms that mean no "take" is expected. Handbook at xv, 3-12 to 3-13.  The Handbook also states that, "[i]f incidental take is anticipated to occur as a result of the proposed action, an 'is likely to adversely affect' determination should be made."  *Id.* at xv.

Hence, formal consultation is required if a federal action is "likely to adversely affect" listed species or designated critical habitat.  50 C.F.R. §§ 402.13(c), 402.14(a)-(b).  Formal consultation concludes with the issuance of a written biological opinion ("BiOp") by the consulting agency that assesses the likelihood of jeopardy to listed species and destruction or adverse modification of critical habitat.  *Id.* § 402.14(g)-(h) .  Because a BiOp serves an advisory function, after formal consultation concludes, the action agency must then determine "whether and in what manner to proceed with the action in light of its Section 7 obligations and the Service's biological opinion."  *Id.* § 402.15(a) .

### 2.   Section 9 Prohibition Against Unauthorized Take and Exemptions for Non-Jeopardizing Take

ESA Section 9 prohibits "take" of members of a fish or wildlife species listed as endangered without authorization and, pursuant to ESA Section 4(d), this prohibition may be extended to species listed as threatened.  16 U.S.C. §§ 1538(a)(1)(B), (C), (G); 1532(19); 1533(d) .  ESA Section 7 provides that, if a consulting agency concludes in its BiOp that "the agency action" under consultation is not likely to cause jeopardy under Section 7, but is nonetheless reasonably certain to result in take of listed species, then the consulting agency must issue an ITS that provides the action agency an exemption, or safe harbor, from liability under Section 9.  The ITS specifies the amount or extent of the non-jeopardizing take that is anticipated to result from that action and any

reasonable and prudent measures the consulting agency "considers necessary or appropriate" to minimize the impact of the take from the agency action.  *Id.* § 1536(b)(4)(C)(i)-(ii); 50 C.F.R. § 402.14(i).  The ESA states that "any taking that is in compliance with the terms and conditions specified in [the ITS] . . . shall not be considered to be a prohibited taking of the species concerned." 16 U.S.C. § 1536(o)(2); *see also* 50 C.F.R. § 402.14(i)(5).

### 3.     Reinitiating Consultation on the Federal Action

Once consultation on an action has been completed, the consultation must be reinitiated where the action agency retains discretionary federal involvement or control over "the action," or such discretionary federal involvement or control is authorized by law, and:

> (1) If the amount or extent of taking specified in the incidental take statement is exceeded; (2) If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered; (3) If the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion or written concurrence; or (4) If a new species is listed or critical habitat designated that may be affected by the identified action.

50 C.F.R. § 402.16(a)(1)-(4) .

### 4.     Withdrawing a BiOp and ITS in the Absence of Federal Action

As noted above, where there is no federal action, ESA Section 7(a)(2) consultation is not required.  Consequently, where a BiOp has been issued in the absence of federal action, it may be withdrawn.  *See Defs. of Wildlife v. Flowers*, No. CIV 02-195-TUC-CKJ, 2003 WL 22145708 (D. Ariz. Aug. 18, 2003).  In *Flowers*, FWS withdrew its BiOp at the request of the action agency after the action agency determined that it had not engaged in a federal action for Section 7 purposes.  FWS declared the BiOp "null and void and without effect."  *Id.* at *2.  There is no indication that the agencies followed any specific procedure to withdraw the BiOp in *Flowers*.  Indeed, the ESA regulations do not set forth any procedure that must be followed to withdraw a BiOp.  The *Flowers* court ruled that the plaintiffs' challenge to the BiOp was mooted by its withdrawal, and also failed

for lack of statutory standing.  *Id.* at *4-5.  The case was appealed to the Supreme Court, which

affirmed FWS' withdrawal of the BiOp.  *Nat'l Ass'n of Home Builders v. Def. of Wildlife*, 551 U.S. 644

(2007).  The Court noted that "the fact that the agencies changed their minds" about the need to

consult was "something that, as long as the proper procedures were followed, they were fully

entitled to do."  *Id.* at 658-59.  The Court identified no procedures to be followed, and there were

none, other than satisfying the Administrative Procedure Act's ("APA"), 5 U.S.C. § 706, standard of

review, as discussed below.  *Infra* §§ IV, V.A.1.

III.    **Factual Background**

    A.    **USFS' National Policy of Deferring to State Regulation of Baiting**

As the Court is aware, there was a flurry of litigation and administrative process in the 1990s

regarding the use of bait in hunting resident game on NFS lands.  What is relevant to the Court's

determination here is that, in March 1995, USFS adopted the National Policy, a "policy on the use

of bait in hunting resident game on National Forest System lands," which it included in its Forest

Service Manual, Ch. 2640.  60 Fed. Reg. 14,720 (Mar. 20, 1995).[2]  USFS explained that "[t]he

intended effect of the final policy is to clarify the Agency's role with regard to baiting in relation to

the role of the States and, thus, to provide a consistent approach to the regulation of baiting resident

game on National Forest System lands."  *Id.*  In pertinent part, the National Policy on bear baiting

provides as follows:

> The practice is prohibited on National Forest System lands where State hunting
> regulations prohibit its use. Where States permit the use of bait for attracting resident
> game, this activity is allowed on National Forest System lands, subject to State

---

[2] Plaintiffs assert that the National Policy is a "rule" that was promulgated through "notice and comment rulemaking."  ECF 93-1 at 7; *id.* at 8, 11.  That is incorrect.  The National Policy is not a rule, and it was not adopted through APA rulemaking procedure.  The Federal Register notice for the National Policy does not include the word "rule" or any of the regulatory certifications that are required of rules.  60 Fed. Reg. 14,720.  The Federal Register notice describes the action as "Notice; adoption of final policy."  The notice does not explain why public comment was taken, though it was most likely in accordance with the Forest and Rangeland Renewable Resources Planning Act of 1974, as amended, 16 U.S.C. § 1612.

hunting laws and regulation, unless the authorized [USFS] officer determines on a
site-specific basis that there is a need to prohibit or restrict the practice.

*Id.* at 14,723.

In responding to comments received on this proposed policy, USFS made it clear that it is

"not intended to determine whether or not the practice of using bait in hunting is to be allowed on

National Forest System lands."  *Id.* at 14,721.  This was because "[t]he practice of placing bait (food

or scent to attract wildlife) is a hunting activity subject to State law and regulations."  *Id.*  USFS

explained that "[t]he final policy acknowledges the State fish and wildlife agencies' authority to adopt

hunting regulations and provides for Federal action if State regulations do not protect Federal

interests."  *Id.*  USFS stated that it would not be appropriate for it to authorize the practice of bear

baiting through special use permits because the agency's special use authorization regulations (*see* 36

C.F.R. § 251.50) exempt noncommercial "hunting," from the special use authorization requirement.

