UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| WILDEARTH GUARDIANS, WESTERN WATERSHEDS PROJECT, and WILDERNESS WATCH, | Case No. 1:19-cv-00203-CWD |
| Plaintiffs, | **MEMORANDUM DECISION AND ORDER** |
| v. | |
| UNITED STATES FOREST SERVICE and UNITED STATES FISH & WILDLIFE SERVICE, | |
| Defendants, | |
| and | |
| IDAHO FISH & GAME COMMISSION, STATE OF WYOMING, | |
| Defendant-Intervenors. | |

**INTRODUCTION**

Plaintiffs in this lawsuit contend Defendants have violated and continue to violate

Section 7 of the Endangered Species Act by failing to reinitiate and complete

consultation to ensure the Forest Service does not jeopardize the continued existence of

grizzly bears related to the use of bait to hunt black bears in national forests in Idaho and

Wyoming. Before the Court are the following motions: Plaintiffs' Motion for Summary

Judgment; Defendant-Intervenor Idaho Fish and Game Commission's Cross-Motion for

Summary Judgment; Defendant-Intervenor State of Wyoming's Cross-Motion for

Summary Judgment; Defendants' Cross-Motion for Summary Judgment; Plaintiffs'

Motion to Strike; and Safari Club International's Amicus Curiae Brief. (Dkt. 93, 99, 100,

104, 106, 108.) The Court conducted a video hearing on January 31, 2023.

After careful consideration of the records, the parties' arguments, and relevant

legal authorities, the Court will grant Defendants' motions and deny Plaintiffs' motion.[1]

WEG has not shown that Defendants exercised discretionary federal involvement or

control over the States' regulation of black bear baiting sufficient to establish agency

action, or ongoing agency action, such that reinitiation of consultation under Section 7 of

the Endangered Species Act is not required.

## FACTS AND PROCEDURAL HISTORY

### 1.    Facts[2]

This matter concerns the use of bait in national forests in Idaho and Wyoming by

hunters to attract resident game, specifically black bears, and the impact of this baiting

practice on grizzly bears (*Ursus arctos horribilis*). Baiting entails placing food, salt, or

---

[1] The Court will refer to the parties as follows: Plaintiffs are collectively referred to as WEG; Defendant United States Forest Service is referred to as the Forest Service; Defendant United States Fish and Wildlife Service is referred to as FWS; and collectively, Defendants are referred to as Defendants; Defendant-Intervenor Idaho Fish and Game Commission is referred to as Idaho; Defendant-Intervenor State of Wyoming is referred to as Wyoming; and Amicus Safari Club International is referred to as Safari Club.

[2] Defendants filed the administrative records of the USFS and FWS, lodging two flash drives with the Court. (Dkt. 77.) The record of the USFS will be cited as "USFS R." and the record of the FWS will be cited as "FWS R." WEG submitted a statement of facts referencing the records and other documents of public record, to which Defendants responded. (Dkt. 93-2, 104-1.) The Court referenced both WEG's statement of facts and Defendants' response, and independently reviewed the cited authorities in both of the administrative records.

manufactured scents in a fixed location to attract the wildlife to the hunter, rather than to have the hunter travel through the environment searching for the wildlife. 60 Fed. Reg. 14,720 (Mar. 20, 1995). Baiting is considered a hunting practice[3] subject to state law and regulations, and the Forest Service acknowledges the States' traditional role in managing fish and wildlife. *Id.*

### Background

In 1975, FWS listed the grizzly bear of the coterminous 48 states as a threatened species under the Endangered Species Act (ESA), 16 U.S.C. § 1533(a)(1). AMENDMENT LISTING THE GRIZZLY BEAR OF THE 48 CONTERMINOUS STATES AS A THREATENED SPECIES, 40 Fed. Reg. 31,734 (July 28, 1975). When FWS listed grizzly bears in the lower 48 under the ESA, FWS cited as a reason to list grizzlies that they were "isolated from other populations so that they cannot be reinforced, either genetically or by movement of individual bears." *Id.*

The 1982 Grizzly Bear Recovery Plan issued by FWS "addresses six areas in the coterminous 48 states where grizzly bears are known to have been present during the past decade." Plf.s' Ex. A at 31. (Dkt. 94-1 at 6.)[4] These six grizzly bear ecosystems were identified as "presently hav[ing] adequate space and suitable habitat to offer the potential for securing and restoring this species as a viable, self-sustaining member of each ecosystem." *Id.*

---

[3] This hunting practice often will be shortened to "black bear baiting" for ease of reading in this decision.

[4] The entirety of the Grizzly Bear Recovery Plan is not included in Plaintiffs' Ex. A. The Court referenced the archived version, found at: https://www.biodiversitylibrary.org/item/137553#page/11/mode/1up, or alternatively at http://archive.org/details/grizzlybearrecov1982usfi.

The 1982 Grizzly Bear Recovery Plan stated that, to delist the species in the coterminous 48 states, FWS must "[e]stablish recovery of at least three populations in three distinct grizzly bear ecosystems." *Id*. at 1.

After listing, grizzly bear populations have increased in the Greater Yellowstone Ecosystem (GYE) in northwestern Wyoming, eastern Idaho, and southeastern Montana, and in the Northern Continental Divide Ecosystem (NCDE) in north-central Montana. *Crow Indian Tribe v. United States*, 965 F.3d 662, 672 (9th Cir. 2020).[5]

In 2000, the FWS recognized that, of "all remaining unoccupied grizzly bear habitat in the lower 48 States," the Bitterroot Ecosystem in central Idaho "has the best potential for grizzly bear recovery," because it "offers excellent potential to support a healthy population of grizzly bears" that would "boost long-term survival and recovery prospects for this species in the contiguous United States." RECORD OF DECISION CONCERNING GRIZZLY BEAR RECOVERY IN THE BITTERROOT ECOSYSTEM, 65 Fed. Reg. 69,644 (Nov. 17, 2000).

In 2017, FWS found that "grizzly bears have nearly doubled their occupied range since the early 1980s" in the lower 48 states, primarily onto lands outside of the GYE and NCDE recovery zones. 82 Fed. Reg. at 30,511.

---

[5] *Crow Indian Tribe* stated that, "[a]t present, only two ecosystems have a substantial population of grizzlies: the Greater Yellowstone Ecosystem,… which has approximately 700 bears, and the Northern Continental Ecosystem of northcentral Montana, which is estimated to have approximately 900 bears. [2017 Rule, 82 Fed. Reg.] at 30,509. In Yellowstone National Park, within the Greater Yellowstone Ecosystem, grizzlies reached Park capacity by 2006." 965 F.3d at 672.

In 2020, FWS published a map depicting the grizzly recovery zones, delineating the areas where grizzly bears "may be present." Plfs' Ex. C. (Dkt. 94-3.) In 2021, FWS published a map to show recovery zones, the estimated current distribution of grizzly bears, and documented individual "outliers" from estimated distribution during the years 2011 to 2021. Plfs' Ex. D. (Dkt. 94-4.)

There are currently no known populations of grizzly bears in the North Cascade and Bitterroot Ecosystems. Plfs' Ex. B, SPECIES STATUS ASSESSMENT FOR THE GRIZZLY BEAR (*Ursus arctos horribilis*) IN THE LOWER-48 STATES: A BIOLOGICAL REPORT, U.S. Fish and Wildlife Serv., at 6 (Jan. 2022). (Dkt. 94-2 at 3.)

The isolated nature of the GYE grizzly bear population was identified as a potential threat when listing occurred in 1975, because in isolated populations, declines in genetic diversity are expected. ENDANGERED AND THREATENED WILDLIFE AND PLANTS; REMOVING THE GREATER YELLOWSTONE ECOSYSTEM POPULATION OF GRIZZLY BEARS FROM THE FEDERAL LIST OF ENDANGERED AND THREATENED WILDLIFE, 82 FR 30502-01 (June 30, 2017.) *See also* RECORD OF DECISION CONCERNING GRIZZLY BEAR RECOVERY IN THE BITTERROOT ECOSYSTEM, 65 FR 69644-01 ("Wildlife species, like grizzly bear, are most vulnerable when confined to small portions of their historical range and limited to a few, small populations.").

FWS "recognize[s] the GYE grizzly bear population could be a possible source population to re-colonize the Bitterroot Ecosystem to the west." 82 Fed. Reg. at 30,536. "In addition, current distribution of grizzly bears in the GYE and NCDE continue to expand, the NCDE and BE are less than 5 km (3 mi) apart and multiple verified sightings

**MEMORANDUM DECISION AND ORDER - 5**

have occurred between them and the BE." SPECIES STATUS ASSESSMENT FOR THE GRIZZLY BEAR (*Ursus arctos horribilis*) IN THE LOWER-48 STATES: A BIOLOGICAL REPORT, U.S. Fish and Wildlife Serv., at 180 (Jan. 2021).[6]

FWS identified that "[t]he primary factors affecting grizzly bears at both the individual and ecosystem levels are excessive human-caused mortality and human activity that reduces the quality and quantity of habitats, which increases the potential for human-caused mortality, both directly and indirectly." *Id*. at 7. "Hunting over bait can be a source of mortality (due to mistaken identity killings) and conflicts (due to conditioning to human foods)." *Id*. at 126.

FWS identified also that "[m]anagement removal of nuisance bears, particularly food conditioned bears, has been the second highest cause (31 percent) of human-caused mortalities [of grizzly bear] in the [GYE] from 1992 to 2001." USFS R. at 374.