60 Fed. Reg. at 14,721-22.  With respect to potential effects on grizzly bears, USFS stated that "[i]f

State regulations are adequate to protect grizzly bears or any other threatened or endangered species,

no action is needed by the Forest Service."  *Id.* at 14,722.  USFS further explained that "[t]he policy

in this section, in and of itself, does not compel an authorized officer to undertake a specific

decision to allow baiting on National Forest System lands in those States where the practice is

permitted."  *Id.* at 14,723.

USFS stated in its 1995 biological evaluation ("BE") of the National Policy that "[t]his policy

is an administrative action which will not directly affect any listed or proposed species."  FS AR 207.

USFS determined that its adoption of the National Policy was "not likely to adversely affect" the

grizzly bear on the grounds that it merely maintained the status quo, which was USFS' longstanding

policy of deferring to state regulation of hunting practices, including using bait.  *See Fund for Animals*

*v. Thomas*, 127 F.3d 80, 84 (D.C. Cir. 1997).  USFS sought FWS' concurrence in its "not likely to

adversely affect" determination, and FWS concurred that the National Policy was "not likely to

adversely affect" the grizzly bear, and provided USFS with a written LOC in accordance with the ESA regulations.  FWS AR 167.  This concluded the informal ESA Section 7 consultation process on the National Policy, "and no further action [was] necessary."  50 C.F.R. § 402.13(c).

Prior to adopting the National Policy, USFS had adopted the Region 2 Policy in April 1993, which was limited to the use of bait for black bear hunting on National Forests in Wyoming.  In particular, through the Region 2 Policy, USFS had proposed to "regulate noncommercial bear baiting on National Forest System lands in Wyoming through State Game Regulations and close all designated Wilderness to bear baiting" through a Memorandum of Understanding with the Wyoming Game and Fish Commission.  FS AR 118-19.  Unlike the National Policy, which underwent informal ESA consultation, USFS underwent formal ESA consultation with FWS on the Region 2 Policy.  *Id.* at 116.  That consultation terminated with FWS' issuance of a BiOp in April 1993 that concluded adopting the proposed Region 2 Policy was not likely to jeopardize the continued existence of the grizzly bear.  *Id.* at 116-127.  FWS did not anticipate any incidental take of grizzly bears, and therefore issued an ITS that did not exempt any take.  *Id.* at 123.  USFS withdrew the Region 2 Policy in July 1993 – three months after adopting it – to be replaced by the National Policy.  *Id.* at 259.

**B.      The D.C. Circuit's Review of USFS' National Policy in *Fund for Animals***

The lack of formal ESA consultation and a BiOp on the National Policy was challenged in *Fund for Animals*, 127 F.3d 80, and the D.C. Circuit ruled that the National Policy did not require them.  Even though USFS and FWS had consulted informally, the D.C. Circuit suggested that there may not have been a consultation obligation at all, ruling that, "*[t]o the extent that there was an ESA consultation obligation*, [USFS] and FWS fulfilled it by engaging in 'informal consultation.'"  *Id.* at 84 (emphasis added).  The Circuit Court further found that the National Policy was "not a major federal action" that required preparation of an environmental impact statement ("EIS") under the

National Environmental Policy Act ("NEPA"). *Id.* at 83. Similarly, this Court ruled in this case that there is "no ongoing or proposed federal action" that could necessitate supplemental analysis under NEPA. *WildEarth Guardians v. U.S. Forest Serv.*, No. 1:19-cv-00203-CWD, 2020 WL 2239975, at *7 (D. Idaho May 7, 2020).

### C.    The Reinitiation Decision

Over the course of a year following the filing of Plaintiffs' complaint, USFS and FWS considered whether reinitiation of the National Policy consultation was required. In June 2020, they agreed that it was not. FS AR 1653, 1657. Primarily, the agencies agreed that the National Policy and the Region 2 Policy before it were not federal actions within the meaning of ESA Section 7 that would require consultation, but rather constitute *inaction* that does not require consultation. Neither policy statement authorized, funded, or carried out bear baiting. Rather, the National Policy and the Region 2 Policy before it restated and clarified USFS' recognition of the States' traditional role in managing fish and wildlife populations, including the practice of hunting with bait, and deference to the States to regulate such activities on NFS lands. As such, the policy statements could not themselves be the legal cause of any take of grizzly bears by private individuals hunting black bears using bait on NFS lands in accordance with state authorization of the practice. USFS explained that its interpretation of the two policy statements comported with the plain language and meaning of the ESA and its implementing regulations, as well as the D.C. Circuit's opinion in *Fund for Animals*, 127 F.3d at n.3, n.6, and the Ninth Circuit's ruling in *Western Watersheds Project v. Matejko*, 468 F.3d 1099 (9th Cir. 2006).

USFS further explained that, in addition to constituting inaction, the Region 2 Policy could not be an action upon which to reinitiate ESA Section 7 consultation because it was withdrawn in 1993, and is null and void. 59 Fed. Reg. 11,765 (Mar. 14, 1994); 60 Fed. Reg. 14,720. Because the Region 2 Policy is null and void (and constituted federal inaction under ESA Section 7 to begin

with), the BiOp and ITS that FWS had prepared analyzing it are also inoperative.  For these reasons, USFS requested that the Region 2 Policy BiOp and ITS, as well as FWS' LOC on the National Policy, be withdrawn.  FS AR 1653.  In response to USFS' determinations, FWS agreed that, given the unique circumstances in this matter, the 1995 LOC on the National Policy and the 1993 BiOp and ITS on the Region 2 Policy were not operative and should be withdrawn.  FS AR 1657.

> ### D.  Closure Orders and Food Storage Orders

USFS may issue orders that close or restrict the use of described areas pursuant to a grant of statutory authority (16 U.S.C. § 551), and in accordance with regulations that authorize specific USFS officials to issue orders for the protection of forests and their resources (36 C.F.R. § 261.50(a)).  The regulations authorize USFS to exempt certain users from such orders.  *Id.* at § 261.50(e)(.  Also, Forest Supervisors are authorized to issue orders regulating occupancy or use of NFS lands.  *Id.* § 261.58(.  So-called "closure orders" and "food storage orders" are issued under these authorities.  The National Policy requires no action to "implement" it.  The National Policy is unrelated to food storage orders, and such orders do not "implement" the policy.  The National Policy is a statement of policy that exists separately and independently of any food storage order.