### *Regulation of the Use of Bait in Hunting*

Prior to 1992, the Forest Service required special use authorizations for black bear baiting issued on a number of national forests in the state of Wyoming. USE OF BAIT IN HUNTING, 59 FR at 11766 (March 14, 1994). "Additionally, some Forest Service Regions issued orders under 36 C.F.R. § 261 to control litter, as well as to close certain areas to bear baiting where the practice could create unacceptable adverse effects on other resources or forest users." *Id.*

---

[6] Pl.'s Ex. B contains excerpts of the SSA for the Grizzly Bear. The entire report may be found at: https://ecos.fws.gov/ServCat/DownloadFile/196991

"In March of 1992, the Regional Foresters for the Rocky Mountain and Intermountain Regions issued a joint closure order prohibiting bear baiting in the national forests in Wyoming, unless the baiting activity was conducted in compliance with the requirements of the order pertaining to the placement and disposal of baits." 59 Fed. Reg. at 11,766. The closure order, issued on March 23, 1992, closed specific areas to black bear baiting in certain portions of the Medicine Bow, Bighorn, and Shoshone National Forests, Rocky Mountain Region, and the Bridger, Teton, Targhee, Ashley, Caribou, Wasatch, and Cache National Forests, Intermountain Region, located in Wyoming. USFS R. at 12, 30.

Prior to 1992, Wyoming did not have regulations covering the placement and removal of bear baits used for hunting black bear. USFS R. at 43. In the spring of 1992, Wyoming prepared regulations covering bear baiting, which became effective on July 1, 1992. USFS R. at 30, 43.

The Forest Service's March 23, 1992, closure order was challenged in federal court by the Fund for Animals and the Friends of the Bow. The organizations "perceived this shift in method as a diminution in the level of Forest Service regulation and wildlife protection." 59 Fed. Reg. at 11766; USFS R. at 30. The parties settled the case, and the lawsuit was dismissed on November 16, 1992, following the Forest Service's decision to rescind the closure order and prepare an environmental assessment to analyze the effects of eliminating the special use authorization requirement for black bear baiting on National Forest System lands in Wyoming. 59 Fed. Reg. at 11766; USFS R. at 43.

The Forest Service published an Environmental Assessment (the 1993 EA) on February 19, 1993, concerning the effect of bear baiting in national forests in Wyoming. USFS R. at 30 – 31; 40 - 70. The area under  consideration was defined as "those National Forest System lands within the State of Wyoming." USFS R. at 44. The proposed action and preferred alternative in the 1993 EA was to "regulate noncommercial bear baiting on National Forest System lands through State Game Regulations." USFS R. at 56.

On March 25, 1993, the Forest Service published a Biological Evaluation (1993 BE)[7] under Section 7(a)(2) of the ESA that considered effects on grizzlies of the preferred alternative for black bear baiting in the 1993 EA. USFS R. at 71–100. The 1993 Biological Evaluation provides:

> The proposed action and preferred alternative is to discontinue issuing special use permits to authorize bear baiting locations, close all designated Wilderness to bear baiting, beginning in 1994, and through a Memorandum of Understanding with the Wyoming Game and Fish Commission regulate noncommercial black bear baiting on National Forest System lands through Wyoming Game and Fish Commission Trophy Game Regulations (alternative 4). In addition to these Trophy Game Regulations listed below, the following mitigation measures are for all alternatives, including the preferred (Alternative 4), until such time as they become State Regulations[.]

USFS R. at 72.

---

[7] The 1993 BE was dated March 2, 1993, and updated on March 25, 1993. USFS R. at 71.

The "mitigation measures" common to all alternatives in the 1993 EA (and conservation measures listed in the Biological Evaluation) included: (1) prohibiting black bear baiting in the GYE recovery zone and (2) outside of the recovery zone, prohibiting black bear baiting where the Forest Service otherwise prohibits "the improper storage of food in grizzly bear habitat." USFS R. at 57–58.

On April 2, 1993, the Forest Service issued a Decision Notice and Finding of No Significant Impact adopting a modified form of proposed alternative number four set forth in the 1993 EA. USFS R. at 103 – 115. Alternative number four of the 1993 EA, as modified, required the Forest Service to develop a process with the Wyoming Game and Fish Department through a memorandum of understanding to limit bait density; establish special food storage orders in grizzly bear habitat; and eliminate the use of garbage or processed foods as black bear bait in grizzly habitat. USFS R. at 103.

On April 6, 1993, the Forest Service requested formal consultation with the FWS under Section 7 of the ESA. FWS R. at 74. Informal consultation meetings were held on February 12 and March 19, 1993, with the FWS's Wyoming State Office, Wyoming Game and Fish Department, and the Forest Service. FWS R. at 74.

On April 14, 1993, the FWS issued a Biological Opinion (1993 BiOp) on the Forest Service's administration of the placement of baits on Forest Service lands in Wyoming for the purpose of black bear hunting. FWS R. at 74–83. The 1993 BiOp states that "baiting for black bears" that "occurs within the range of the grizzly bear" can result in mortality to grizzlies, if a hunter mistakes a grizzly for a black bear or perceives a grizzly threatens the hunter's safety; that grizzlies may become "conditioned" to foods

used in baiting, and seek them elsewhere, and become "problem" bears requiring "management actions;" and that, between 1967 and 1993, five grizzlies were "reported shot" at black bear bait sites in Wyoming. FWS R. at 77, 78.

The 1993 BiOp finds the alternatives analyzed in the 1993 EA and 1993 Biological Evaluation "would have no effect on any of the species for which [the Forest Service] made such a determination….Closing the proposed grizzly bear recovery zone and all areas covered by a special order prohibiting improper storage of food in grizzly bear habitat (mitigation measures common to all alternative[s]) will have a beneficial affect [sic] on grizzly bears." FWS R. at 75. The conclusion reached by the FWS in the 1993 BiOp reads:

> After reviewing the current status of the grizzly bear, the environmental baseline for the action area, the effects of the proposed modifications in administration of black bear baiting, and the cumulative effects, it is the Service's biological opinion that none of the alternatives considered are likely to jeopardize the continued existence of the grizzly bear.

FWS R. at 79.

However, "[b]ecause of the remaining potential for incidental take of grizzly bears following implementation of the alternatives considered,…the conditions contained in the following Incidental Take Statement are critical to fulfillment of [the Forest Service]'s responsibilities" under Section 7 of the ESA. FWS R. at 79. The Incidental Take Statement (1993 ITS), set forth in the 1993 BiOp, includes mandatory terms and conditions necessary to minimize the potential for take "as a result of black bear baiting on Forest Service lands in Wyoming." FWS R. at 80. The two mandatory terms in the

**MEMORANDUM DECISION AND ORDER - 10**

ITS, limited to National Forest lands in Wyoming, were: (1) elimination of the "use of processed human, livestock or pet foods, and fruits and vegetables produced for human consumption, as bear baits in any areas regularly used by grizzly bears[;]" and (2) elimination of the requirement that "hunters, outfitters or guides who report a grizzly bear on a legally placed bait remove the bait." FWS R. at 80. Rather, removal of the bait, "if deemed appropriate by the [Forest Service] in consultation with the [Wyoming Game and Fish Department] and the Service, should be accomplished by individuals experienced with grizzly bear behavior. FWS R. at 80.

The FWS's 1993 BiOp stated also that the Forest Service "has a continuing duty to regulate the activity covered by this incidental take statement." FWS R. at 80. FWS found that, "[a]lthough there remains a remote possibility that a grizzly bear may be taken as a result of black bear baiting on [Forest Service] lands in Wyoming, [FWS] does not anticipate that such take will occur. Therefore, no incidental take is authorized. Should any take occur, the [Forest Service] must reinitiate formal consultation with [FWS] and provide the circumstances surrounding the take." FWS R. at 80.

On July 29, 1993, the Forest Service withdrew the April 2, 1993, Decision Notice issued on "Black Bear Baiting on National Forest System Lands in Wyoming" and issued a closure order prohibiting black bear baiting until a national policy could be developed. USFS R. at 130. On March 17, 1994, the Regional Forester for the Rocky Mountain Region and the Acting Regional Forester for the Intermountain Region finalized a joint closure order prohibiting black bear baiting within grizzly bear recovery zones, areas under a food restriction order, and areas occupied by grizzly bears within the Shoshone

National Forest, the Bridger National Forest, Teton National Forest, and that portion of

the Targhee National Forest within the State of Wyoming until further notice. USFS R. at

137. The Forest Service notified forest users of the closure of bear baiting on National

Forest System lands in Wyoming on April 8, 1994. USFS R. at 150.

On July 29, 1993, the regional foresters for the Rocky Mountain and

Intermountain Regions of the Forest Service wrote the Chief: "Should the National Policy

permit the continuation of black bear baiting, we will re-establish the closure orders

related to grizzly bear habitat in accordance with the mitigation measures in the Decision

Notice and non-discretionary measures in the Biological Opinion issued by the Fish and

Wildlife Service. That part of the environmental analysis process and Decision Notice

that relates to grizzly bear habitat, the Biological Evaluation, and Biological Opinion will

be re-instated [sic] and considered adequate to protect" grizzlies. USFS R. at 130.

On March 14, 1994, the Forest Service published an interim policy, with a request

for public comment, on the agency's role in regulating the placement of bait on National

Forest System lands. 59 FR 11765.[8] On April 14, 1994, the Forest Service issued a notice

withdrawing the interim policy and republishing it as a proposed policy. 59 FR 17758.