Currently, the National Forests in Wyoming and Idaho with grizzly bears present have no closure orders regarding bear baiting in place.  USFS had issued a closure order to correspond with its 1994 interim policy on bear baiting on NFS lands (Order Number 02-94-03/04-00-041 (Mar. 22, 1994); FS AR 136-139), however this order was rescinded when the National Policy was adopted (FS AR 266, 254).  A subsequent closure order was issued in 1995 in Wyoming (#02-95-03/04-00-053 (Mar. 14, 1995); FS AR 229), however this order was rescinded in 1998 when Wyoming promulgated its regulations to mirror where closures to baiting were in place (FS AR 360; 1667 (attached hereto).[3]

---

[3] FS AR 1667 is a July 17, 1998 letter from Lyle Laverty, USFS Regional Forester, to Mike Long, FWS Wyoming State Supervisor, inadvertently omitted from USFS' administrative record.  A copy is provided with the attached Declaration of John Morse, PhD, supplementing the record.

Food storage orders are not used or intended to regulate hunting practices. Rather, they are issued to protect the public and to minimize conflicts between grizzly bears and humans unrelated to hunting, primarily to keep people who are camping safe and to avoid having bears become habituated to human food by successfully raiding human food sources. FS AR 367 ("The purpose of the Order is to promote human safety and to protect grizzly bears. The area covered by the Order is being expanded because of existing and potential conflicts occurring with grizzly bears as a result of their becoming habituated to human food. … This action falls under the "protect public health and safety" wording of this category because the major emphasis of the Order is to protect public safety by reducing incidents of public contact with food habituated bears"). Food storage orders are in place across NFS lands within most areas of ID and WY that are occupied by grizzly bears. FS AR 1099-1103, 1326-1331, 1097-1098. Because food storage orders are not intended to regulate the placement of bait for hunting, but could otherwise be interpreted as prohibiting this activity, some specify that baiting is exempted where such activity is permitted under state law. Food storage orders are mentioned in ESA consultation on forest plans as an action USFS has taken on certain NFS lands to protect humans and grizzly bears from conflict.

## IV.    Standard of Review on the Merits

Plaintiffs' complaint is, effectively, a challenge to the Reinitiation Decision, in particular the conclusion that reinitiation of ESA consultation is not required because USFS' deferral to state regulation of bear baiting on NFS lands is not a federal action that requires consultation. The Reinitiation Decision is properly reviewed under the same standard as a finding of "no effect," because where, as here, there is a finding of no federal action, there is necessarily no effect on listed species or designated critical habitat for Section 7 purposes. Findings of "no effect" are reviewed under the APA's "deferential review" standard. *Nat'l Fam. Farm Coal.*, 966 F.3d at 923. This is true with respect to Plaintiffs' claims against FWS under the limited waver of sovereign immunity

provided by the APA, as well as to Plaintiffs' claims against USFS under the ESA's citizen suit provision. *Bennett v. Spear*, 520 U.S. 154, 177–79 (1997); *Grand Canyon Tr. v. U.S. Bureau of Recl.*, 691 F.3d 1008, 1016 (9th Cir. 2012) ("We review Reclamation and FWS's compliance with the ESA . . . under the standard set forth in the APA").

In short, Plaintiffs' burden here is to show that the Reinitiation Decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A). This is a heavy burden, as the APA's standard of review is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agric.*, 499 F.3d 1108, 1115 (9th Cir. 2007) (citation omitted); *accord Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008) (*en banc*).  In more recent years, the Ninth Circuit has strongly affirmed the narrow and deferential nature of the APA standard, noting that it sets a "high threshold" to establish that agency action or inaction is unlawful.  *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1067 (9th Cir. 2010) (per curiam); *see also McNair*, 537 F.3d at 988 (overturning prior jurisprudence that had "shifted away from the appropriate standard of review").

The Court's role is "not to make its own judgment" on the matters considered and resolved by the agency, as the standard of review "does not allow the court to overturn an agency decision because it disagrees with the decision." *River Runners*, 593 F.3d at 1070.  "Where the agency has relied on 'relevant evidence [such that] a reasonable mind might accept as adequate to support a conclusion,' its decision is supported by 'substantial evidence.'" *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014) (citations omitted).  Courts must uphold a reasonable agency action "even if the administrative record contains evidence for and against its decision." *Modesto Irrigation Dist. v. Gutierrez*, 619 F.3d 1024, 1036 (9th Cir. 2010) (citation omitted).

## V.     Argument

### A.     USFS Rationally Determined that Its Policy of Deferring to State Regulation of Bear Baiting is Not Federal Action that Requires Consultation Under ESA Section 7(a)(2)

#### 1.     The Reinitiation Decision Easily Meets the Standards for Change in Agency Position

As explained above (*supra* § II.A.4), USFS and FWS were "fully entitled" to "change[] their minds" about whether the National Policy is a federal action that requires ESA Section 7 consultation, *Nat'l Ass'n of Home Builders*, 551 U.S. at 658-59, and neither the ESA nor the implementing regulations set forth any specific procedures for doing so.  The Reinitiation Decision comports with procedure as well as the applicable substantive review standards.  The Ninth Circuit "appl[ies] the same standard of review whether an agency issues a new policy or changes a previous policy position." *Alaska Oil & Gas Ass'n v. Pritzker*, 840 F.3d 671, 681 (9th Cir. 2016).  "An agency must provide a reasoned explanation for adoption of its new policy—including an acknowledgment that it is changing its position and if appropriate, any new factual findings that may inform that change—but it need not demonstrate that the new policy is better than its prior policy." *Id.* at 682.  Nor must an "agency action representing a policy change [] be justified by reasons more substantial than those required to adopt a policy in the first instance." *Friends of Alaska Nat'l Wildlife Refuges v. Haaland*, 29 F. 4th 432, 441 (9th Cir. 2022) (citation omitted).  As the Court explained in *Haaland*:

> A "satisfactory explanation" need not be a perfect explanation.  After studying an agency's decision, a reviewing court will usually be able to identify ways in which the agency might have been more precise or more thorough.  But as long as the agency has considered the relevant factors, a court should not set aside the decision simply because it believes it could have written a better one.  To the contrary, the Supreme Court has made clear that "a court is not to substitute its judgment for that of the agency" and must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'"

*Id.* at 440) (citations omitted).  These standards reflect the fact that, unless Congress has restricted an agency's authority to alter policies once they are in place, "the APA does not require 'regulatory agencies [to] establish rules of conduct to last forever.'"  )*Id.* at 441 (citations omitted).