USFS R. at 151. The intended effect of the proposed policy was to "clarify the agency's

role in relation to the role of the States and, thus, to provide a consistent approach to the

regulation of baiting resident game." 59 FR 17758. USFS R. at 151. Public comment was

invited, and the comment period was closed on June 13, 1994. *Id.*

---

[8] The interim policy concerned the Forest Service's role in regulating the placement of bait generally, noting, however, that the baiting of bears "is particularly controversial." *Id.*

**MEMORANDUM DECISION AND ORDER - 12**

On February 13, 1995, the Forest Service informed the FWS that it was "in the process of preparing a National Policy on bear baiting[.]" FWS R. at 164. The Forest Service wrote:

> As a result of the mitigation measures in the [1993] EA and the reasonable and prudent alternatives in the [BiOp], we implemented a closure order prohibiting the use of bait for black bear hunting in the recovery zone, in the food restrictions areas on the Wind River Ranger District, Shoshone National Forest, and prohibited hunting of black bears with non-natural baits in grizzly habitat not covered by the other closure orders.

FWS R. at 164. The Forest Service noted that "[t]he [1993] EA was rescinded but the closure orders are still in effect." *Id*. The Forest Service added that, in "accordance with one of the conservation recommendations [in the BiOp], an additional area on the Greybull District, Shoshone National Forest, has been closed since the [BiOp] was issued." *Id*. The Forest Service concluded: "We ask that you review the original [BiOp] in light of this proposed new policy, and the actions we have taken, to determine if you concur that the actions we have taken to protect the grizzly bear are still adequate." *Id*.

On February 27, 1995, the FWS responded to the Forest Service's February 13, 1995, letter regarding the Forest Service's proposed national policy on the use of bait for resident game hunting. FWS R. at 165. The FWS indicated it had reviewed the proposed policy and its April 14, 1993, BiOp concerning black bear baiting on National Forest Lands in Wyoming, and concluded that the "two documents are compatible." FWS R. at 165. The FWS acknowledged the Forest Service's March 17, 1994, Order eliminating the use of non-natural baits in any areas regularly used by grizzly bears. FWS R. at 165.

**MEMORANDUM DECISION AND ORDER - 13**

FWS concluded: "The proposed National Policy appears to be consistent with our biological opinion of April 14, 1993, and no information has become available to suggest that additional terms and conditions are necessary at this time." FWS R. at 166.

In March of 1995, the Forest Service prepared an Environmental Assessment concerning the "National Policy on Use of Bait in Hunting on National Forest System Lands" (1995 EA). USFS R. at 155 – 248.[9] The action under consideration was the Forest Service's proposed policy on the use of bait in hunting on National Forest Service lands. USFS R. at 161. The stated purpose of the policy was to "clarify that baiting is a hunting method which is authorized by the States and regulated by the States," and to establish "procedures that will be used by the Forest Service when State regulations conflict with Federal laws, regulations, and policies." USFS R. at 163. The 1995 EA acknowledged that, prior to 1993, the State of Wyoming had no regulations covering the placement and removal of baits, and thus the Forest Service had historically issued special use permits to regulate the placement and removal of baits on National Forest lands in Wyoming. USFS R. at 163.[10]

The 1995 EA included, as attachment B, a February 23, 1995, Biological Evaluation (BE) concerning the National Policy on use of bait in hunting on national forest system lands. USFS R. at 207. The 1995 BE acknowledged that the scope of the

---

[9] The exact publication date of the 1995 EA is not reflected in the USFS record. However, it is clear from context that it was prepared in or about March of 1995. The 1995 EA concerned the placement of bait as a hunting method generally, although this lawsuit involves the specific practice of black bear baiting.

[10] Between 1993 and 1995, "the State of Wyoming, in cooperation with the USFS and FWS, incorporated baiting restrictions within the State's regulatory framework to adequately address the protection of endangered species, specifically the grizzly bear." USFS R. at 165.

**MEMORANDUM DECISION AND ORDER - 14**

national policy would affect hunting of resident game on all National Forest system lands, but that "it would specifically lift a ban on bear baiting on NFS lands in Wyoming." USFS R. at 207. The 1995 BE referenced the March 2, 1993, Biological Evaluation that had been completed on an "earlier site-specific proposed change in regulation of bear baiting on NFS lands in Wyoming…." USFS R. at 207.[11] The Forest Service indicated that the 1995 BE would be reevaluated to determine if it was "still applicable under the new policy." USFS R. at 189.

On March 14, 1995, FWS responded to a letter from the Forest Service "requesting concurrence" with the Forest Service's finding that the Forest Service's proposed national policy on use of bait during hunting on National Forest System Lands is not likely to adversely affect federally listed species. USFS R. at 213. FWS noted that the proposed national policy would require authorized Forest Service officers to monitor state baiting-related hunting regulations, "and to establish administrative closures to baiting where necessary to protect federally listed species." USFS R. at 213. FWS referred to a March 8, 1995, letter "clarifying certain issues" raised during discussions between the agencies, and noted the two agencies' staff had agreed to "revisions to the proposed policy." USFS R. at 213. FWS indicated that it "concur[red] in [USFS's] determination that the proposed national policy on baiting is not likely to adversely affect federally listed species." USFS R. at 213.

---

[11] The 1993 BE was not attached to the 1995 EA, nor was it included in Appendix B to the 1995 EA. Further, the April 14, 1993 BiOp on Forest Service administration of the placement of baits on FS lands in Wyoming for the purpose of black bear (*Ursus americanus*) hunting was also not attached to the 1995 EA or included in Appendix B to the 1995 EA.

On March 15, 1995, the Forest Service issued a Decision Notice and Finding of
No Significant Impact (FONSI) based on the results of the analysis documented in the
1995 EA regarding the proposed national policy on the use of bait in hunting on National
Forest System Lands. USFS R. at 259 – 265. The DN/FONSI indicated that the proposed
national policy "can trace its origin to the Forest Service's experiences with baiting in the
State of Wyoming…." USFS R. at 259.

On March 20, 1995, the Forest Service issued a notice of its final policy on the use
of bait in hunting resident game on National Forest System Lands. 60 FR 14720. USFS
R. at 263, 151 - 154. The Forest Service indicated it was:

> [A]dopting a final policy on the use of bait on National Forest
> System lands. The policy retains the long-standing reliance on
> State regulation of baiting resident game. Where State law
> and regulation permit baiting the practice is permitted on
> National Forest System lands unless the authorized officer
> determines on a site specific basis that the practice conflicts
> with Federal laws or regulations, or forest plan direction, or
> would adversely affect other forest uses or users.

USFS R. at 153. The notice indicated that an EA "was prepared to identify the
environmental effects of the policy and three alternative baiting policies. A finding of no
significant impact (FONSI) was made, documenting that there are no direct, indirect or
cumulative significant impacts to the human environment arising from the
implementation of this policy." 60 FR 14722. USFS R. at 153.

The National Policy reads as follows:

> *Use of Bait for Resident Game Hunting*. The use of bait for
> the purpose of taking resident game on National Forest
> System lands is a hunting practice. The practice is prohibited
> on National Forest System lands where State hunting

**MEMORANDUM DECISION AND ORDER  - 16**

regulations prohibit its use. Where States permit the use of bait for attracting resident game, this activity is allowed on National Forest System lands, subject to State hunting laws and regulation, unless the authorized officer determines on a site-specific basis that there is a need to prohibit or restrict the practice.

1. The authorized officer shall continually monitor State hunting regulations with regard to the use of bait. A site-specific restriction or prohibition on baiting shall occur when the authorized officer determines that one or more of the following circumstances exists:

a. The State laws and regulations on placement of bait are not adequate to protect forest land, other resources, or users in a particular location. The determination of the adequacy of State laws and regulations shall be based on consideration of the likely impact of baiting on such matters as water quality, public health and safety, the potential for litter, sanitation problems, or the potential to threaten the viability of wildlife;

b. The effects of baiting are not consistent with direction in the applicable forest plan; and

c. The State laws and regulations conflict with Federal law, such as the Endangered Species Act.

2. Where the authorized officer determines that baiting must be restricted or prohibited, the following actions are necessary:

a. The officer shall immediately inform the State fish and wildlife agency of the determination; and

b. If, after consultation and coordination, the State is unable to resolve the matter with the Forest Service, the authorized officer shall close the area to baiting or otherwise restrict baiting by issuing an order pursuant to Part 261 of Title 36 of the Code of Federal Regulations (36 CFR Part 261).

3. Where the hunting season is underway and it would be impracticable to issue an order to close an area to baiting, the authorized officer shall take such measures as appropriate and practicable to ensure consistency with forest plan management direction; compliance with Federal laws, orders, and regulations; and protection of forest users and resources. For example, the officer might close a road or gate to restrict access.

Closure of an area to baiting is not the only way to address the practice of baiting. It is expected that land managers as part of their day-to-day management of National Forest

**MEMORANDUM DECISION AND ORDER - 17**

> System lands and resources will be cognizant of the effects of
> hunting activities and take such proactive measures as may be
> necessary to ensure resource protection. Also hunter
> education programs could be implemented in consultation
> with the State agencies.
>
> The policy in this section, in and of itself, does not compel an
> authorized officer to undertake a specific decision to allow
> baiting on National Forest System lands in those States where
> the practice is permitted. Nothing in this section shall be
> construed to affect valid existing treaty rights of American
> Indian Tribes. For the purposes of this section and to assure
> consistency in coordination of national forest wildlife matters
> with State agencies, the authorized officer is the Regional
> Forester or Forest Supervisor responsible for executing
> memorandums of understanding with the State wildlife
> agency (FSM 2610).