In *Pritzker*, the Ninth Circuit upheld NMFS' change in interpretation of the ESA's term "foreseeable future" for listing decisions, consistent with an M-Opinion from the Interior Department's Office of the Solicitor, wherein the Solicitor's opinion had "acknowledge[d] that its interpretation represent[ed] a change in agency policy, and [] provide[d] a thorough and reasoned explanation for its recommendation," as well as "stat[ing] explicitly that the policy change seeks to conform to federal appellate decisions" regarding the ESA's best available science standard.  840 F.3d at 682.  In *Haaland*, the Ninth Circuit upheld the Secretary of Interior's change in position on a land exchange for construction of a road through a wildlife refuge.  29 F. 4th at 440. )

Here, the Reinitiation Decision easily meets the applicable review standards.  It demonstrates that USFS and FWS fully recognized that they had previously consulted in 1993 and 1995 and that they thoughtfully conferred with one another on whether reinitiation of consultation was required under the facts and the law as they exist today.  The agencies provided a reasoned explanation for their conclusion that reinitiation is not required.  FS AR 1653, 1657.  In short, ESA Section 7(a)(2) requires consultation only where a *federal* agency "authorize[s], fund[s], or carrie[s] out" an action (16 U.S.C. § 1536(a)(2)), and here, where the practice of bear baiting currently occurs on NFS lands in Idaho and Wyoming, it is authorized by those states and regulated by the Idaho Fish & Game Commission and Wyoming Game & Fish Department, respectively, pursuant to state regulations.  USFS reasonably determined that its policy of deferring to state regulation does not authorize the practice of hunting black bears with bait on NFS lands and is not the cause of take of grizzly bears by private individuals who hunt black bears using bait where the states have authorized the practice.

14

As the Ninth Circuit explained in *Haaland*, an agency may take a new stance "even on precisely the same record" as the old stance.  29 F. 4th at 441-42).  In that case, the Court found the Secretary's explanation sufficient where he "did not rely on new facts, but rather on a reevaluation of which policy would be better in light of the facts."  )*Id.* at 442 (citations omitted).  Here, the administrative record does not indicate that USFS and FWS previously considered whether USFS' policy statements constituted action versus inaction, or could be the legal cause of any take of grizzly bears.  FS AR 74, 207; FWS AR 74, 167.  USFS' 1993 BE on the Region 2 Policy merely states that USFS would formally consult with FWS because "'[t]aking' of a grizzly bear can occur and is considered a 'may adverse affect.'"  FS AR 74.  USFS' 1995 BE on the National Policy essentially just references the 1993 BE.  FS AR 207.  It is worth noting that it is not a violation of the ESA to undertake ESA consultation even if consultation may not have been legally required.  *Fish Nw. v. Thom*, No. C21-570 TSZ, 2021 WL 4744768, at *6 (W.D. Wash. Oct. 12, 2021).  Because the Reinitiation Decision did not rely on new factual findings or even necessarily on a new interpretation of the term "action," no corresponding explanations were required.  USFS did explain, however, analogous to *Pritzker*, 840 F.3d at 681, that its interpretation of federal "action" conformed to federal appellate decisions.

### a.    The Reinitiation Decision Conforms to *Fund for Animals*

The Reinitiation Decision explains that it conforms to the D.C. Circuit's ruling in *Fund for Animals*, 127 F.3d 80.  In that case, the D.C. Circuit considered an ESA claim that the National Policy required formal consultation and preparation of a BiOp, rather than informal consultation.  This claim necessarily put the question of whether the National Policy is a federal action subject to Section 7 consultation before the Court; however, because USFS had already consulted, it did not need to argue that consultation was not required because the policy is not a federal action under Section 7.  Nonetheless, USFS did explain to the Ninth Circuit that it had "not only complied with

NEPA and the ESA, but it *overcomplied* by conducting an [environmental assessment ("EA")][4] that

was unnecessary."  ECF 41-2 at 47 (emphasis added).  Similarly, USFS stated to the district court

"that its policy of laissez faire is essentially one of inaction, i.e., a considered judgment to do nothing

about game-baiting by leaving to the several states the responsibility for regulating the hunting of

their wildlife, including baiting, unless and until a federal interest is seen to be imperil[]ed in

individual cases by an officer on the scene."  *Fund for Animals v. Thomas*, 932 F. Supp. 368, 370

(D.D.C. 1996).

It is persuasive and telling that the D.C. Circuit went out of its way to opine that ESA

consultation may not have been required even though USFS had consulted and was not strictly

disputing whether it had engaged in a federal action that required consultation.  The D.C. Circuit

found that the National Policy merely "maintained the substantive status quo" 127 F.3d at 846) and

opined that it "may not constitute 'action' at all" *id.* at n.3).  The Court further suggested that, "[i]f

promulgation of the policy constituted 'inaction,' . . . there most probably would have been no

'agency action' to trigger the ESA consultation requirement."  *Id.* at n.6.  Just as the D.C. Circuit had

opined, USFS determined that the National Policy was not, in fact, agency action under ESA Section

7 that "trigger[s] the ESA consultation requirement."  Ultimately, the D.C. Circuit ruled in *Fund for*

*Animals* that the National Policy did not require formal ESA consultation and a BiOp.  Notably,

USFS had not contended that the National Policy was already covered by the Region 2 Policy BiOp

and ITS, and the D.C. Circuit made no finding that it was.  Rather, the Court held that, "[t]o the

extent that there was an ESA consultation obligation, USFS and FWS fulfilled it *by engaging in*

*'informal consultation.'"  *Id.* at 84 (emphasis added).  That informal consultation terminated with the

1995 LOC.

---

[4] An EA is an analysis of proposed action that federal agencies prepare in accordance with NEPA to
determine if the proposed action is a "major federal action" that requires preparation of an EIS
under NEPA.  42 U.S.C.A. § 4332(C); 33 C.F.R. § 230.10.