Use of Bait in Hunting, 60 FR 14720-0237. USFS R. at 154.

Ten states currently regulate bear baiting: Alaska, Arkansas, Idaho, Maine, Michigan, Minnesota, New Hampshire, Wisconsin, Wyoming, and Utah. In Utah, the use of bait is restricted to archery hunting for black bears. Defs.' Facts ¶ 43. (Dkt. 104-1 at 7.)[12]

### *The Presence of Grizzly Bears in Idaho and Wyoming*

On January 29, 2010, to "reduce grizzly bear and human encounters and conflicts thereby providing for user safety and the protection of the grizzly bear," the Forest Service issued an "Occupancy and Use" order pursuant to 36 C.F.R. § 261.50(a)

---

[12] *See also* Matt Smythe, THE BAIT DEBATE: BEAR BAITING AS PREDATOR MANAGEMENT, September 15, 2022, found at *https://freerangeamerican.us/bear-baiting/* (last visited on March 21, 2023.)

**MEMORANDUM DECISION AND ORDER - 18**

and (b),[13] prohibiting certain methods of food storage within the Teton Basin,

Ashton/Island Park, and Dubois Ranger Districts in the Caribou-Targhee National Forest

in Idaho, but exempting "[p]ersons in the act of placing black bear baits for the lawful

purpose of hunting black bears under state law and regulation." USFS R. at 1097–98.

On June 14, 2016, in part to minimize or reduce conflicts between grizzlies and

humans, the Forest Service issued an occupancy and use restriction pursuant to 26 C.F.R.

§ 261.50(a) and (b) prohibiting specified methods of food storage or processing in areas

of the Shoshone and Bridger - Teton National Forests in Wyoming, but exempting the

placement of bait to hunt black bears pursuant to 26 C.F.R. § 261.50(e).[14] USFS R. at

1326– 31.

---

[13] This regulation provides:

> (a) The Chief, each Regional Forester, each Experiment Station Director, the Administrator of the Lake Tahoe Basin Management Unit and each Forest Supervisor may issue orders which close or restrict the use of described areas within the area over which he has jurisdiction. An order may close an area to entry or may restrict the use of an area by applying any or all of the prohibitions authorized in this subpart or any portion thereof.

> (b) The Chief, each Regional Forester, each Experiment Station Director, the Administrator of the Lake Tahoe Basin Management Unit and each Forest Supervisor may issue orders which close or restrict the use of any National Forest System road or trail within the area over which he has jurisdiction.

[14] Subsection (e) states:

> (e) An order may exempt any of the following persons from any of the prohibitions contained in the order:
> (1) Persons with a permit specifically authorizing the otherwise prohibited act or omission.
> (2) Owners or lessees of land in the area;
> (3) Residents in the area;
> (4) Any Federal, State, or local officer, or member of an organized rescue or fire fighting force in the performance of an official duty; and
> (5) Persons engaged in a business, trade, or occupation in the area.
> (6) Any other person meeting exemption requirements specified in the order.

**MEMORANDUM DECISION AND ORDER - 19**

On September 11, 2001, in part to minimize or reduce conflicts between grizzly bears and humans, the Forest Service issued an Occupancy and Use Restriction order pursuant to 36 C.F.R. § 261.50(a) prohibiting the burying, discard, and burning of attractants (such as bait), in areas of the Sandpoint, Bonners Ferry, and Priest Lake Ranger Districts in the Idaho Panhandle National Forests in Idaho. The order did not expressly exempt the placement of bait to hunt black bears pursuant to 26 C.F.R. § 261.50(e). USFS R. at 1099–1103.

On December 1, 2017, the Forest Service issued an Occupancy and Use order pursuant to 36 C.F.R. § 261.50(a) and (b) in the Bridger-Teton National Forest in Wyoming prohibiting certain methods of food storage or processing. USFS R. at 1356 – 62. Pursuant to 36 C.F.R. § 261.50(e), Federal or State officers placing baits to capture animals for research or management purposes as part of their official duties were exempted from the provisions of the order. USFS R. at 1356.

In June of 2019, a grizzly was spotted during the hunting season by a hunting guide while stocking a black bear baiting site with food in the Kelly Creek drainage of the Nez Perce-Clearwater National Forests in Idaho, within the Bitterroot Ecosystem. Plf.s' Ex. E at 2. (Dkt. 94-5.)

Idaho allows bear baiting in the portion of game management unit 61 on the west side of Howard Creek, which is located in the Caribou-Targhee National Forest in Eastern Idaho. Decl. of Dave Stricklan ¶ 17. (Dkt. 97.) A grizzly sow and her cub were documented in game management unit 61 in the Caribou-Targhee National Forest in Eastern Idaho on August 16, 2021. Id. at ¶¶ 15 – 17.

**MEMORANDUM DECISION AND ORDER - 20**

*Grizzly Bear Mortalities*

The record reflected that, on May 8, 2000, a licensed hunter seeking black bears and using bait killed a grizzly bear near Owl Creek in the Shoshone National Forest in Wyoming. (Dkt. 56 ¶ 49; Dkt. 69 ¶ 49; Dkt. 75 ¶ 1.) However, the Forest Service later learned that information was incorrect. Decl. of Morse, ¶ 3. (Dkt. 104-1 at 12.)[15] Verified GPS coordinates reflect that this grizzly bear mortality likely occurred on private land, and there is no indication that black bear bait was involved with this incident. USFS R. at 1668. (Dkt. 104-1 at 16.)

The record reflected that, on May 26, 2003, a licensed hunter seeking black bears and using bait killed a grizzly bear near Middle Fork Owl Creek in the Shoshone National Forest in Wyoming. (Dkt. 56 ¶ 52; Dkt. 69 ¶ 52; Dkt. 75 ¶ 1.) However, the Forest Service later corrected the record to indicate this mortality occurred on BLM land. Decl. of Morse, ¶ 3. (Dkt. 104-1 at 12.) GPS records reflect this mortality occurred at a black bear bait site on BLM lands located near Owl Creek, Wyoming. USFS R. at 1668. (Dkt. 104-1 at 16.)

On May 28, 2007, a licensed hunter seeking black bears and using bait killed a grizzly bear on Dutch Joe Creek in the Bridger-Teton National Forest in Wyoming. (Dkt. 56 ¶ 56; Dkt. 69 ¶ 56; Dkt. 75 ¶ 1.)

---

[15] The Forest Service recently located two additional documents inadvertently omitted from its administrative record. These documents are attached to the Declaration of John Morse, and are identified as USFS R. 1667 and 1668. (Dkt. 104-1 at 15, 16.)

On September 3, 2007, a licensed hunter seeking black bears and using bait killed a grizzly bear in the North Fork Clearwater watershed, in what was then the Clearwater National Forest and is now the Nez Perce Clearwater National Forest in Idaho. (Dkt. 56 ¶ 57; Dkt. 92 ¶ 57; Dkt. 74 ¶ 57.) The grizzly bear was the first grizzly sighting verified in the Bitterroot Mountains since 1946. *Id*.

Some reports of grizzly mortalities caused by hunters did not disclose whether bait was present or did not precisely identify locations to determine whether the incident took place in a national forest (Dkt. 56 ¶ 50, Dkt. 75 ¶ 1; Plfs' Ex. G).

### *Other References to the 1993 BiOp*

In or about 2007, the National Park Service, Grand Teton National Park, and the FWS consulted pursuant to Section 7 of the ESA concerning the anticipated adverse effects of the proposed bison and elk management plan on the grizzly bear in Grand Teton National Park. FWS R. at 238. The Park Service reinitiated consultation with the FWS in 2013. FWS R. at 239.

Pursuant to the National Park Service's request, the FWS prepared a biological opinion on the 2007 Bison and Elk Management Plan for the National Elk Refuge and Grand Teton National Park Environmental Impact Statement. FWS R. at 238. After reinitiating consultation in 2013, the FWS issued an addendum to its 2007 BiOp, and updated the same in an August 23, 2016, Memorandum (the 2016 BiOp). FWS R. at 238 – 39.

In the 2016 BiOp, the FWS compiled grizzly bear biological opinion history and exempted incidental take throughout the entire Greater Yellowstone Area. FWS R. at 248

– 251. The FWS's 1993 BiOp pertaining to Wyoming, titled "Bear Baiting (Statewide Programmatic)," was included in the historical account. FWS R. at 251. The FWS noted that the allowable "Incidental Take (IT) Exempted" due to the "Bear Baiting (Statewide Programmatic)" biological opinion is "0." FWS R. at 251. The FWS acknowledged that the 1993 BiOp had been superseded by a newer biological opinion and only the ITS, reasonable and prudent measures, and implementing terms and conditions of the most recent document were currently relevant, and that the projects' Biological Opinion had reached its end date. FWS R. at 251, 253.