*Fund for Animals* cannot be viewed as anything but supportive of the determination that the National Policy is not federal action under ESA Section 7(a)(2), and contrary to Plaintiffs' claims in this case.  The National Policy that the D.C. Circuit suspected was not "'agency action' to trigger the ESA consultation requirement" – and ruled did not require formal consultation and a BiOp – is the same policy that Plaintiffs now argue to this Court is federal action that mandates reinitiation of ESA consultation (and is subject to the BiOp and ITS on the Region 2 Policy).  Not surprisingly, Plaintiffs have little to say about the ruling other than that it is not binding on this Court.  ECF 93-1 at 17.  The D.C. Circuit's ruling may not be binding, but its discussion of the National Policy is highly persuasive and supportive of the conclusion that it is not a federal action under ESA Section 7 that requires consultation.  Indeed, this Court relied on *Fund for Animals* when it ruled that USFS is not presently undertaking any "ongoing or proposed federal action" that could require supplemental NEPA analysis.  *WildEarth Guardians*, 2020 WL 2239975 at *7.

Plaintiffs also assert in a single sentence that USFS' and FWS' administrative records here "plainly [establish] the existence of 'agency action' as defined by this circuit."  ECF 93-1 at 17.  This bald assertion is wholly conclusory and unsupported by fact or law.  Plaintiffs cannot transform the National Policy from inaction into action by pointing to closure or food storage orders.  Consistent with the National Policy, no such order authorizes funds, or carries out bear baiting, and none is the cause of take of grizzly bears by private individuals hunting black bears using bait where states have authorized black bear baiting.  Nor can Plaintiffs overcome the fact that the National Policy is not federal action subject to ESA Section 7 by pointing to the ITS for the inoperative Region 2 Policy, which never applied to the National Policy in the first instance.

   **b.**  **The Reinitiation Decision Conforms to *Matejko* and Related Ninth Circuit Case Law Authority**

The Reinitiation Decision also explains that it is supported by the Ninth Circuit's ruling in *Matejko*, 468 F.3d 1099, where the Ninth Circuit found that the Bureau of Land Management

("BLM") and USFS had no ESA consultation obligations under circumstances analogous to this case.  Similar to hunting by private individuals on NFS lands, *Matejko* concerned water diversions being made by private individuals on public lands.  And analogous to USFS' 1995 policy statement here reaffirming its longstanding deference to state regulation of hunting, in *Matejko*, BLM had issued a policy statement in 1983 embracing "a doctrine of prior appropriation and a general policy of deference to state and local law regarding water rights."  *Id.* at 1103.  In *Matejko*, like here, the agencies had discretion to take enforcement action to protect the public lands under certain conditions, but were not exercising that discretion.  *Compare id.* at 1105 (BLM regulations "reflect[ing] long-standing law and BLM's historical practice by clarifying that 1866 Act rights-of-way are not subject to regulation so long as a right-of-way is being operated and maintained in accordance with the scope of the original rights granted") *with* 60 Fed. Reg. at 14,720 (National Policy providing that, "[w]here baiting is allowed by States, the practice would continue on National Forest System lands unless the authorized officer [from the Forest Service]. . . determine[s] on a site-specific basis that the use of bait conflicts with Federal laws or regulations, forest plan direction, or other uses or users").

The plaintiffs in *Matejko* alleged that BLM and USFS were required to consult with FWS under ESA Section 7 on the grounds that their decisions not to exercise their discretion to control water diversions constituted agency action for purposes of Section 7.  The district court agreed, finding that consultation was required based on what it viewed as BLM's "decision not to impose conditions on certain water diversions."  *Matejko*, 468 F.3d at 1106.  On appeal, the Ninth Circuit reversed.  The Court described the issue as "whether the BLM's failure to exercise any discretion it might have had to regulate the diversions at issue in this appeal constitutes a BLM 'action' that 'authorizes, funds, or carries out' the diversions," and "whether such a failure to exercise discretion (assuming the BLM had discretion) is an 'agency action' for purposes of section 7(a)(2), so as to

require consultation." *Id.* at 1107. The Ninth Circuit concluded that the decision not to exercise discretion was not action for purposes of ESA Section 7 consultation. *Id.* The Court surveyed its prior Section 7 case law and found that "Ninth Circuit cases have emphasized that section 7(a)(2) consultation stems only from 'affirmative actions'" and that "'inaction' is not 'action' for section 7(a)(2) purposes." *Id.* at 1108. The Court noted that BLM's and USFS' conduct in *Matejko* stood "in marked contrast to cases involving truly 'affirmative' actions" where consultation was required. *Id.* at 1109. The Court concluded that "BLM did not affirmatively act and was 'not an entity responsible for [the challenged] decisionmaking.'" *Id.*

The same reasoning applies here. Analogous to *Matejko*, USFS did not take action under ESA Section 7 when it issued policy statements reaffirming its deference to state regulation of hunting with bait on NFS lands. The statements did not authorize, fund, or carry out bear hunting with bait. *Accord Matejko*, 468 F.3d at 1109 ("[h]ere, the BLM did not fund the diversions, it did not issue permits, it did not grant contracts, it did not build dams, nor did it divert streams"); 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.02 (definition of "action"). To the contrary, as the D.C. Circuit in *Fund for Animals* recognized, the National Policy was meant to memorialize the "Forest Service's decision to refrain from future regulation of baiting" and "leav[e] baiting regulation to individual states" without furthering whatever decision a state may choose to make. 127 F.3d at 83, n.3. Thus, just as the agencies' inaction was not the cause of the water diversions in *Matejko*, USFS' inaction here is not the cause of private individuals hunting black bears with bait, nor is USFS' inaction to regulate baiting the cause of private individuals taking a grizzly bear because he or she is using bait to hunt black bears where the states have authorized bear baiting.

For purposes of ESA Section 7, USFS' policy statements here constituted, at most, decisions to defer to state regulation of hunting practices which, under controlling Ninth Circuit authority, do not require consultation. *Matejko*, 468 F.3d 1099; *see also Cal. Sportfishing Prot. All. v. FERC*, 472 F.3d

593 (9th Cir. 2006) (ESA consultation on a previously-issued license was not required because the agency was not affirmatively taking new action; the agency's mere possession of authority to reopen the license and take action did not require consultation); *Marbled Murrelet v. Babbitt*, 83 F.3d 1068, 1074–75 (9th Cir. 1996) (where private-party activities did not require federal authorization, an agency's informal proffer of advice to the private party is not "agency action" requiring consultation); *Sierra Club v. Babbitt*, 65 F.3d 1502, 1512 (9th Cir. 1995) (Section 7 applies to private activity "only to the extent the activity is dependent on federal authorization").  Here, black bear baiting on NFS lands does not require federal authorization.