Within the August 2016 BiOp, the FWS defined the environmental baseline as "the past and present impacts of all federal, state, or private actions and other human activities in the action area. Also included in the environmental baseline are the anticipated impacts of all proposed federal projects in the action area that have undergone section 7 consultation, and the impacts of state and private actions which are contemporaneous with the consultation in progress." FWS R. at 247. Past projects, their impact on grizzly bears, and the level of incidental take were considered in assessing the environmental baseline discussed in the 2007 BiOp. FWS R. at 247. The 2016 BiOp contained a list of all previous formal consultations that occurred within or overlapped the action area since 2007 and since 2013, as well as consultations that occurred throughout the entire Greater Yellowstone Area. FWS R. at 247. The FWS explained that these historical projects, their impact on grizzly bears, and the level of incidental take were considered in the environmental baseline for the 2016 BiOp. FWS R. at 247. The 2016 BiOp also identified which locations of exempted incidental take were identified

**MEMORANDUM DECISION AND ORDER  - 23**

within the action area, or outside the action area. FWS R. at 248. The 1993 BiOp related

to "Bear Baiting (Statewide Programmatic)" for the state of Wyoming was noted as

"outside" the action area corresponding to the 2016 BiOp. FWS R. at 251.

## 2.    Prior Litigation

After adoption and publication of the 1995 National Policy, several environmental

groups challenged the policy in a lawsuit filed on June 21, 1995, claiming that the Forest

Service: (1) violated the ESA by failing to formally consult with FWS regarding the

policy; and (2) violated NEPA by failing to first prepare an EIS. *See Fund for Animals v.*

*Thomas*, 932 F. Supp. 368, 370 (D.D.C. 1996), *aff'd* 127 F.3d 80. On August 8, 1996, the

District Court for the District of Columbia granted summary judgment to the Forest

Service, rejecting both claims. *Id*. at 371. The plaintiffs appealed the decision.

On October 17, 1997, the United States Court of Appeals for the D.C. Circuit

affirmed the district court's judgment. The circuit court held that, "[t]o the extent that

there was an ESA consultation obligation, the Forest Service and FWS fulfilled it by

engaging in 'informal consultation.'" *Fund for Animals*, 127 F.3d at 84. The circuit court

also found that the National Policy was "not a major federal action" for NEPA purposes,

such that the Forest Service  had "no EIS obligation." *Id*. at 83. In dicta, the court stated

that, if promulgation of the policy constituted inaction, "there most probably would have

been no 'agency action' to trigger the ESA consultation requirement." *Id*. at 84 n.6. But,

the question of whether the 1995 National Policy constituted agency action triggering the

ESA's Section 7 consultation requirement was not squarely before either the district court

or the circuit court.

### 3.      Procedural History in this Lawsuit

On June 5, 2019, WEG filed this lawsuit,[16] claiming that the Forest Service and the FWS have violated and continue to violate Section 7 of the ESA by failing to reinitiate and complete consultation on the National Policy. (Dkt. 1.) WEG filed an amended complaint on July 19, 2019. To date, the Forest Service and the FWS have not reinitiated consultation under Section 7(a)(2) of the ESA on the impact to grizzly bears of the Forest Service's 1995 National Policy on the use of bait in hunting black bears on national forests.

WEG alleges that numerous grizzly bears have been taken due to black bear baiting in national forests in Idaho and Wyoming, exceeding the level of permissible incidental take set forth in the 1993 BiOp and thereby triggering the duty to reinitiate consultation under Section 7 of the ESA. WEG alleges also that the 1993 EA is outdated, and significant new information exists requiring supplementation of the 1993 EA.

The complaint seeks to compel supplemental processes under the ESA and NEPA regarding the 1995 National Policy. In the two-count amended complaint, WEG contends: (1) both the Forest Service and the FWS failed to reinitiate consultation in violation of Section 7 of the ESA; and (2) the Forest Service failed to supplement its prior NEPA analysis.

Defendants filed a partial motion to dismiss on November 15, 2019, claiming Count I, as asserted against the FWS, and Count II asserted against both the FWS and the

---

[16] On December 19, 2018, WEG served the Forest Service and FWS with a notice of intent to sue under Section 11 of the ESA for failing to reinitiate consultation under Section 7. (Dkt. 1.)

**MEMORANDUM DECISION AND ORDER  - 25**

Forest Service, should be dismissed. The Court granted the motion in part. The Court

held that WEG's failure to reinitiate claim under Section 7 of the ESA could proceed

against both the Forest Service and the FWS, because the duty to reinitiate consultation,

if triggered, rests with both the action agency and the consultation agency. Order, May 7,

2020. (Dkt. 35 at 12 – 13.) The Court dismissed WEG's NEPA claim in its entirety,

finding persuasive the holding in *Fund for Animals* that there was no ongoing proposed

federal action requiring supplementation of the Forest Service's NEPA analysis regarding

the National Policy. *Id.* (Dkt. 35 at 34 – 35.)

   During the pendency of this lawsuit, in June of 2020, the Forest Service requested

that the FWS withdraw its 1993 BiOp and associated ITS, as well as its request for

consultation and the March 14, 1995, Letter of Concurrence (LOC) concerning the 1995

National Policy. USFS R. at 1653- 1656. (*See also* Dkt 38-2.) On June 26, 2020, the FWS

agreed that the 1993 BiOp and ITS were not operative and without effect, and that both,

along with the 1995 LOC, should be withdrawn. USFS R. at 1657 – 1658. The FWS

withdrew the BiOp, ITS, and LOC.

   On July 17, 2020, Defendants filed a second motion to dismiss, claiming WEG's

remaining ESA claim was jurisdictionally moot, because the Forest Service withdrew its

1993 and 1995 requests for consultation on the proposed 1993 policy regarding black

bear baiting on Forest Service lands in Wyoming and the 1995 National Policy.

Defendants explained that the Forest Service determined that neither the Region 2 policy

statement nor the National Policy statement "constituted affirmative agency action that

required Section 7 consultation in the first instance," and thus there was no requirement to reinitiate consultation. Defs.' Mem. at 8 - 9. (Dkt. 38-1 at 13 - 14.)

In response, WEG not only contested the second motion to dismiss, but also sought to amend its complaint to challenge Defendants' actions in withdrawing its consultation requests and the BiOp, ITS, and LOC. (Dkt. 40, 43.) The Court denied Defendants' second motion to dismiss and granted WEG's motion to file an amended and supplemental complaint. Order, Dec. 23, 2020. (Dkt. 55.) WEG's amended and supplemental complaint was filed on January 2, 2021. (Dkt. 56.)[17]

The Court explained that "resolution of the question of whether the decisions to withdraw the consultation requests, and to rescind the 1993 BiOp and 1995 Letter of Concurrence, were improper is integral to [the Court's] determination whether Plaintiffs' allegations concerning reinitiation of consultation under the ESA have merit." *Id.* at 19. The Court made clear, however, that although WEG had stated a plausible claim for relief, the Court was not deciding the merits of WEG's claims and the question whether there was "agency action" triggering the ESA consultation requirement in the first instance remained unanswered. *Id.* The Court is now tasked to answer that question.

---

[17] Idaho, Wyoming, and Safari Club sought to intervene in this lawsuit. On April 8, 2021, the Court granted Idaho's and Wyoming's motion to intervene, but denied Safari Club's motion, instead allowing it to participate as Amicus in conjunction with dispositive motions. (Dkt. 73.) Idaho and Wyoming have filed their own motions for summary judgment, and Safari Club submitted an amicus brief. (Dkt. 99, 100, 106.)

## LEGAL STANDARDS

### 1.    Summary Judgment

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1017 (9th Cir. 2012) (en banc). Because this is an administrative record review case, the Court may grant summary judgment to either party based upon a review of the administrative record. *Id.*

In addition, the Court "may consider evidence outside the administrative record for the limited purposes of reviewing Plaintiffs' ESA claim." *Western Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 497 (9th Cir. 2011). This action arises under 5 U.S.C. § 706(1) to "compel agency action unlawfully withheld or unreasonably delayed." *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000); Order, Jan. 3, 2022. (Dkt. 87 at 8-9.) "In such cases, review is not limited to the record as it existed at any single point in time, because there is no final agency action to demarcate the limits of the record." *Friends of the Clearwater*, 222 F.3d at 560. In other words, when there is a failure to act, there is no contemporaneous administrative record to which review can be confined. *San Francisco Bay Keeper v. Whitman*, 297 F.3d 877, 886 (9th Cir. 2002). Nonetheless, such outside evidence must be otherwise admissible and relevant to the question of whether relief should be granted. *See* Order at 8 n.8, Jan. 1, 2022. (Dkt. 87 at 8.)

2.      **Endangered Species Act**

The Endangered Species Act ("ESA"), 16 U.S.C. §§ 1531–1544, evidences

congressional intent to afford endangered species the highest of priorities. *TVA v. Hill*,

437 U.S. 153, 194 (1978). "The plain intent of Congress in enacting this statute was to

halt and reverse the trend toward species extinction, whatever the cost." *Id*. at 184. To

accomplish this goal, the ESA sets forth a comprehensive program to limit harm to

endangered species within the United States. Section 9 of the ESA establishes a blanket

prohibition on the taking[18] of any member of a listed endangered species. 16 U.S.C. §

1538(a)(1)(B). Section 7 affirmatively commands each federal agency to "insure that any

action authorized, funded, or carried out" by the agency "is not likely to jeopardize the

continued existence of any endangered species...or result in the destruction or adverse

modification of habitat of such species." 16 U.S.C. § 1536(a)(2). However, Section 7

carves out limited exceptions for federal agencies and certain statutorily defined

"applicants," allowing those contemplating action that may harm endangered species to

obtain a limited exemption from penalties under certain circumstances. 16 U.S.C. §

1536(a)–(c), (o); 50 C.F.R. § 402.02.