Plaintiffs also have little to say about *Matejko*, and they fail to distinguish it.  They simply mischaracterize it as involving mere agency "acquiescence" to water diversions.  ECF 93-1 at 18.  As explained above, *Matejko* involved far more than that.  The agency issued a policy statement and regulations deciding not to exercise the discretion it possessed to regulate the diversions, which is analogous to USFS' policy statements here that the agency defers to state regulation of hunting with bait on NFS lands.[5]

Plaintiffs attempt to manufacture federal authorization of bear baiting where it does not exist.  They argue that USFS has "committed to monitor baiting and any grizzly mortalities, and to close additional areas in national forests if it deems it appropriate to do so" (*id.* at 18; *accord id.* at 16), but commitments to act are not ESA Section 7 actions under the case law cited above, much less federal authorizations of bear baiting or causes of grizzly bear take by private individuals.  Plaintiffs also argue that closure orders are federal actions that require reinitiating consultation on the National Policy.  *Id.* at 18.  As explained below, the closure orders Plaintiffs identify *restricted or*

---

[5] Plaintiffs cite *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1021 (9th Cir. 2012) (*en banc*) as setting the standard for ESA Section 7 "action."  ECF 93-1 at 14.  That may be true as far as the general standard, however, the facts of *Karuk Tribe* render its holding inapposite here.  The statutory and regulatory regime to conduct suction dredge mining described in *Karuk Tribe, id.* at 1021-22, is readily distinguishable from the statutory and regulatory regime applicable to black bear baiting.

*prohibited* baiting rather than authorized it and, in any event, are no longer in effect.  Fundamentally, Plaintiffs have not shown, and cannot show, that where a private hunter (licensed by the state) using bait to hunt black bears on NFS lands (where the practice is authorized by the state) has taken a grizzly bear – which is prohibited under federal law – that take was caused by USFS' National Policy of deferring to state regulation of bear baiting, much less that it is caused by any inoperative closure order, a food storage order, or monitoring commitment.  Plaintiffs fail to show that *the (purported) federal action that previously underwent consultation* – the National Policy – requires reinitiating the prior consultation.  50 C.F.R. § 402.16(a).  Plaintiffs' assertion that USFS is "the 'entity responsible for the challenged decisionmaking'" (*id.* at 18) is plainly erroneous.  It is beyond dispute that, where bear baiting occurs on NFS lands in Idaho and Wyoming, it has been authorized by those states.

At bottom, Plaintiffs disagree with the Reinitiation Decision's determination that reinitiation of consultation is not required, but Plaintiffs fail to show, as a threshold matter, that the determination that the National Policy is not federal action is unlawful.  It is important to recognize that the only issue raised by Plaintiffs' complaint here is consultation under ESA Section 7.  In the absence of ESA Section 7 consultation, grizzly bears in Idaho and Wyoming remain protected under ESA Section 9.  16 U.S.C. §§ 1538(a)(1)(B)-(C), (G); 1532(19); 1533(d) .  Section 9 makes it illegal under federal law to take a grizzly bear in these states without authorization, and no such authorization has been granted in connection with black bear baiting.  As the Ninth Circuit has explained, "Congress has . . . indicated that when a wholly private action threatens imminent harm to a listed species the appropriate safeguard is through section 9 . . ., and not section 7."  *Sierra Club*, 65 F.3d at 1512.

**B.**      **Plaintiffs Fail to Show Either that the Reinitiation Decision Is Unlawful or that Reinitiation of ESA Consultation on the National Policy Is Required**

        **1.**      **The Reinitiation Decision Is New Final Agency Action Under the APA**

Plaintiffs argue that the Reinitiation Decision did not actually withdraw the Region 2 Policy BiOp and ITS but was a mere "attempt" to do so, and also is a *post hoc* rationale. ECF 93-1 at 13. These are basic mischaracterizations. The Reinitiation Decision is neither an "attempt" at agency action nor a "rationale" offered to justify a prior agency action. The Reinitiation Decision is a new, final agency action under the APA. Were it anything less, this Court would lack jurisdiction to review it. The APA provides a limited waiver of sovereign immunity to review "final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. The Reinitiation Decision is subject to judicial review under the APA precisely because it: (1) marked the consummation of the agency's decisionmaking process; and (2) is a decision from which legal consequences will flow. *Bennett*, 520 U.S. at 177–79. Principally, the Reinitiation Decision: (1) determined that reinitiation of ESA consultation is not required; (2) withdrew the LOC on the National Policy; and (3) withdrew the Region 2 Policy BiOp and ITS.[6] These new determinations are plainly not *post hoc* rationale.

Plaintiffs' mischaracterizations of the Reinitiation Decision work at cross-purposes to their complaint, which asks this Court to review the decision and vacate it. ECF 56 ¶ ¶ 84, 89, Rel. Sought ¶ 2. Plaintiffs cannot deny that the Reinitiation Decision is a final agency action under the APA at the same time they ask the Court to review it. Plaintiffs' assertion that the Reinitiation Decision "attempts to evade judicial review" (ECF 93-1 at n.2) is baseless, as the decision is

---

[6] Plaintiffs assert that the Region 2 Policy BiOp remains in effect because FWS referenced it in a 2016 BiOp on an action by the U.S. Park Service to manage bison and elk in the Tetons. ECF 93-1 at 11, 17. Not so. Whether or not FWS referenced the Region 2 Policy BiOp in the Tetons BiOp has no impact on whether the Region 2 Policy is operative (it is not), whether the Region 2 Policy BiOp and ITS apply to the National Policy (they do not), or whether the National Policy or Region 2 Policy are federal authorizations that require consultation under ESA Section 7 (they do not).

presently under review.  Plaintiffs' argument is tantamount to an assertion that an agency can never

change its view, which is plainly not the law.  *Pritzker*, 840 F.3d at 682; *Haaland*, 29 F. 4th at 441-42).

2.      **No Closure Order or Food Storage Order Has Authorized Bear Baiting
or Caused any Incidental Take of Grizzly Bears**

Plaintiffs argue that, even though USFS withdrew the Region 2 Policy, the ITS on that

withdrawn policy mandates reinitiation of consultation on the National Policy.  ECF 93-1 at 18-19.

Plaintiffs argue that the amount or extent of take anticipated in the ITS has been exceeded,[7] and that

this, and other information regarding grizzly bear distribution, constitutes new information that

reveals "effects of the action that may affect listed species or critical habitat in a manner or to an

extent not previously considered."  50 C.F.R. § 402.16(a)(2).