Under Section 7, if any listed (or proposed listed) species may be present in the

area of the proposed action, the federal agency (the "action agency") must conduct a

---

[18] The ESA defines the term "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). "Harm," in this context, is "an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3; *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 691 (1995).

**MEMORANDUM DECISION AND ORDER - 29**

biological assessment to determine the likely effect of its proposed action on the species. 16 U.S.C. § 1536(c)(1); *see also* 50 C.F.R. § 402.02. If the action agency concludes that its proposed action may affect listed species or critical habitat, it must initiate formal consultation with the FWS. *See* 50 C.F.R. § 402.14.

If formal consultation is necessary, the FWS will issue a Biological Opinion (BiOp), summarizing the relevant findings and determining whether the proposed action is likely to jeopardize the continued existence of the species. 16 U.S.C. § 1536(b). If the answer to that question is affirmative, the BiOp must list any "reasonable and prudent alternatives" that, if followed, would not jeopardize the continued existence of the species. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14.

Additionally, the FWS must specify whether any "incidental taking" of protected species will occur, specifically "any taking otherwise prohibited, if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 17.3. The FWS's determination that an incidental taking will result leads to the publication of an Incidental Take Statement (ITS), identifying areas where members of the particular species are at risk.

The ITS functions as a safe harbor provision immunizing persons from liability under Section 9 of the ESA, and from the imposition of penalties for takings committed during activities that are otherwise lawful and in compliance with the terms and conditions of the ITS. 16 U.S.C. § 1536(o). Any incidental taking "shall not be considered to be a prohibited taking of the species concerned." *Id*. Although the action agency is "technically free to disregard the Biological Opinion and proceed with its

proposed action,...it does so at its own peril...." *Bennett v. Spear*, 520 U.S. 154, 170 (1997). Consequently, if the terms and conditions of the ITS are disregarded and a taking does occur, the action agency or an individual may be subject to potentially severe civil and criminal penalties under Section 9 of the ESA.

Thus, the ITS "set[s] forth a 'trigger' that, when reached, results in an unacceptable level of incidental take, invalidating the safe harbor provision [of the ESA], and requiring the parties to re-initiate consultation." *Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.*, 273 F.3d 1229, 1249 (9th Cir. 2001); *Oregon Nat. Res. Council v. Allen*, 476 F.3d 1031, 1038 (9th Cir. 2007). Ideally, the trigger should be a specific number. *See, e.g., Mausolf v. Babbitt*, 125 F.3d 661 (8th Cir. 1997) (snowmobiling activity may take no more than two wolves).

Consultation must be reinitiated under the ESA:

> [W]here discretionary Federal involvement or control over the action has been retained or is authorized by law and:
> (a) If the amount or extent of taking specified in the incidental take statement is exceeded; [or]
> (b) If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered....

50 C.F.R. § 402.16(a), (b).

## DISPOSTION

WEG contends that the 1995 National Policy constitutes agency action triggering the consultation requirement, which WEG contends was fulfilled initially,, and that reinitiation of consultation is required now because: (1) the Forest Service retains authority to exercise discretionary involvement or control over baiting in national forests;

**MEMORANDUM DECISION AND ORDER  - 31**

(2) the amount of grizzly bear take set forth in the 1993 BiOp and associated ITS, which is zero, has been exceeded; and, (3) the unanticipated amount of take constitutes "new information" that reveals effects of the 1995 National Policy on grizzly bears "to an extent not previously considered." Pls.' Reply at 10 – 11. (Dkt. 107), *citing* 50 C.F.R. § 402.16(a)(1) and (2). WEG asks the Court to order Defendants to reinitiate consultation under the ESA, and to order the Forest Service to close areas in Idaho and Wyoming to black bear baiting where grizzly bears may be present but where the use of bait for hunting black bears is allowed. WEG claims also that Defendants had no lawful authority in 2020 to rescind the 1993 BiOp, associated ITS, or 1995 LOC, and requests that the Court set aside Defendants' decision.

Defendants, on the other hand, claim there is no "ongoing agency action" sufficient to trigger the duty to reinitiate consultation, because Defendants have not retained discretionary involvement or control over black bear baiting pursuant to the 1995 National Policy. Rather, Defendants explain that black bear baiting is a hunting activity regulated by the States, and that the Forest Service does not authorize, fund, or carry out this action. Defendants contend that federal inaction does not require consultation. Thus,

Defendants argue consultation was not legally required in the first instance, and they cannot be compelled to reinitiate consultation now.[19]

Defendants argue also that the 1993 BiOp and associated ITS were prepared with regard to a Forest Service policy statement (the "Region 2 Policy") concerning deferral to state regulation of baiting on Wyoming NFS lands, which policy was withdrawn once Wyoming adopted regulations in 1992 applicable to baiting, and the 1995 National Policy was adopted. Accordingly, Defendants insist that WEG's challenge to their 2020 decision withdrawing the BiOp, ITS, and LOC is without merit. Defendants argue also that WEG has not established that the 2020 decision withdrawing the BiOp, ITS, and LOC was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. Defs.' Mem. at 12, *citing* 5 U.S.C. § 706(2)(A). (Dkt. 104.)

For WEG's claim to succeed, not only must the Court find that federal agency action occurred within the meaning of Section 7 of the ESA in 1995, when the National Policy was adopted, but also that there is ongoing agency action such that the agencies must reinitiate consultation. As explained below, the Court finds that the 1995 National Policy did not constitute agency action, and that there is no ongoing agency action within

---

[19] Defendants also raise a statute of limitations defense, alleging that all of the takings identified in the amended complaint of grizzly bears by licensed black bear hunters using bait in national forests in Idaho and Wyoming occurred outside the limitations period. Defs.' Mem. at 23 n.7. (Dkt. 104.) WEG responds that Defendants did not affirmatively raise the statute of limitations as an affirmative defense, and therefore it was waived. Pls.' Mem. at 1. (Dkt. 107.) Defendants' statute of limitations argument is confined to a footnote, and appears entirely subordinate to the parties' arguments presented to the Court. The Court declines, therefore, to address it. *Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 43 F.3d 1054, 1058 (6th Cir. 1995) (issue that was raised in a footnote, and not stated in either the statement of issues or the argument section of the party's brief, was not properly raised before the court.).

the meaning of Section 7 of the ESA. Consequently, the Court cannot compel Defendants to reinitiate consultation.

## 1.     Agency Action in 1995

WEG argues that the 1995 National Policy constitutes agency action under Section 7 of the ESA. Pls.' Reply at 6. (Dkt. 107.) WEG's assertion is central to its contention that Defendants' decision in 2020 to rescind the 1993 BiOp and associated ITS, and the 1995 LOC, was unlawful. Pls.' Reply at 6. (Dkt. 107.)[20] As support for its argument that agency action occurred, WEG contends that the 1995 National Policy: formally ended the Forest Service's practice of issuing special use permits to individuals hunting black bears on National Forests with bait; and authorizes and charges Forest Service staff with monitoring state allowance of bait on national forests. *Id.* at 6 – 9.

"Agency action" is defined broadly and includes "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies." 50 C.F.R. § 402.02; *W. Watersheds Project v. Matejko*, 468 F.3d 1099, 1108 (9th Cir. 2006).[21] The Court applies a two-step test to determine whether an action qualifies as a sufficient "agency action" under the ESA. *Env't Def. Ctr. v. Bureau of Ocean Energy*

---

[20] WEG contends that the 1993 BiOp and ITS, and the 1995 BE, are "tethered to affirmative, discretionary agency action," and therefore could not be lawfully rescinded. *Id.* at 4 – 5.

[21] The standards for "major federal action" under NEPA and "agency action" under the ESA are much the same. *Marbled Murrelet v. Babbitt*, 83 F.3d 1068, 1075 (9th Cir. 1996). If there is any difference, case law indicates "major federal action" under NEPA is the more exclusive standard. *Sierra Club v. Babbitt*, 65 F.3d 1502, 1512 (9th Cir. 1995). Accordingly, although the Court concluded in its May 7, 2020, Memorandum Decision and Order (Dkt. 35) that the 1995 National Policy did not constitute "major federal action" under the more exclusive NEPA standard, that did not answer whether the 1995 National Policy constitutes "agency action" under the ESA. *C.f. Marbled Murrelet v. Babbitt*, 83 F.3d 1068, 1075 (9th Cir. 1996) ("Where, as here, there is no 'agency action' under what is probably the more liberal standard of the ESA, there is no "major federal action" under the more exclusive standard of NEPA.").

*Mgmt.*, 36 F.4th 850, 884 (9th Cir. 2022). First, the Court must consider whether the agency "affirmatively authorized, funded, or carried out the underlying activity." *Ocean Energy*, 36 F.4th at 884 (quoting *Karuk Tribe of California v. U.S. Forest Serv.*, 681 F.3d 1006, 1021 (9th Cir. 2012)). If this standard is met, the Court must next determine whether the action was discretionary, meaning that the agency had "some discretion to influence or change the activity for the benefit of a protected species." *Ocean Energy Mgmt.*, 36 F.4th at 884 (quoting *Karuk Tribe*, 681 F.3d at 1021).

*Karuk Tribe* instructs that there is agency action for ESA purposes if the agency made an "affirmative, discretionary decision about whether, or under what conditions, to allow private activity to proceed." *Id*. at 1027. For example, "agency action" exists if the federal agency grants a license, enters into a contract or lease, or issues a permit. 50 C.F.R. § 402.02; *Turtle Island Restoration Network v. Nat'l Marine Fisheries Serv.*, 340 F.3d 969, 974 (9th Cir. 2003) ("[T]the Fisheries Service issuance of fishing permits to boats to allow fishing on the high seas clearly constitutes 'agency action' sufficient to trigger the protections of the ESA.").