These arguments fail for a number of reasons.  First, the Region 2 Policy ITS cannot require

reinitiation of consultation because, as explained above, USFS rationally determined that the Region

2 Policy was not federal action under Section 7 that required consultation in the first instance.

Furthermore, the Region 2 Policy was withdrawn in 1993.  *Fund for Animals*, 127 F.3d at 82 (finding

that the "Wyoming policy was never implemented").  Plaintiffs attempt to overcome the fact that

the Region 2 Policy is inoperative with an argument that it continues to be "implemented" through a

closure order(s).  ECF 93-1 at 14-15.  That is simply incorrect.[8]  Plaintiffs fail to mention that, as

---

[7] Plaintiffs allege that, since 1995, "at least four grizzly bears have been killed by licensed black bear
hunters using bait in national forests in Idaho and Wyoming;" in 2000 (Wyoming), 2003 (Wyoming),
2007 (Wyoming), and 2007 (Idaho).  ECF 931-1 at 11.  All of these takings occurred outside of the
statute of limitations period, and they therefore cannot form the basis for a claim for relief.  28
U.S.C. § 2401(a) (providing, in relevant part, that "every civil action commenced against the United
States shall be barred unless the complaint is filed within six years after the right of action first
accrues"); *Conservation Force v. Salazar*, 811 F. Supp. 2d 18, 27 (D.D.C. 2011) (because "[t]he ESA
prescribes no statute of limitations; therefore 28 U.S.C. § 2401(a), the general six-year statute of
limitations for civil actions against the federal government, provides the applicable limitations
period").  Plaintiffs filed this case on June 5, 2019, and therefore are barred from asserting any claim
for relief that first accrued prior to June 5, 2013.

[8] Plaintiffs also assert that USFS "has implemented" the National Policy by issuing food storage
orders.  ECF 93-1 at 9-10.  As explained above (*supra* § III.D), that is incorrect.  The National Policy
is not an action to be "implemented" and, furthermore, food storage orders do not regulate hunting

23

USFS made clear in the 1993 BE it prepared on the Region 2 Policy, "the proposed action [wa]s to *temporarily* close black bear baiting within the proposed recovery zone [on the Bridger-Teton, Shoshone, and Targhee National Forests] *until the recent Wyoming Game and Fish Commission decision to close this recovery zone to bear baiting becomes effective on July 1, 1993.* FS AR 71 (emphasis added).

The 1993 BE further states that, "[i]n addition, any areas covered by the grizzly bear special order prohibiting improper food storage will also be *temporarily* closed to black bear baiting under all action alternatives *until the Wyoming Game and Fish Commission closes those areas to black bear baiting. Id.* Similarly, the mitigation measures for the Region 2 Policy were intended to last "*until such time as they become State Regulations.*" FS AR 72 (emphasis added). The administrative record shows that a March 1995 Special Order 02-95-03/04-00-053 that closed areas included the grizzly bear recovery zone and the areas outside the recovery zone under food restriction orders designed to minimize potential conflicts with grizzly bears, meaning areas on the Shoshone NF, Wind River Ranger District, north of Highway 26/287 and south of the recovery zone, was withdrawn in 1998. USFS AR 360. It was withdrawn because Wyoming Game and Fish Commission developed regulations related to bear baiting that duplicated restrictions in USFS' closure order. *Id.*

Plaintiffs also try to overcome the withdrawal of the Region 2 Policy by implying that the BiOp and ITS on the Region 2 Policy lived on by extension to the National Policy, which they simply could not have been. As USFS stated in its 1993 BE on the Region 2 Policy, "[t]he analysis area for this proposed action is all areas on National Forest System lands *within the State of Wyoming* where black bear hunting is authorized by the Wyoming Game and Fish Commission and regulated by the Wyoming Game and Fish Department." FS AR 71 (emphasis added). Accordingly, FWS'

---

practices. *Id.* To the extent that food storage orders seek to reduce conflicts between grizzly bears and humans, it is in the context of storing food, not hunting. *Id.* Exempting the placement of baits from food storage orders where a state allows hunting with baits is not federal authorization of hunting with bait, it is federal deferral to state authorization of the practice consistent with USFS policy.

finding in the BiOp of "no jeopardy" and the exemption that FWS provided to USFS from "take"

liability in the ITS attached only to activities in Wyoming.  The BiOp and ITS state that they were

premised on the "administration of the placement of baits on FS lands *in Wyoming*" (FWS AR at 116

(emphasis added)); they did not purport to extend to effects on grizzly bears outside of Wyoming.

The reasonable and prudent measures, terms and conditions, and conservation recommendations of

the Region 2 BiOp and ITS were all limited to the Region 2 Policy in Wyoming.  *Id.* at 124.  The

BiOp and ITS included no analysis of measures outside of Wyoming and they did not purport to

extend to any such measures.  Under these facts, the Region 2 BiOp and ITS could not simply be

transferred retroactively to the National Policy.

Plaintiffs point to a statement by FWS that "[t]he proposed National Policy appears to be

consistent with our biological opinion of April 13, 1993, and no information has become available to

suggest that additional terms and conditions are necessary at this time."  FWS AR 166.  This

statement did not, and plainly could not, transfer the BiOp from the Region 2 Policy to the National

Policy.  Rather than transferring the BiOp, FWS' statement is consistent with its LOC that the

National Policy was, itself, "not likely to adversely affect."  It was precisely because USFS and FWS

were aware that the Region 2 BiOp and ITS could not provide a basis for the National Policy that

they completed a separate consultation on the National Policy.  And it was precisely because the

National Policy was not subject to any BiOp that Fund for Animals filed suit alleging that USFS

"failed to formally consult with *and obtain a final biological opinion* from FWS as required by ESA."

*Fund for Animals*, 127 F. 3d at 83 (emphasis added).

USFS did not argue in defense of that claim that formal consultation was not required

because the National Policy was already covered by the Region 2 Policy BiOp and ITS, and the D.C.

Circuit made no such finding.  Instead, "Defendants' response to the charge that they disregarded

their mutual duty of [formal] consultation under the ESA [was] that they initially consulted

'informally,' pursuant to 50 C.F.R. 402.13(a), to ascertain if formal consultation were even needed. Both agencies agreed that it was not." *Fund for Animals*, 932 F. Supp. at 370.  Accordingly, the D.C. Circuit ruled that the National Policy did not require a BiOp and ITS because, "[t]o the extent that there was an ESA consultation obligation, USFS and FWS fulfilled it by engaging in 'informal consultation.'" *Fund for Animals*, 127 F.3d at 84.