It has been historically accepted that "the States had complete ownership over wildlife within their boundaries," and the concomitant "power to preserve this bounty for their citizens…." *Baldwin v. Fish & Game Comm'n of Montana*, 436 U.S. 371, 384 (1978). The court in *Fund for Animals, Inc. v. Thomas*, in reviewing the 1995 National Policy, explained that the Forest Service's policy is to:

> [L]eave the decision to prohibit baiting, or to allow but
> regulate it as a 'hunting practice' or technique, to the
> individual states in which a particular national forest is

> situated, as it does with most other matters relating to the
> management of the indigenous fauna, in accordance with
> common law, tradition, and what it understands to be the will
> of Congress as consistently expressed in the several statutes
> defining its mission.

*Fund for Animals, Inc. v. Thomas*, 932 F. Supp. 368, 369 (D.D.C. 1996), *aff'd*, 127 F.3d

80 (D.C. Cir. 1997).

The Federal Government also recognizes generally that hunting is subject to state

regulation. *See* 16 U.S.C. § 528 ("Nothing herein shall be construed as affecting the

jurisdiction or responsibilities of the several States with respect to wildlife and fish on the

national forests."); 16 U.S.C. § 1604(e)(1) (land and resource management plans for units

of the National Forest System must "provide for multiple use and sustained yield of the

products and services obtained therefrom…and include coordination of outdoor

recreation, range, timber, watershed, wildlife and fish, and wilderness…."). And,

specifically, the 1995 National Policy expressly recognizes that "[t]he use of bait for the

purpose of taking resident game on National Forest System lands is a hunting

practice…subject to State hunting laws and regulation…."

Nonetheless, the States' interest in regulating and controlling wildlife within their

boundaries is not absolute. *Baldwin*, 436 U.S. at 385. A State's control over its resources

does not preclude the proper exercise of federal power. *Id*. at 385 (citing *Douglas v.

Seacoast Products, Inc*., 431 U.S. 265 (1977)).

The 1995 National Policy does nothing more than reaffirm these principles,

expressly recognizing that the activity of black bear baiting is regulated by the States.

The National Policy allows for the Federal Government to step in if state laws and

hunting regulations conflict with federal law, or are inadequate "to protect forest land, other resources, or users in a particular location." But the 1995 National Policy itself does not reflect "agency action" for purposes of the ESA. By promulgating the 1995 National Policy, the Forest Service did not affirmatively authorize, fund, or carry out the underlying activity, which in this case is regulating the activity of using bait for hunting black bears. *See Karuk Tribe*, 681 F.3d at 1027.

Instead, states issue permits and site tags to licensed hunters who wish to engage in black bear baiting, and hunters may use bait provided they comply with state law when doing so. Thus, this is not a case concerning the "authorization of, or promulgation of management plans for, projects or other activities conducted either by third parties or the agency" itself. *See, e.g., Wash. Toxics Coal. v. Envtl. Prot. Agency*, 413 F.3d 1024, 1028 (9th Cir. 2005) (approval of use of pesticides); *Turtle Island Restoration Network*, 340 F.3d at 977 (issuance of fishing permits); *Natural Res. Def. Council v. Houston*, 146 F.3d 1118, 1123 (9th Cir. 1998) (renewal of water contracts); *Pacific Rivers Council v. Thomas*, 30 F.3d 1050, 1053 (9th Cir. 1994) (adoption of "comprehensive management plans" for "multitude of individual projects"); *Lane County Audubon Society v. Jamison*, 958 F.2d 290, 294 (9th Cir. 1992) (promulgation of "management criteria" for timber harvest and sales).

Nor does the Court find the facts support a conclusion that the 1995 National Policy constitutes agency action because it formally ended the Forest Service's prior practice of issuing special use permits to individuals engaging in black bear baiting on National Forest lands. While the Forest Service previously regulated the placement of

bait, it did so only with respect to Forest Service land in Wyoming. The Forest Service discontinued issuing special use permits in March of 1992. Thereafter, Wyoming's regulations covering the placement and removal of black bear baits became effective on July 1, 1992. In turn, the 1993 EA, which concerned the effect of baiting black bears in national forests, was limited only to Wyoming, as was the 1993 BiOp; 1993 BE; and 1993 ITS. On July 29, 1993, the Forest Service withdrew the Decision Notice pertaining to black bear baiting on National Forest System lands in Wyoming, and issued a closure order in its stead, which remained in place through the 1993 and 1994 Wyoming black bear hunting seasons. USFS R. at 151.

The Court therefore finds that the adoption of the 1995 National Policy, which refrains from regulating the hunting practice of baiting,[22] does not constitute "agency action" within the meaning of the ESA. *See Fund for Animals, Inc. v. Thomas*, 127 F.3d 80, 84 n.6 (D.C. Cir. 1997) ("If promulgation of the policy constituted 'inaction,'…there most probably would have been no 'agency action' to trigger the ESA consultation requirement.").

## 2.    Ongoing Agency Action

Nonetheless, WEG contends the Forest Service retained authority pursuant to the 1995 National Policy to exercise discretionary involvement or control over black bear baiting in national forests. Reply at 10 – 11. (Dkt. 107.) Accordingly, WEG claims that reinitiation of consultation under Section 7 is required.

---

[22] The 1995 National Policy pertained generally to the use of bait in hunting, although this lawsuit specifically challenges black bear baiting.

**MEMORANDUM DECISION AND ORDER  - 38**

The duty to reinitiate consultation under Section 7 of the ESA is triggered if there is "ongoing agency action." *Center for Biological Diversity v. Chertoff*, No. C-08-299-MMC, 2009 WL 839042 at * 5 (N.D. Cal. Mar. 30, 2009) (citing *Pacific Rivers Council*, 30 F.3d at 1053). Ongoing agency action exists where an "agency acts, retains discretion under such action to benefit listed species, and thereafter continues to act pursuant to such discretion." *Id.* (citing *Turtle Island Restoration Network*, 340 F.3d at 976-77 (9th Cir. 2003) (finding "ongoing agency action" where agency had discretion to place "conditions and restrictions on each permit issued" to benefit listed species and where the agency continued to issue such permits)). Ongoing agency action exists also when an agency does not directly authorize private activity, but "rather establishes criteria for future private activity and has an ongoing and long-lasting effect." *Ocean Energy*, 36 F.4th at 884.[23]

But, where an agency has acted and no discretion is retained under such action, there is no "ongoing agency action." *See Matejko*, 468 F.3d at 1108, 1110 (holding "there is no 'ongoing agency action' where the agency has acted earlier but specifically did not retain authority or was otherwise constrained by statute, rule, or contract"); *Envtl. Protection Info. Ctr. v. Simpson Timber Co.*, 255 F.3d 1073, 1083 (9th Cir. 2001)

---

[23] WEG insists it has no obligation to show ongoing agency action to prevail on its reinitiation claim, because the 1993 BiOp and 1995 BE were "predicated on agency action." Reply at 12. (Dkt. 107.) WEG also claims that the ESA does not limit reinitiation to situations where there is ongoing agency action. *Id.* at 11. WEG's argument does not comport with the authorities discussed above. "The determinative question…is whether 'discretionary Federal involvement or control over the [activity] has been retained or is authorized by law." *Cottonwood Env't L. Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1086 (9th Cir. 2015) (quoting 50 C.F.R. § 402.16). The initial action, such as the adoption of a forest plan, for example, constitutes ongoing agency action where such plan has "ongoing and long-lasting effect even after adoption." *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1053 (9th Cir. 1994).

(holding no duty to reinitiate consultation existed where agency "ha[d] not retained

discretionary control" over permit that "would inure to the benefit of" listed species);

*Sierra Club v. Babbitt*, 65 F.3d 1502, 1509 (9th Cir. 1995) (holding no agency action

existed where agency lacked discretion under existing contract to influence private action

thereunder; noting "the [agency's] inability to influence [private party's] right-of-way

project is what sets this case apart from Pacific Rivers" ); *see also Cal. Sportfishing*

*Protection Alliance v. Fed. Energy Regulatory Comm'n*, 472 F.3d 593, 598 (9th Cir.

2006) (distinguishing *Pacific Rivers* "[b]ecause [management plans] continued to apply

to new projects").

      Here, WEG has failed to demonstrate that the Forest Service retained discretion

pursuant to the 1995 National Policy to regulate black bear baiting, or thereafter acted

pursuant to such discretion. The 1995 National Policy did not establish criteria regulating

the placement of bait or black bear baiting within national forests, and the Policy has no

ongoing or lasting effect other than to leave such regulatory action to states that allow the

practice. Further, the 1995 National Policy expressly indicates that it "does not compel an

authorized officer to undertake a specific decision to allow baiting on National Forest

System lands in those States where [the use of bait for the purpose of taking resident

game on National Forest System lands] is permitted." 60 FR 14720-0237. USFS R. at

154.

      Although the 1995 National Policy authorizes Forest Service officers to determine

"on a site specific basis" if there is a need to prohibit or restrict black bear baiting, the

circumstances under which officers can do so are limited, and may be carried out only

pursuant to other existing laws. For example, if state laws or regulations fail to afford

protection to forest land, resources, or other users of the land in terms of water quality,

public health and safety, or the "the viability of wildlife" and the like; if the "effects of

baiting" are in conflict with the forest management plan; or if state laws and regulations

contravene federal laws such as the ESA, the Forest Service officer may take appropriate

action to abate the offending activity. *Fund for Animals, Inc. v. Thomas*, 932 F. Supp.