Plaintiffs' reliance on closure orders is also misguided because any closure order that *prohibited* or *restricted* bear baiting plainly did not authorize it or cause grizzly bears to be taken by private individuals hunting with bait where a state had authorized the practice.  To the contrary, the Region 2 Policy BiOp found that "[c]losing the proposed grizzly bear recovery zone and all areas covered by a special order prohibiting improper storage of food in grizzly bear habitat (mitigation measures common to all alternative[s]) will have *a beneficial [e]ffect* on grizzly bear."  FS AR at 118 (emphasis added).  Plaintiffs also argue variously that USFS has a duty to monitor for grizzly mortalities and to issue closure orders or other measures as needed to protect Federal interests.  *Id.* at 16.  The existence of such duties is neither a federal authorization of bear baiting nor the cause of any grizzly bear take.  *Supra* § V.A.1.b.

Indeed, a causal linkage between any USFS authorization and take of grizzly bears by private individuals hunting black bears using bait is entirely missing here.  The ESA's implementing regulations define "effects of the action" as "all consequences to listed species or critical habitat *that are caused by the proposed action*, including the consequences of other activities that are caused by the proposed action.  A consequence is caused by the proposed action if it would not occur but for the proposed action and it is reasonably certain to occur."  50 C.F.R. § 402.02 (emphasis added); *see also Ariz. Cattle Growers' Ass'n v. BLM*, 273 F.3d 1229, 1250 (9th Cir. 2001) (there must be "a link between the activity and the taking of species" that is exempted in an ITS).  Because there is no causal link to the take that is alleged here, there is no duty to reinitiate ESA consultation.  *See Ctr. for*

*Biological Diversity v. HUD*, 541 F. Supp. 2d 1091, 1100–01 (D. Ariz. 2008) (federal agencies were not required to consult where they allegedly promoted private development by providing loan guarantees, but did not approve or undertake the development, because their actions were too attenuated to be the legal cause of the effects of the development on listed species), *aff'd* 359 F. App'x 781 (9th Cir. 2009).

In sum, Plaintiffs' attempt to cobble together the Region 2 Policy ITS and either a closure order(s), food storage order(s), or a mitigation measure(s) to compel reinitiation of ESA consultation on the National Policy has no merit. Plaintiffs cannot use such orders and measures to obscure the fact that their complaint effectively attempts to compel federal agencies to reinitiate ESA consultation on a state-authorized activity. USFS does not presently authorize bear baiting through any closure order(s), food storage order(s), or a mitigation measure, or cause private individuals to take grizzly bears because they are hunting black bears with bait where a state has authorized bear baiting. The Region 2 BiOp and ITS cannot be transferred onto the National Policy, as they were limited to the Region 2 Policy, which has been withdrawn and which USFS and FWS have agreed was not federal action that required consultation in the first instance. Plaintiffs' request to reinstate the BiOp and ITS on the inoperative Region 2 Policy (ECF 93-1 at 18-19), has no merit.

### C.     Plaintiffs Are Not Entitled to their Requested Relief

Plaintiffs' requested relief exemplifies the incoherence of their legal theory. Plaintiffs ask the Court to "[o]rder Federal Defendants to reinitiate consultation on the effects on grizzly bears *of the national bait policy*" (ECF 93-1 at 19 (emphasis added)) on the basis of the Region 2 Policy ITS, which does not cover the National Policy but rather the Region 2 Policy – which is inoperative – and not necessarily because the National Policy is federal action causing take of grizzly bears but because of food storage orders that do not regulate hunting practices and closure orders that are inoperative and that never authorized bear baiting when they were in place.

Plaintiffs do not stop at requesting an order to reinitiate Section 7 consultation, but rather ask the Court to go further and "[o]rder the Forest Service to close to baiting the areas where it has issued food storage closure orders to prevent interactions between humans and grizzly bears but exempted baiting, do not prohibit it during all of the black bear hunting season, or otherwise do not prohibit it where grizzlies may be present." ECF 93-1 at 20. Presumably, Plaintiffs request this as interim relief pending completion of the requested reinitiated consultation, though they do not specify an end point to the requested injunction. Regardless, Plaintiffs have fallen far short of the showing necessary to justify such extraordinary relief. The standard for a permanent injunction is essentially the same as for a preliminary injunction, except that to obtain a permanent injunction, the party seeking the injunction must have prevailed on the merits. *See Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12 (1987); *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008) (to obtain a preliminary injunction, a plaintiff must demonstrate (1) a likelihood of success on the merits; (2) a likelihood of suffering irreparable harm absent a preliminary injunction; (3) that the balance of equities tips in the plaintiff's favor; and (4) that injunctive relief is in the public interest).

Here, Plaintiffs are not entitled to judgment on their claims for the reasons set forth above. Additionally, they have not shown it is *likely* they will suffer irreparable harm in the form of grizzly bear take unless their requested injunctive relief is granted. Plaintiffs have not shown that the alleged lack of consultation has caused unlawful take of grizzly bears, and Plaintiffs have not identified an incidental take of a grizzly bear related to black bear baiting that has occurred within the last 15 years. To the extent that the Court considers Plaintiffs' proffered evidence of grizzly take, it does not show that, unless the Court orders the identified areas closed to black bear baiting, irreparable harm to Plaintiffs is imminent or likely. Lastly, Plaintiffs ask the Court to order USFS to close areas to baiting where the practice is allowed "under state law and regulation" (ECF 93-1 at 20), which would bring USFS into direct conflict with state law. In essence, Plaintiffs ask this Court

to enjoin Wyoming's and Idaho's hunting regulations.  Such conflict and confusion in the orderly administration of the law would not be in the public interest.

## VI.     Conclusion

For all of the foregoing reasons, the Court should deny Plaintiffs' motion for summary judgment and enter summary judgment in favor of Federal Defendants.

Dated: June 16, 2022

*/s/ Robert P. Williams*
Robert P. Williams, Sr. Trial Attorney
U.S. Department of Justice

***Attorney for Federal Defendants***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 16th day of June, 2022, I filed the foregoing electronically

through the CM/ECF system, which caused the following parties or counsel to be served by

electronic means, as more fully reflected on the Notice of Electronic Filing:

For Plaintiffs
Matthew Kellogg Bishop          Peter M.K. Frost                Dana M. Johnson
bishop@westernlaw.org           frost@westernlaw.org           danajohnsonecf@gmail.com

Sangye Ince-Johannsen
sangyeij@westernlaw.org

For Defendant-Intervenor Idaho Fish and Game Commission
owen.moroney@idfg.idaho.gov

For Defendant-Intervenor State of Wyoming
travis.jordan@wyo.gov


/s/ Robert P. Williams
Robert P. Williams
Sr. Trial Attorney
U.S. Department of Justice