368, 369 n.1 (D.D.C. 1996), *aff'd*, 127 F.3d 80 (D.C. Cir. 1997); 60 FR 14720-0237;

USFS R. at 154. The National Policy also contemplates continuing contact between state

and federal officials to harmonize, to the extent practicable, their respective rules

governing the uses of forest lands generally and to coordinate enforcement activities. *Id.*

However, this is nothing more than a restatement of the Federal Government's ability to

exercise federal oversight over state hunting regulations to the extent such regulations

conflict with federal law, including the ESA. *See Baldwin*, 436 U.S. at 385.

WEG cites the numerous closure orders instituted by the Forest Service in Idaho

and Wyoming, both before and after promulgation of the 1995 National Policy, as

examples of the Forest Service's exercise of discretionary authority pursuant to the 1995

National Policy. WEG contends also that the Forest Services' failure to issue closure

orders in certain instances where it otherwise would have been consistent with its

authority under the 1995 National Policy, is an independent reason why reinitiation is

required. Reply at 12. (Dkt. 107.) While closure orders authorized pursuant to 36 C.F.R.

§ 261 are referenced in the 1995 National Policy, these closure orders are carried out

pursuant to 54 U.S.C. § 100101, and the implementing regulations promulgated at 36

**MEMORANDUM DECISION AND ORDER - 41**

C.F.R. § 261.50. Indeed, the Forest Service exercised its authority pursuant to 36 C.F.R.

§ 261.50 prior to adoption of the 1995 National Policy, when it issued closure orders in

1993 and 1994 applicable to National Forest lands in Wyoming. USFS R. at 130, 137,

150.[24] WEG has therefore not established that closure orders implemented pursuant to 36

C.F.R. § 261.50 have a direct connection to the 1995 National Policy.

For instance, the Forest Service has the authority to take action, which includes the

issuance of closure orders, for the purpose of conserving "the scenery, natural and

historic objects, and wild life in the System units" and providing "for the enjoyment of

the scenery, natural and historic objects, and wild life in such manner and by such means

as will leave them unimpaired for the enjoyment of future generations." 54 U.S.C. §

100101. The Forest Service may also issue orders, including food closure orders,

pursuant to 16 U.S.C. § 551. ("The Secretary of Agriculture shall make provisions for the

protection against destruction by fire and depredations upon the public forests and

national forests…."). And, the Forest Service may issue closure orders pursuant to 36

C.F.R. § 261.50. Finally, the Forest Service has authority pursuant to other statutes to

regulate National Forest System lands for conservation or other purposes. *See, e.g.,*

*Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1234 (10th Cir. 2011) (discussing the

---

[24] While food closure orders were specifically referenced in the 1993 BE as a mitigation measure considered for regulating black bear baiting on National Forest System lands in Wyoming, the specific mitigation measure consisted of establishing a Memorandum of Understanding between the Forest Service and Wyoming Game and Fish Department that would "examine the need for and establish *special* food storage orders in other grizzly bear habitat where grizzly bear use occurs before the 1994 spring black bear season." USFS R. at 73 (emphasis added); *see also* USFS R. at 103 (Decision Notice and FONSI, Black Bear Baiting on National Forest System Lands in Wyoming). Contrary to the 1995 National Policy, the 1993 BE and the Decision Notice expressly contemplated the Forest Service's continued regulation of black bear baiting within the state of Wyoming. USFS R. at 103 – 115.

**MEMORANDUM DECISION AND ORDER - 42**

Forest Service's authority under the Organic Act of 1897 to "make such rules and regulations…to regulate [the national forests'] occupancy and use and to preserve the forests thereon from destruction." 16 U.S.C. § 551.). The authority to issue closure orders, which the Forest Service exercised both before and after adoption of the 1995 National Policy, exists independent of National Policy, and is not derived from the National Policy itself.[25]

All of this is not to say that WEG has no recourse. Section 9 of the ESA prohibits take of endangered species of fish or wildlife, including the grizzly bear. Regulations promulgated by the United States Department of Interior forbid the taking of grizzly bears, except in certain specified circumstances. 16 U.S.C. § 1538(a)(1)(G), 50 C.F.R. § 17.40(b)(1)(i)(A). Theoretically, WEG could seek relief against the States pursuant to Section 9 of the ESA if the grizzly bear is threatened with imminent harm by state regulatory schemes over black bear baiting. *See, e.g., Center for Biological Diversity v. Little*, No. 1:21-cv-00479-CWD, 2022 WL 3585727 (D. Idaho Aug. 22, 2022); *Sierra Club v. Babbitt*, 65 F.3d 1502, 1512 (9th Cir. 1995) ("Congress has therefore indicated that when a wholly private action threatens imminent harm to a listed species the appropriate safeguard is through section 9, 16 U.S.C. § 1538, and not section 7, 16 U.S.C. § 1536.").

---

[25] WEG contends the closure and food storage orders issued pursuant to 36 C.F.R. § 261.50 "matter in this case to the extent they show the National Policy has been implemented over the intervening years…." Reply at 14. (Dkt. 107.) WEG contradicts itself, however, because WEG also claims the closure and food storage orders are not "essential to Guardians' reinitiation claim." *Id.* WEG cannot have it both ways. Either the closure and food storage orders illustrate retention of discretionary involvement or control pursuant to the 1995 National Policy, or they do not.

For instance, a plaintiff may establish that state hunting regulations are designed in such a way as to cause ongoing or future violations of the ESA by state-licensed hunters. *Ctr. for Biological Diversity v. Otter*, No. 1:14-CV-258-BLW, 2018 WL 539329, at *3 (D. Idaho Jan. 24, 2018). Past grizzly bear takings may "plausibly show that it is likely that additional takings may occur unless further regulations are implemented." *Ctr. for Biological Diversity v. Strommen*, No. 20-CV-2554 (ECT/JFD), 2023 WL 2136650, at *2 (D. Minn. Feb. 21, 2023). The black bear baiting regulations in this case, however, are not those of the Forest Service, because the 1995 National Policy leaves the regulation of the same to the states.

The Court finds WEG has not shown that the Forest Service is engaged in "ongoing agency action" pursuant to the 1995 National Policy. Absent the retention of discretionary involvement or control pursuant to the 1995 National Policy, specifically designed to influence the hunting practice of black bear baiting that inures to the benefit of the grizzly bear, Defendants have no duty to reinitiate consultation to consider the 1995 National Policy's effects on the grizzly bear. *Simpson Timber Co.*, 255 F.3d at 1082 (the duty to reinitiate consultation is contingent upon the retention of discretionary Federal involvement or control over the action).

3.    **The Decision to Withdraw the 1993 BiOp and ITS**

WEG contends that Defendants unlawfully rescinded the 1993 BiOp and associated ITS, as well as the 1995 LOC, concerning the Forest Service's regulation of black bear baiting on National Forest System lands in Wyoming. WEG's argument is premised upon its assertion that the 1995 National Policy constitutes agency action for

purposes of Section 7 of the ESA, and that the 1993 BiOp and ITS were "part of consultation on [the] Policy." Reply at 14. (Dkt. 107.) WEG contends, therefore, that Defendants' rationales for rescinding the 1993 BiOp and 1995 LOC are arbitrary and capricious, in violation of 5 U.S.C. § 706(2)(A).

Section 706(2)(A) permits the Court to hold unlawful and set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." Here, the Court declines to address whether the withdrawal of the 1993 BiOp, its associated ITS, and the 1995 LOC violated of 5 U.S.C. § 706(2)(A). The Court has addressed the central issue pertinent to this lawsuit, and does not find that resolution of WEG's supplemental cause of action under section 706(2)(A) plays a role in the Court's evaluation of whether the 1995 National Policy constitutes agency action for purposes of Section 7 of the ESA. Nonetheless, the Court neither condones nor condemns Defendants' post-hoc withdrawal or rescission of these consultation documents; rather, the Court leaves the question for another day.

## CONCLUSION

In light of the foregoing analysis, the Court will grant Defendants' and Intervenor-Defendants' motions, and deny Plaintiffs' motion. WEG has not shown that Defendants exercised discretionary federal involvement or control over the States' regulation of black bear baiting sufficient to establish agency action, or ongoing agency action. Accordingly, the Court does not reach the merits of Plaintiffs' Motion to Strike the Declaration of Toby Boudreau, which was filed by Intervenor Defendant Idaho Fish and Game Commission, as the declaration was not relevant to the Court's analysis.

## ORDER

**NOW THEREFORE IT IS HEREBY ORDERED:**

1)      Plaintiffs' Motion for Summary Judgment and Injunctive Relief (Dkt. 93) is **DENIED**.

2)      Defendant-Intervenor Idaho Fish And Game Commission's Cross-Motion For Summary Judgment (Dkt. 99) is **GRANTED**.

3)      Defendant-Intervenor Wyoming's Cross-Motion For Summary Judgment (Dkt. 100) is **GRANTED**.

4)      Federal Defendants' Cross-Motion for Summary Judgment (Dkt. 104) is **GRANTED**.

5)      Plaintiffs' Motion to Strike or Exclude Declaration Testimony (Dkt. 108) is **DENIED as MOOT**.

DATED: March 21, 2023

Honorable Candy W. Dale
United States Magistrate Judge